Exhibit 2



# CAL-PACIFIC REPORTING, INC.

Certified Transcript of Audio Recording of:

## Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)

**Transcribed:** December 11, 2018

**Case:** Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

*Reporter: Freddie Reppond*
*18 Professional Center Parkway, 3rd Floor*
*San Rafael, CA 94903*
Phone: 415.578.2480
Fax: 415.952.9451
Email: support@calpacificreporting.com

OFFICER JOSEPH HUFFAKER

INTERVIEW OF JUNE 6, 2018


TRANSCRIPTION OF AUDIO RECORDING


TRANSCRIBED:  DECEMBER 11, 2018

BY:  FREDDIE REPPOND


_____


CAL-PACIFIC REPORTING

18 Professional Center Parkway, 3rd Floor

San Rafael, California 94903

(415) 578-2480

Support@CalpacificReporting.com

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739                                    Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
                                                                                        Transcribed: December 11, 2018

```
 1                        -oOo-

 2        MR. SIMPSON:  You ready?

 3        OFFICER HUFFAKER:  Yeah.

 4        MR. SIMPSON:  Okay.  This is Terry Simpson.  Today

 5   is June the 6th, 2018.  The time is 1335 hours.  I'm at

 6   the City of Rohnert Park City Hall in Rohnert Park,

 7   California.  Present with me is Department of Public

 8   Safety Officer Joseph Huffaker.

 9        OFFICER HUFFAKER:  Correct.

10        MR. SIMPSON:  Also present is Mr. Justin Buffington

11   of Rains Lucia & Stern, who is representing you today.

12        MR. BUFFINGTON:  Yep.

13        MR. SIMPSON:  And we have Investigator Mike Smithy,

14   who is a member of Simpson Investigative Services Group,

15   with us today.  Okay.

16        Q.  To start with, Officer Huffaker, I want to

17   remind you, when we interviewed back on March 22nd, we

18   went over the administrative Lybarger --

19        A.  Uh-huh.

20        Q.  -- admonishment, which talked about your

21   Miranda rights as well as your administrative

22   investigation rights.  Do you recall that?

23        A.  Yes.

24        Q.  And what I'd like to do is an agreement with

25   you that that is still in effect versus me reading the
```

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker          Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
IA 2018-01 / LDF 18-0739                                                                    Transcribed: December 11, 2018

```
 1   whole thing again --
 2        A.   Sounds good.
 3        Q.   -- and that you are aware of your rights.
 4        And Mr. Buffington has agreed to that, correct?
 5        MR. BUFFINGTON:   That's correct.   We understand
 6   we're under an order to answer questions.   If we had the
 7   choice, we would invoke our right to remain silent, but
 8   we understand it's under the compulsion of a threat of
 9   discipline, so my client will speak.
10        MR. SIMPSON:   Q.   Okay.   So first question to you,
11   Officer Huffaker, is, since we talked on March 22nd --
12        A.   Uh-huh.
13        Q.   -- in your first interview --
14        A.   Yes.
15        Q.   -- you're here today because you've been
16   noticed again to be here today --
17        A.   Yes.
18        Q.   -- regarding a stop on the 18th of December.
19        A.   Yes.
20        Q.   Well, since we talked on March 22nd, 2018, have
21   you discussed this investigation with any member of
22   Rohnert Park Department of Public Safety?
23        A.   Not to my recollection, sir.
24        Q.   Okay.
25        A.   Since you put my name in the paper, though, I
```

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker                          Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
IA 2018-01 / LDF 18-0739                                                                    Transcribed: December 11, 2018

1    got a lot of people approach me and ask me about it, but

2    I'd say, I can't talk to you about it.  That's it.

3         Q.  Okay.  Well let me clarify that.  I didn't put

4    your name in the paper.

5         A.  Oh, okay.

6         Q.  The press put your name in the paper, not me.

7         A.  Well, how do they know it's on admin leave?

8         Q.  Well, because they have a records act that's

9    been filed.

10        A.  Okay.

11        Q.  Okay?

12        A.  My -- my misunderstanding --

13        Q.  That's all right.

14        A.  I assumed it was your conversation with her and

15   she just did --

16        Q.  I don't have a problem with -- I don't have a

17   problem with that.

18        A.  -- what she wanted to do.

19        Q.  Okay.  Now, since we met on March 22nd, 2018,

20   have you talked with any member of any other law

21   enforcement agency about this investigation?

22        A.  I've had them approach me and ask, Hey, I heard

23   what's going on, but no details --

24        Q.  Good.

25        A.  -- get told.

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker                          Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
IA 2018-01 / LDF 18-0739                                                                        Transcribed: December 11, 2018

1        Q.   Okay.

2        A.   No.   There's more of a -- obviously, people are

3    inquisitive, but I kind of shut them down; and then

4    since that, it's just -- they'll bring it up and say,

5    Hey, how's it going?   We're there for you -- more of a

6    moral support.

7        Q.   Okay.   Do you recall being with Sgt. Tatum on

8    December 18th and making a car-stop up on Highway 101

9    when you and he seized some 30 pounds of marijuana as

10   found property?

11       A.   Yeah.   So the 18th, I do believe, is the date

12   that the traffic stop we were discussing in our last

13   interview.   I now believe that's actually the date that

14   it occurred.   So what I was relayed via Sgt. Tatum was

15   he had been contacted by I think it was the Mendocino

16   County sheriff; and they had relayed to him there was a

17   traffic stop involving us, that CHP was there, that we

18   were on; and I think they provided him the date of

19   December 5th.

20       Q.   And this is all information relayed to you

21   prior to our interview on the 22nd?

22       A.   Yeah.

23       Q.   Okay.

24       A.   Yep, absolutely.

25       Q.   Okay.

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker                    Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
IA 2018-01 / LDF 18-0739                                                                    Transcribed: December 11, 2018

1      A.   So me being told by Jacy, my sergeant, this is

2   the date, I think they -- yeah, they also provided the

3   guy's name.  So in my head, the first time I -- we're

4   hearing about this, it's obviously -- it's after

5   December, I believe.  It's sometime, some distance

6   there.  So you're told by another law enforcement

7   agency, Hey, on the 5th you did a traffic stop with CHP.

8   You guys seized some marijuana.

9           Just -- boom, trigger.  Okay.  Yeah, yeah,

10  yeah.  I remember that stop.  I remember that guy.  I

11  just assumed that they provided us the correct date of

12  the 5th.  But then, after listening to testimony from

13  other people and then thinking about it and trying to

14  figure out some sort of way of knowing when it was, the

15  18th does make a lot more sense as the date that it

16  actually occurred.

17          So to the end of that, in our last interview

18  you said to me that you were told that we went out on

19  the 1st or 2nd or 1st and 3rd and then the 5th.  As you

20  told me that statement, I just said, Sure and sounds

21  accurate.

22          I didn't take the opportunity or the time 0and

23  I should have -- to actually look at, you know, try to

24  do some research to verify those dates as we on the fly

25  discussed it.  Looking back now, I found out I actually

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1    was working the firehouse.  So Friday the 1st at 7:00 in

2    the morning all the way 'til Monday the 4th at 7:00 in

3    the morning.  So I obviously was not there and I

4    apologize for not taking the time to look --

5        Q.  No.  That's okay.  And I want to clarify also

6    that the dates of the 1st and the 2nd, those were dates

7    that were thrown around during your interview because

8    you guys had indicated you had gone out a couple of

9    days --

10       A.  Yeah.

11       Q.  -- before and I'm not going to hold you guys to

12   the 1st and 2nd --

13       A.  Okay.

14       Q.  -- because you weren't sure of it even then.

15       A.  I just -- there was a couple of other things

16   like that that I just, when you kind of make

17   assumptions, which is -- I shouldn't be doing.  But when

18   you think the 5th and you think a couple days before and

19   it sounds accurate, you go with it.  But in answer to

20   your question, yeah.

21           Now, going off the 18th, since that's a Monday,

22   it does make a lot more sense that it was actually that

23   day that we went out.

24       Q.  So when did you -- when did you in your mind

25   discover that, oh, it was the 18th versus the 5th?

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1    A.   So when -- when the article came out in the

2  paper, there was something about the Mercedes-Benz

3  driver saying it happened, I think, like the later half

4  of the month or something along those lines.  And then

5  when I'm re-served paperwork showing the 18th, then I

6  look at that and I'm, like, The 18th?  And I look at my

7  phone and it's a Monday and we're using Matzen's car.  I

8  listen to his testimony that he works Tuesday to Friday.

9  So obviously Jacy had to get a hold and we borrowed his

10 car on his day off.  So it all kind of makes a lot more

11 sense that it was the 18th.  And then thinking about it,

12 I do believe it was more towards the end of the month

13 than earlier.

14    Q.   Do you recognize that photograph?

15    A.   That's the one that's online.  Honestly, when I

16 first saw it, I wasn't sure if that was the guy or not.

17    Q.   And when you say "online," you're talking about

18 in the newspaper article that Kym Kemp put out in the

19 Internet --

20    A.   Correct.

21    Q.   -- saying that this is Zeke Flatten --

22    A.   Correct.

23    Q.   -- and then he had his statement in there?

24    A.   Yeah.

25    Q.   Okay.

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker                                    Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
IA 2018-01 / LDF 18-0739                                                                                        Transcribed: December 11, 2018

1        A.   You know, people change their appearances and

2   stuff, but I never saw these articles before we talked.

3   And then, obviously, when you told me are you aware of

4   this, that, and the other towards the end of my

5   interview, I go (unintelligible) my research and I'm,

6   like, that's not the car.  It was a Mercedes-Benz.

7        Q.   Okay.  So I'm showing you a picture of this Kia

8   Sportage.

9        A.   Okay.

10        Q.   This is the car that Zeke Flatten had rented

11   out of San Francisco on December 3rd.

12        A.   Okay.

13        Q.   And he returned it on December 6th.  So this is

14   the car he claimed he was driving on December 5th, when

15   this stop was made.  You're looking at his photograph

16   now, telling me this is not the car that you guys

17   stopped and took the 30 pounds of marijuana out of?

18        A.   Not at all, sir.

19        Q.   Okay.

20        A.   No, it was -- a hundred percent, it was a

21   Mercedes Benz --

22        Q.   SUV?

23        A.   -- some sort of SUV with an Oakland

24   dealership -- you know, the paper plate, like wherever

25   you buy, you know, from.

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

```
 1        Q.   Do you recognize that guy?

 2        A.   I can't say for certainty, no.

 3        Q.   That's Zeke Flatten --

 4        A.   Okay.

 5        Q.   -- in December 2017 --

 6        A.   Oh, so he is a lot more clean there.

 7        Q.   -- versus this picture.  Okay?

 8        Let me take you to the 18th.  You guys make the

 9   stop up there --

10        A.   Uh-huh.

11        Q.   -- on a -- what sounds to me like is a very

12   light silver Mercedes SUV.

13        A.   Okay.

14        Q.   -- and you take 30 pounds of marijuana

15   (unintelligible).  Do you know the driver's name?

16        A.   I don't.

17        Q.   Did you ever ask the driver's name?

18        A.   I'm sure we did at that point; however, like we

19   discussed, it ended up being this found-property case.

20   You're not -- you don't need to put a name in there.  I

21   didn't retain it in my head and so, again, the name was

22   provided to me via Jacy Tatum through whatever channels

23   he had heard it from.

24        Q.   Do you have a recollection of what this guy

25   looks like?  A white guy?
```

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1    A.   Yeah.   I think he was, like, probably around
2  thirty-ish.   It was a white guy.
3    Q.   Can you describe his height, weight, his hair
4  style?
5    A.   Not really, sir, no.
6    Q.   Did you have an opportunity?   'Cause you had
7  mentioned that you listened to the recordings that were
8  provided to Mr. Buffington.
9    A.   Uh-huh.
10    Q.   Do you recall reviewing the statements made by
11  Officer Baker, who was the younger CHP officer?   He was
12  the recruit.
13    A.   Okay.
14    Q.   Do you recall his statements about this guy
15  having a rat-tail ponytail kind of thing?
16    A.   I do recall that officer making that statement.
17    Q.   Okay.   Did that jog a memory to you at all of
18  any kind of a ponytail situation of the driver?
19    A.   No, sir.   But I was thinking about that
20  statement, too; and as -- I think he was saying it, too,
21  this guy's back is to him --
22    Q.   Right.
23    A.   -- so I'm looking at this guy's face and I was
24  trying to think, All right.   Rat-tail.   Do you remember
25  that?

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1    But, honestly, I don't.  Didn't trigger
2  anything for me.
3    Q.  Okay.  Because it's also been described that
4  it's a long crop of hair that comes up kind of the side
5  of his head and hangs down.  That could be a ponytail, I
6  guess.  But you don't recall seeing a ponytail?
7    A.  I don't remember the rat-tail thing, no.
8    Q.  But in your mind, as we sit here right now --
9    A.  Uh-huh.
10    Q.  -- you were with Tatum on a stop on the 18th of
11  December, not the 5th, when you took the 30 pounds of
12  marijuana away from the guy who also had hundreds of
13  vials of hash?
14    A.  Correct, sir.  We took that as found property.
15    Q.  You sent him on his way?
16    A.  Yes, sir.
17    Q.  You didn't book that evidence?
18    A.  No, sir.
19    Q.  However, in our discussions on the 22nd, I
20  think I advised you that you were actually listed as the
21  collecting officer?
22    A.  Yes, sir.
23    Q.  Sgt. Tatum booked it.
24    A.  Yes, sir.
25    Q.  And Sgt. Tatum booked it on the 18th?

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1      A.   So --

2      Q.   I'm sorry.  He booked it on the 19th, but he

3  showed it collected on the 18th.

4      A.   Yeah, because that was the one other thing.  We

5  discussed -- we were thinking it was the 18th he was

6  booking it in, but then I think it was actually the

7  19th, correct.

8      Q.   He did book it on the 19th.

9      A.   Okay.

10     Q.   Yeah.

11     A.   Yeah, because Aaron said that in his, that he

12  saw him on the 19th booking it in.

13     Q.   So all of the details that you provided to me

14  in your interview on the 22nd related to the actions you

15  took and that you witnessed Tatum take on that stop?

16     A.   Uh-huh.

17     Q.   Those things haven't changed.  The only thing

18  that's changed is it didn't happen on the 5th.  It

19  happened on the 18th.  That's your recollection now?

20     A.   That and then, based on the whole kind of

21  confusion at that point, the names probably -- it's

22  probably not Ezekiel.

23     Q.   And Ezekiel Flatten, who I just showed you

24  pictures of --

25     A.   Uh-huh.

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1    Q.   -- was not the guy that you stopped on the

2    18th.

3        A.   No.

4        Q.   You stopped a guy driving a light silver

5    Mercedes-Benz and he didn't appear to be the guy in the

6    pictures that I just showed you.

7        A.   No.  I thought the car was white in my head,

8    but a light -- yeah.

9        Q.   Well, I have to be honest with you.  It's been

10   described as white and light -- very light silver.

11       A.   Okay.  Got you.  But, yeah, so --

12       Q.   So I can understand why someone would call it

13   white, yeah.

14       A.   So there's a big confusion, but, yeah, the

15   essence of the story or the stop, all the same things

16   happened.  It's just we were wrong on the date and I'm

17   guessing that it's not Ezekiel.  This is just some sort

18   of a --

19       Q.   Well, something else -- something else I want

20   to point out -- and I forgot to do this during my

21   interview with Sgt. Tatum -- but I do want to report out

22   and get it out on the recording that one of the things

23   we talked about on the 22nd was the fact that the police

24   report listed a white Mercedes.

25       A.   Yes.

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1    Q.   Yet Flatten wasn't driving a white Mercedes.

2  So that information that you stopped a white Mercedes is

3  correct?

4    A.   Correct, yes.

5    Q.   Okay.  You had an opportunity to -- I'm going

6  to say "assist," because I can't think of a different

7  word right now.

8    A.   Yeah.

9    Q.   But you and Sgt. Tatum wrote a police report.

10  Tatum is the author, I'll say, of the police report and

11  that was done on -- a draft of it was done on the

12  computer at your place, right?

13    A.   So that's one of my notes as well.  We were

14  talking last interview about the press release and the

15  police report kind of back and forth and overlapping.

16  So my recollection is that the press release was done at

17  my house.

18    Q.   Uh-huh.

19    A.   And that was the one I believe was sent from my

20  wife's computer.

21    Q.   Okay.

22    A.   Okay.  The police report was not written at my

23  house.  That was the one that you were saying is the

24  same, but you couldn't find it to provide it to me to

25  verify the finalized report versus something you said

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1    was for review.  Do you have that today that I could

2    verify?

3         Q.  No.  What I'm getting at here is that you had

4    indicated you did review a draft, but not the original,

5    not the finalized.

6         A.  Yeah.  So we're talking about the press

7    release, solely, first.  Then I want to discuss the --

8    just to make clear.

9         Q.  Okay.

10        A.  He comes over.  We -- there's -- he needs to do

11   the press release for reasons we've already discussed.

12   We talk about it.  He's the one typing it, okay?  We

13   have a discussion of what's put in there, but in the end

14   he could have put -- I don't know if I reviewed it at

15   the very end before he hit "send" or not.  But in the

16   end he's the guy who types it out and he's the guy who,

17   however it gets sent out, sends out the actual press

18   release.

19        Q.  Got it.

20        A.  So it would be like you two having a discussion

21   over whatever you want to talk about and then you're the

22   one who writes in the end, but you're the one taking --

23   you take the responsibility, because whatever he told

24   you he's not the one saying it, right?

25        Q.  Yeah, I got you.

Audio Transcription re: Tatum & Huffaker                    Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
IA 2018-01 / LDF 18-0739                                                                    Transcribed: December 11, 2018

1      A.  So there could be -- I don't know if I reviewed

2  it at the very end before he clicked "send" or not.

3  Obviously, he could have made any changes he wanted to

4  whatever we discussed prior to going out.

5      Q.  Okay.  And am I correct that whatever review

6  you did of that press release --

7      A.  Uh-huh.

8      Q.  -- at the time you reviewed it you believed you

9  were talking about a stop made on December 5th involving

10  a guy named Zeke Flatten who had 30 pounds of marijuana?

11      A.  I did, because that was information provided to

12  us -- provided to me via Jacy Tatum versus --

13      Q.  From Mendocino.  Got you.

14      A.  So in my head we're talking about the 5th and

15  we're talking about the name provided and we're going

16  back -- whatever it was --

17      Q.  It was a couple months.

18      A.  -- a couple months.  So you're handed

19  information from a different law enforcement agency.

20  Why would you -- especially -- especially what I was

21  told was it was a stop that CHP was on and the one we

22  confiscated marijuana from.  That's it.  Okay.  Here we

23  go.

24          So I never -- I never doubted it.  You know,

25  like, I didn't have a way to disprove that the 5th

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1    wasn't the day.  You just take what someone tells you as

2    fact until later on when I'm re-served paperwork and

3    after doing additional -- what would you call it --

4    research, being able to pull from testimony and reading

5    the Mercedes thing.  Then when I go, Oh, shoot, I think

6    we were wrong.

7          Q.  Whatever review --

8          A.  Uh-huh.

9          Q.  -- or reading --

10         A.  Uh-huh.

11         Q.  -- that you may have done related to the police

12   report --

13         A.  Uh-huh.

14         Q.  -- be it a draft or even a final copy --

15         A.  Yes.

16         Q.  -- again, was done under the belief that it

17   occurred on the 5th and that Mr. Flatten was driving the

18   car.

19         A.  Yes, sir.  Same --

20         Q.  Same scenario as the press release --

21         A.  Yeah.

22         Q.  -- correct?

23         A.  Uh-huh.  But on that one you said in the last

24   interview that he sent me something to review, was

25   identical.  You couldn't show me that.  I couldn't

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1  remember that specifically.  That's why I was hoping you

2  could show me the final police report versus this email

3  that you're talking about.

4      Q.  Yeah.  And I'll -- I'll check one more time,

5  too, to try and satisfy that concern.

6      Have you ever reviewed a report done by the

7  Mendocino County Sheriff's Office, in this case by

8  Sgt -- or by Jeff Andrade, a detective there, related to

9  an inquiry he made of Tatum and other people about who

10  stopped Zeke Flatten?

11      A.  No.  I've never reviewed any report from --

12  hardly ever from Mendocino, definitely not that one.

13      Q.  I'm going to make an assumption on my part that

14  I misspoke --

15      A.  Oh, okay.

16      Q.  -- because this was the document I was

17  referring to.  But what this turns out to be, this was

18  actually Tatum's emailing himself a copy of the draft of

19  the police report.

20      A.  Okay.

21      Q.  Okay.  And nowhere on this email document is

22  your email address.

23      A.  Okay.

24      Q.  Okay.

25      A.  It was one thing that just stuck out to me and

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1    I was hoping that there's some way we could clarify it

2    today to see --

3        Q.  No.  That's -- that's one of the reasons why

4    we're doing this, 'cause I want to clarify as much as I

5    can clarify because we need this thing to end.

6        A.  Yeah.

7        Q.  Okay.

8        A.  I'm well aware.

9        Q.  So, again -- and I'm going to point it out

10   again.  Any review -- whenever you may have done any

11   review of a police report, at the time you reviewed it,

12   you believed you stopped Mr. Flatten on December 5th and

13   you took 30 pounds of marijuana away from him?

14       A.  Correct, sir.

15       Q.  And it turns out you didn't stop him on the

16   5th.  You stopped another person, a different person

17   other than Flatten, and that was on the 18th and you

18   don't know the name of the guy you stopped.

19       A.  I do not.

20       MR. SIMPSON:  Do you have any questions, Mike?

21       MR. SMITHY:  Q.  Just to clarify this, the press

22   release that you guys did at your house --

23       A.  Uh-huh.

24       Q.  -- on your wife's computer --

25       A.  Uh-huh.

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1    Q.  -- you said you sent it out from there?

2    A.  Yeah.  He was typing it up and then he e-mailed

3  it out, I think, to himself or to his work email.  I'm

4  not sure.

5    Q.  Okay.  You don't know if he sent it to the

6  other commanders or --

7    A.  No.

8    Q.  -- others who should --

9    A.  I don't think so.  I think it was just to get

10  it to himself, you know, as opposed to -- but I would

11  assume, if it was me, I would send it to my own work

12  email and then you could -- when you're at work you'd

13  have access to it.

14    Q.  Okay.

15    A.  That's my -- that's just a guess.  I don't know

16  that for a fact.

17    MR. SIMPSON:  Justin, you have anything?

18    MR. BUFFINGTON:  Q.  Did you -- Officer Huffaker,

19  did you bring any phone records with you today?

20    A.  Yes, sir.

21    Q.  And whose phone records did you bring?

22    A.  It's my cellphone.

23    Q.  And can you explain why you brought the phone

24  records you did?

25    A.  Yes.  So, as we discussed in our last

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1    interview, that November 21st was a very important day

2    for me to -- because you were kind of -- you were kind

3    of wondering why are we allowed to go out and work,

4    right?  And I told you November the 21st.  And you went,

5    Well, you're really certain on that day, right.  And I

6    explained to you today was my last day at work before

7    Thanksgiving break, before I drive up to Northern

8    California to go to my wife's in-laws' cabin.  And I

9    told you specifically during that there was -- so you

10   called them -- you tend to call them "meetings" and I

11   kind of did too, but more conversations.  So when I walk

12   in to the main station and I sit down in Commander

13   Bates's office or Johnson, they're not going to call

14   that a meeting.  So I think that's kind of --

15        MR. SIMPSON:  Q.  They're conversations.

16        A.   They're conversations.  So when you ask

17   someone, Hey, did you have a meeting this day, they

18   break out their little pocket calendar.  They go, No.

19   Because it's an impromptu conversation but ends up as

20   kind of -- it's synonymous words in some people's heads,

21   but in other people's that are planners, they go, No,

22   there's nothing there, right?

23            So I told you there's the conversations that we

24   had between Casey Quinn, Jacy, myself, Commander

25   Bates -- Aaron Johnson comes in at some point.  Then

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1  later on there's the whole separate one with Jacy,

2  Victoria, the Chief, Aaron, and Bates.

3       Q.  Uh-huh.

4       A.  So I specifically told you, though, what stuck

5  out to me was I got a phone call from the commander that

6  day.  And I notice in your interview you never asked

7  him.

8       Q.  Uh-huh.

9       A.  Did you ever call --

10      Q.  From Johnson, correct?

11      A.  No.  This is from Commander Bates.

12      Q.  Okay.

13      A.  Did you ever call -- you know, I told you this

14  happened -- did you ever call Officer Huffaker and tell

15  him something along the lines of, Hey, we had this

16  meeting.  Things are, you know, looking good -- anything

17  along those lines, right, because I don't -- I don't

18  have specific quotes, but I told you.  He called me,

19  which is kind of bizarre to not call me on a work phone

20  at the firehouse for a work thing.

21          So November 21st at 3:57 p.m., there's a phone

22  call from -- to my cellphone from this number

23  707-584-2647.  So three-minute conversation.  There's

24  a -- the second piece of paper is from the Rohnert Park

25  staff directory.  It lists Fire Commander Mike Bates

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1   business phone, 707-584-2647.  So I just want to point

2   out you never asked him about it, but this phone call he

3   made to me that afternoon.  So --

4           MR. BUFFINGTON:  Q.  And what did he tell you?

5           A.  He had -- basically what I said before is --

6           Q.  Fine --

7           A.  -- it was a short conversation, but in essence

8   kind of giving me the overall feeling that it's

9   happening.  Don't leave the department.  This new

10  federal thing -- kind of interdiction, drug

11  suppression -- whatever words you want to all is going

12  to happen.

13          So like I said, the earlier meeting I get this

14  phone call from my fire commander as kind of a

15  reassurance of -- because this is the day I told him

16  we're thinking about leaving the agency.  And then the

17  dinner meeting with Sgt. Tatum.  Casey Quinn's there and

18  the information they tell me -- or Jacy tells me from

19  his meeting with the Chief, Victoria, Aaron, and Bates,

20  why would you not think you're allowed to work again,

21  especially when I told you we're not email-heavy in this

22  department?  It's always been verbal.

23          So there's just one thing that really stuck out

24  to me is I noticed it wasn't something that you asked

25  and I just wanted to get it on record that --

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1     MR. SIMPSON:  Q.  That I didn't ask him if he

2  called?

3     A.  Specifically, you know, if I point out the

4  Commander called me to talk to me about this that

5  afternoon or evening or whatever I said at the time, you

6  never asked him.  So I just want it documented that he

7  did call me.  So if all this stuff -- I just want --

8  'cause he -- to clarify, like, this all happened on the

9  21st.  That's why it's there and there's one more piece

10  of proof that it did happen.

11     Q.  There's proof here to me that you received a

12  phone call from his (unintelligible) or his work phone

13  or whatever it is.

14     A.  Absolutely.

15     Q.  Okay.

16     A.  Yep.

17     Q.  All right.

18     A.  I'm just saying you never asked him that little

19  piece of, like, Okay, so you don't remember, you know.

20  And here's the first thing:  You had to prompt several

21  times.  Do you remember on the November 21st that

22  meeting with us?  And he said, No.  And then once you

23  start to the build in some specifics, he starts to come

24  around, like most people.  This is such a time delay

25  between where it is that people are having a lot of

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1  trouble figuring out --

2      MR. BUFFINGTON:  You want him -- we'd, like, to

3  enter this in the record.

4      OFFICER HUFFAKER:  Just people are having a lot of

5  trouble figuring out -- you know, recalling it without

6  prompts.  So that's one more thing to show that, you

7  know, everyone has their different recollections --

8      MR. SIMPSON:  Q.  Uh-huh.

9      A.  -- and some people flat out don't remember

10  stuff (unintelligible) specifics.

11          And tying into that, like, if Jacy tells me he

12  goes to this meeting, conversation, or whatever with

13  Victoria, the Chief, Aaron Johnson, and Mike Bates.  You

14  interviewed the Chief and Aaron before, right?  You know

15  our -- first time we ever tell you anything.  He says

16  this meeting happened or conversation happened.  He

17  tells it to me.  I tell you that this is relayed to me

18  that this happened.  You don't talk to Victoria about

19  it, even though she's here all the time.  You talk to

20  her.  She's in the background of other meetings.  You

21  never asked her, Victoria, do you remember this?  You

22  never go back, after all the other people you called,

23  just to clarify on the 18th did this happen.  CHP, did

24  this happen?  Did this happen?

25          Why not call the Chief and say, Chief, is there

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1    a possibility that on this date this conversation

2    happened with specifics we give, right?  Go back to

3    Aaron.  Is it possible that this happened?  Casey Quinn,

4    he's there on the engine.  I know that, obviously, you

5    didn't interview him, because he's not in there, but

6    he's the guy that I provided to you last time and said

7    that I sent my (unintelligible) sheet to because he knew

8    that we were going to be --

9        Q.  Well, I don't doubt that you did.

10       A.  -- going back to work, right?

11       Q.  No.  I don't doubt that for a minute.

12       A.  So why not ask any of those guys?

13       Q.  You assume I haven't.

14       A.  I'm assuming you haven't because --

15       Q.  You were only given the recorded interviews.

16       A.  -- I'm given the recordings I have.  So I don't

17   know.  If you did, that's better for me.  I just -- this

18   is a huge deal to me, because there's a lot of

19   allegations that are on there and I'm the guy who's

20   never been in trouble.  I've had two (unintelligible)

21   for driving.  I'm not the insubordinate guy.  I'm the

22   guy who goes to work.  I stay out of trouble.  I do my

23   job.  And this just blows me away that it's going this

24   way.

25               So I understand how it could get here between

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1   people's misconceptions of nomenclature for marijuana

2   and concentrated cannabis and processed versus not

3   processed.  So I can understand that.  But this is --

4   this is a huge deal to me to look at how many

5   allegations there are and a lot of them are the

6   insubordination, the failure to follow orders -- along

7   those lines, right?  So a lot of hinges to me of please

8   talk to those people if you haven't.  If I didn't get

9   the recordings and you already have, fantastic.  But why

10  would -- why would we not?  If that's the one thing that

11  a ton of things are hanging on this, why not ask all the

12  people that were there?  Why not ask Sgt. Sutter, who I

13  borrowed the white Impala from, Hey, did you ever get a

14  phone call or text from Huffaker asking to borrow a car

15  to do surveillance?  Once again, proving, like, our

16  intent -- like, you know, we went out to do

17  surveillance.  A lot of the times you say interdiction

18  and we're working surveillance.  There's a difference

19  there.  I noticed in a lot of your recordings, you keep

20  saying interdiction, interdiction, interdictions.  But

21  we went out there to do surveillance.  We didn't plan on

22  doing enforcement.  We didn't even do enforcement.  We

23  come across a guy who we thought was the guy and he has

24  a bunch of weed that he says is not his.

25          Q.  You don't even know if you made a car stop on

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1    the 5th, do you?

2        A.  I'm not -- honestly, I don't -- I don't really

3    know.  At this point I don't know if I was out there on

4    the 5th or not.  I don't want to tell you I wasn't,

5    because for five months I've thought that I was, but I

6    don't know.

7        MR. SIMPSON:  Okay.

8        MR. BUFFINGTON:  Q.  Did you bring anything else

9    would you with you, such as a photograph?

10       A.  Yeah, I did, sir.

11           So I know that we discussed -- you said you've

12   seen my uniform in newspaper articles or something --

13   something before.  But I just want to point this out to

14   you.  So this is the pretty much typical outfit that I

15   would wear when I would do interdiction.

16       Q.  Describe it.

17       A.  It's a ball cap.  It's typically black or gray.

18   A black or gray sweatshirt.  A black TAC vest.

19       Q.  Uh-huh.

20       A.  I have -- or a T-shirt, black or gray T-shirt.

21   I wear same blue jeans and my black boots.

22       MR. SIMPSON:  Q.  Well, I can tell you this right

23   up front, because I was going to tell Mr. Buffington

24   anyhow today.  I have no intentions of sustaining you of

25   an allegation of violating a uniform policy.

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1    A.   Okay.  But that's great -- good to hear.

2    Q.   Oh, yeah.  You didn't violate it.

3    A.   Okay.  But one more thing that I just want to

4  point out is, after reviewing the statements and the

5  Zeke Flatten statements online, he says --

6    Q.   He said the people were wearing green fatigues.

7    A.   Exactly.  We were wearing green.  I wore that

8  same outfit every single time I went out, except for

9  maybe a couple times in my full uniform.

10   Q.   I believe -- I believe you.

11   A.   So there are a couple more things I just want

12  to hit on (unintelligible).

13        His statement we were both wearing green.  One

14  of us has a green hat with a muted U.S. flag on it.  I

15  went through all my hats today.  I do not own a green

16  hat at all.  The picture provided with the muted flag --

17  I don't have anything on any of my hats that looks

18  anything like that.  Typically, the hat in that picture

19  is the one I would wear almost every time until it is

20  worn out and then I'd buy a new one.

21        For him, like, he's very -- he's certain it's

22  Hobb, right?  He's looked at pictures of Hobb.  He sees

23  a picture of me, obviously, at this point.  In the

24  comments he still says he strongly believes it's still

25  Hobb, that it's not us.  He's very bizarre with his

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1    statement of how specific he is on certain things.  The

2    gas-smell thing, the license plate that's 1-2-3 that

3    doesn't match the car that we were in.  He made a

4    statement about knowing that we didn't use our radios,

5    indicating we had our radios.  I didn't carry a radio up

6    there.  They didn't work.  Why have the extra weight on

7    there?  Like, tons of just bizarre things that just

8    don't make sense.  So --

9        Q.  Maybe you didn't stop him.

10       A.  I don't think I did.  If I did, I don't recall

11   it ever happening and I think --

12       Q.  But you said you did because you were under the

13   belief that that's who it was on the 5th because that's

14   what Mendocino County told you it was.

15       A.  Yes, sir.

16           So in the end, the cellphone thing -- the white

17   out-of-box case with the orange or light blue -- my

18   phone --

19       Q.  I saw your phone.

20       A.  Yeah.

21       Q.  Doesn't match, does it?

22       A.  For a guy to be that specific on all these

23   things and to not be able to pick out my picture or to

24   just be able to say, like, The guy was six foot one, two

25   hundred pounds, a white guy.  The other guy -- like, he

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1    has so many details, but he doesn't talk about that.

2    Like, it's -- it's putting me through a ton of stress.

3    I'm sorry.  It's just --

4        Q.   These things are never pleasant.

5        You've been doing interdictions for how long?

6        A.   A couple years.

7        Q.   Couple of years.  In those two years you've

8    been doing interdictions, have you ever been accused of

9    misappropriating or misreporting the amount of drugs

10   you've seized or the amount of money you've seized?

11       A.   No, sir.

12       MR. BUFFINGTON:  First off, I have an objection as

13   irrelevant.  It has nothing to do with this

14   investigation.

15       MR. SIMPSON:  Okay.

16       OFFICER HUFFAKER:  No, sir.  I've never had any

17   complaint of (unintelligible) anything.

18       MR. SIMPSON:  Q.  Are you aware of any pending or

19   in-progress investigations against you by any other

20   federal state or local agency?

21       MR. BUFFINGTON:  Objection.  Relevance to this

22   case.  Has nothing to do with the service -- unless it

23   has to do with the circumstances of this case, which --

24       MR. SIMPSON:  Q.  Okay.  Are you aware of any other

25   investigations regarding Mr. Flatten's claims being

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

```
 1   conducted by any other organization other than me?
 2        A.   Currently?
 3        Q.   Yeah.
 4        A.   No.  I know that earlier, obviously, you must
 5   have talked to Mendocino and --
 6        Q.   Yeah.  They did one.  That's what I showed you
 7   before, yeah.
 8        A.   I think you talked to the FBI or something, but
 9   that was it.
10        Q.   Okay.  You got anything else?
11        A.   No.
12        Q.   It was a lot faster, wasn't it?
13        A.   A lot, yeah.
14        MR. SIMPSON:  I'm going to admonish you not to
15   discuss the case with anyone other than Mr. Buffington.
16             I'm going to wrap this thing up.  It's time to
17   move on.
18             I'm going to end your interview at -- we'll
19   make it 1415 hours.
20                     (End of recording)
21
22
23
24
25
```

Cal-Pacific Reporting, Inc.
415.578.2480

Audio Transcription re: Tatum & Huffaker
IA 2018-01 / LDF 18-0739

Audio of: Interview of Officer Joseph Huffaker (06/06/2018) (audio 180606-001)
Transcribed: December 11, 2018

1          CERTIFICATE OF TRANSCRIBER

2

3          I hereby certify that the recordings in the

4    within-entitled cause were transcribed by me, FREDDIE

5    REPPOND, a stenographic reporter and disinterested

6    person, in shorthand and were thereafter transcribed

7    into typewriting.

8

9

10                    Dated: December 11, 2018

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cal-Pacific Reporting, Inc.
415.578.2480