Pages 1 - 46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

UNITED STATES OF AMERICA,         )
                                  )
            Plaintiff,            )
                                  )
    VS.                           )   NO. 3:21-cr-00374-MMC-2
                                  )
JOSEPH HUFFAKER,                  )
                                  )
            Defendant.            )
_____ )

                        San Francisco, California
                        Monday, July 7, 2025

            <u>TRANSCRIPT OF PROCEEDINGS</u> - **EXCERPT**

**<u>APPEARANCES:</u>**

For Plaintiff:
                        CRAIG H. MISSAKIAN
                        United States Attorney
                        1515 Clay Street
                        Oakland, California 94612
                  BY:   **ABRAHAM H. FINE**
                        **BENJAMIN K. KLEINMAN**
                        **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                        FERRONE LAW GROUP, APLC
                        4333 Park Terrace Drive - Suite 200
                        Westlake Village, California 91631
                  BY:   **RICHARD CEBALLOS**
                        **ROBERT L. BAUMANN**
                        **ATTORNEYS AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

**<u>APPEARANCES</u>:** **(CONTINUED)**

Also Present:        Special Agent Duncan Haunold, FBI
                     Veronica Hernandez, Paralegal
                     Michael Easter, Investigator

```
 1    Monday - July 7, 2025                              1:44 p.m.

 2                        P R O C E E D I N G S

 3                            ---o0o---

 4                        (Begin excerpt.)

 5           THE COURT:  So who would be the next witness,

 6    Mr. Kleinman?

 7           MR. KLEINMAN:  The Government calls to the stand

 8    Barron Lutz.

 9           THE COURT:  All right.

10       (Barron Lutz steps forward to be sworn.)

11           THE COURT:  Is somebody going to get him?

12           MR. KLEINMAN:  Yes, Your Honor.  One of the agents is

13    getting him.

14           THE COURT:  Good.  Is this Mr. Lutz coming in?

15           MR. KLEINMAN:  It is.

16           THE COURT:  Mr. Lutz, would you come through those

17    swinging doors, please, and up to the witness stand.  And then

18    if you'll remain standing until the clerk swears you in.  Right

19    up here.

20           THE COURTROOM DEPUTY:  Please raise your right hand.

21                          BARRON LUTZ,

22    called as a witness for the Government, having been duly sworn,

23    testified as follows:

24           THE WITNESS:  Yes.

25           THE COURTROOM DEPUTY:  Please be seated.
```

**LUTZ - DIRECT / KLEINMAN**

1          **THE COURT:**  Now, I notice there is water up there.  I

2    don't know if the last witness was aware, but they had brought

3    up a bottle.  So if you need water, it's there.

4          **THE WITNESS:**  Thank you.

5          **THE COURT:**  Okay.  It's kind of out of the sight of

6    the witness.

7          **THE COURTROOM DEPUTY:**  Please state your full name for

8    the record and spell your last name, please.

9          **THE WITNESS:**  Barron Lutz.  B-A-R-R-O-N, L-U-T-Z.

10       (Reporter interrupts for clarification of the record.)

11          **THE WITNESS:**  Yes, B-A-R-R-O-N, L-U-T-Z.

12          **THE COURT:**  Do you pronounce it Lutz or Lutz

13    [different pronunciation]?

14          **THE WITNESS:**  Correct.  Lutz.

15          **THE COURT:**  Lutz?  Okay.

16      Go ahead, please.

17          **MR. KLEINMAN:**  Thank you, Your Honor.

18                        <u>**DIRECT EXAMINATION**</u>

19    BY MR. KLEINMAN:

20    **Q.**   Good afternoon, Mr. Lutz.

21    **A.**   Good afternoon.

22    **Q.**   Mr. Lutz, where did you grow up?

23    **A.**   Los Angeles, California.

24    **Q.**   Where do you live now?

25    **A.**   Arcata, California.

**LUTZ - DIRECT / KLEINMAN**

1  Q.  Where is that located?

2  A.  Humboldt County.

3  Q.  So that's kind of way north area?

4  A.  Yeah, around five hours north.

5  Q.  And where did you go to school?

6  A.  I went to school in Los Angeles until I was 13, and I

7  spent my high school years in India.

8  Q.  Did you attend college?

9  A.  Yes.

10  Q.  Where?

11  A.  The Culinary Institute of America.

12  Q.  And did you attend any additional schooling after the

13  Culinary Institute?

14  A.  No.

15  Q.  Did you graduate?

16  A.  Yes.

17  Q.  After graduation, where did you work?

18  A.  I worked in some restaurants in Napa and then in

19  San Francisco.

20  Q.  Excuse me.  And then where?

21  A.  Here in San Francisco.

22  Q.  And ultimately, did you begin and open your own business?

23  A.  Yes.

24  Q.  What was that business?

25  A.  It's a cannabis business.

**LUTZ - DIRECT / KLEINMAN**

1          (Reporter interruption for clarity of the record.)

2    BY MR. KLEINMAN:

3    Q.   I believe if it's helpful, Mr. Lutz, you can move that

4    camera slightly towards you -- that microphone slightly towards

5    you.

6         You just said "the cannabis business"; correct?

7    A.   Yes, the cannabis industry.

8    Q.   Before I ask you any additional questions, I just have a

9    few separate questions here.

10        You've received court-ordered immunity prior to your

11   testimony today; correct?

12   A.   Correct.

13   Q.   Why did you seek that immunity?

14   A.   Because I did and currently do work in the cannabis

15   industry.

16            THE COURT:  All right.  It should be made clear that

17   was at the request of the United States Attorney.

18            MR. KLEINMAN:  Yes, Your Honor.

19            THE COURT:  All right.

20   BY MR. KLEINMAN:

21   Q.   And I was about to actually say:  So it's your

22   understanding that that was, in fact, at the request of the

23   United States Attorney's office; correct?

24   A.   Correct.

25   Q.   And it is your understanding that marijuana is still, at

1    least federally, illegal; correct?

2    **A.**   Correct.

3    **Q.**   And was that in part why you sought immunity?

4    **A.**   Correct.

5    **Q.**   What is your understanding of that immunity?

6    **A.**   It means I cannot be prosecuted for anything that I

7    tes- -- anything in my testimony from this case.

8    **Q.**   I want to ask you a few more questions about that, but I

9    would just ask that you keep your voice up a little bit just to

10   make sure that everyone can hear you.

11       When you say you can't be prosecuted about any testimony

12   you give in this case, is it your understanding that that's

13   testimony in regards to your work in the cannabis business?

14   **A.**   Correct.

15   **Q.**   Does the order from the Court regarding your immunity

16   permit you to lie?

17   **A.**   No.

18   **Q.**   Commit perjury?

19   **A.**   No.

20   **Q.**   And are you, in fact, testifying today because you have

21   received a court-ordered subpoena to do so?

22   **A.**   Yes.

23           **THE COURT:**  At the request of the United States

24   Attorney.  You're making it sound like this was all the Court's

25   idea.  It was not.

1          MR. KLEINMAN:  That was -- I broke up those two

2    questions.

3    BY MR. KLEINMAN:

4    Q.   My next question was:  And that subpoena was, in fact,

5    requested by the United States Attorney's office in relation to

6    this case; correct?

7    A.   Correct.

8    Q.   Now, you testified earlier that you began working in the

9    cannabis industry.  When was that?

10   A.   I started my original company in 2016.

11   Q.   And in 2016, where were you living?

12   A.   Willow Creek, California.

13   Q.   And is that in roughly the same area in which you live

14   now?

15   A.   Yes.

16   Q.   So --

17         (Reporter interruption for clarity of the record.)

18          THE WITNESS:  Willow Creek.

19   BY MR. KLEINMAN:

20   Q.   And did you move up to that area in relation to beginning

21   this cannabis business?

22   A.   Yes.

23   Q.   So that was in 2016; correct?

24   A.   Yes.

25   Q.   Okay.  What was the name of that company?

**LUTZ - DIRECT / KLEINMAN**

1  A.    Humboldt Private Reserve.

2  Q.    And what did Humboldt Private Reserve do?

3  A.    We applied for a manufacturing license from the

4  Humboldt -- from the Humboldt County Planning Commission.

5  Q.    And it was a manufacturing license to do what?

6  A.    To manufacture cannabis concentrate.

7  Q.    You just used the term "cannabis concentrate."  Can you

8  please explain to the jury what that is?

9  A.    There are many ways of concentrating cannabis.  I started

10  a company which uses a solventless-based way of concentrating

11  cannabis.  We essentially use ice and water to concentrate

12  cannabis.

13  Q.    And then what would you do with your product?

14  A.    It would go to dispensaries around the state.

15  Q.    What types of regulations were required within the

16  industry to sell that product to dispensaries?

17  A.    So there was Proposition 215, which was a medical

18  proposition.  And dispensaries were collectives and had

19  caregivers, and so we were operating under Proposition 215

20  originally.  After 2018, we were operating under

21  Proposition 64.

22  Q.    I'm going to ask you about 64 in a moment, but focusing on

23  this 2016 time frame, what type of quality control exists

24  within the industry regarding the testing of your marijuana

25  product?

**LUTZ - DIRECT / KLEINMAN**

1  **A.**   So there was no state regu- -- regulated requirement, but

2  certain cities had requirements for third-party testing of

3  cannabis products at that point.

4  **Q.**   And what were those requirements?

5  **A.**   They tested for pesticides and microbial and potency.

6  **Q.**   Now you've used the term "cannabis."  Just to clarify for

7  the jury, is cannabis synonymous with marijuana?

8  **A.**   Yes.

9  **Q.**   Now, turning your attention to December 2017, where were

10 you working then?

11 **A.**   I was CEO of Humboldt Private Reserve.

12 **Q.**   And how many employees did you have?

13 **A.**   At that point it was one or two.

14 **Q.**   So this was still the same company that you had just

15 started in 2016; correct?

16 **A.**   Correct.

17 **Q.**   And at that point in 2017, what was Humboldt Private

18 Reserve doing?

19 **A.**   It was manufacturing cannabis concentrate.

20 **Q.**   And when you say "cannabis concentrate," what were the

21 different types of cannabis products that you offered?

22 **A.**   Mostly something colloquially known as bubble hash.

23 **Q.**   What is bubble hash?

24 **A.**   It's a solventless concentrate.

25 **Q.**   Did you also produce what is known as marijuana bud?

**LUTZ - DIRECT / KLEINMAN**

1   **A.**   No.

2   **Q.**   Did you also produce what is -- or just marijuana, the

3   plant, generally?

4   **A.**   No.

5   **Q.**   And as you -- so what was the process in turning the

6   marijuana into marijuana bubble hash?

7   **A.**   You essentially make a large cannabis soup.  You agitate,

8   that causes the crystals to fall into the water.  The water is

9   then filtered through a filtration process, and the crystals

10  are collected.

11  **Q.**   Prior to selling the marijuana, what was the process to

12  test it?

13  **A.**   So there were a very limited amount of labs at that point,

14  so we would get lab testing done in the Bay Area.

15  **Q.**   And now, back to this December 2017 time frame, what types

16  of permits did you have?

17  **A.**   So we had applied for a state permit, and we had a

18  conditional use permit which was a zoning permit from the

19  County of Humboldt, and we applied and been approved for a

20  state license by the State of California.

21  **Q.**   And what is the relationship between the state licenses

22  and Proposition 64 which you testified about earlier?

23  **A.**   So part of Prop 64 is to get a license from the state.  So

24  you could -- you could have an application with the state, but

25  they didn't issue the license till after Prop 64 went into

LUTZ - DIRECT / KLEINMAN

1  effect.

2  Q.   And just for the record, what is Proposition 64?

3  A.   It was a proposition to legalize the recreational use and

4  medical use of cannabis in the State of California.

5  Q.   When was Proposition 64 to take effect?

6  A.   January 1, 2018.

7  Q.   And as you just testified to, now in December of 2017, you

8  had already applied for that license; correct?

9  A.   Yes.  We had applied and approved.

10 Q.   Turning your attention now specifically to December 17 of

11 2017, what did you do that day?

12 A.   On the 17th of December, I was preparing to go down to the

13 Bay Area with some hash and some flower, which is cannabis

14 buds, for testing.

15 Q.   I want to talk about the cannabis flower for a moment.

16      Where did you obtain that flower?

17 A.   From local farms around us.

18 Q.   And what were you planning to do with that flower?

19 A.   Get it lab tested.

20 Q.   And why had you obtained that flower from local farms?

21 A.   To get it lab tested, and then once it clears, then we

22 could continue to manufacture.

23 Q.   So is it fair to say that the business of Humboldt Reserve

24 was to purchase marijuana flower, which you yourself did not

25 produce and grow, and then turn that purchased flower into

LUTZ - DIRECT / KLEINMAN

1   bubble hash which is the product of Humboldt Reserve?

2   **A.**   Correct.

3   **Q.**   Where was the lab that you were going to have this tested?

4   **A.**   Berkeley.

5   **Q.**   About how long is that drive from where you were located?

6   **A.**   Six to seven hours.

7   **Q.**   How many days was it going to take you to make that drive?

8   **A.**   Two.

9   **Q.**   What car were you driving?

10  **A.**   A Mercedes white SUV.

11  **Q.**   What was the condition of that car?

12  **A.**   It was a new car.

13  **Q.**   When you say a new car, had you recently purchased it from

14  the dealer?

15  **A.**   Correct.

16  **Q.**   So it was brand-new?

17  **A.**   It was brand-new.

18  **Q.**   In December 17, 2017, did you, in fact, leave for that

19  trip?

20  **A.**   I did.

21  **Q.**   Was anyone else with you in the car?

22  **A.**   No.

23  **Q.**   And approximately what were you transporting and in what

24  quantities?

25  **A.**   I had about 20 pounds of cannabis flower, also known as

1    cannabis buds, and then around four dozen mason jars of bubble

2    hash.

3    **Q.**    And where was the marijuana flower and bubble hash?

4    **A.**    I had the seats folded down, and it was in the back of the

5    car with a blanket over.

6    **Q.**    Did you keep records of the various cannabis strands to be

7    tested?

8    **A.**    Yes.

9        **MR. KLEINMAN:**    Ms. Hernandez, if we could pull up

10   Government's Exhibit 119.

11   **BY MR. KLEINMAN:**

12   **Q.**    Mr. Lutz, do you recognize this exhibit?

13   **A.**    Yes.

14   **Q.**    What is it?

15   **A.**    This is a list of cannabis I was carrying on that day.

16   **Q.**    And is the information created in this document, was it

17   created in and around the time of the -- that the list was

18   created?

19   **A.**    Yes.

20   **Q.**    Is it the regular practice of your company to make such

21   records while conducting its business?

22   **A.**    Yes.

23   **Q.**    And was this list, in fact, kept in the regular course of

24   business?

25   **A.**    Yes.

LUTZ - DIRECT / KLEINMAN

1          MR. KLEINMAN:  The Government moves to admit

2     Exhibit 119.

3          THE COURT:  Is there any objection?

4          MR. CEBALLOS:  No, Your Honor.

5          THE COURT:  119 is admitted.

6     (Trial Exhibit 119 received in evidence.)

7          MR. KLEINMAN:  And if we can publish that to the jury.

8     BY MR. KLEINMAN:

9     Q.   Mr. Lutz, if you can walk the jury through this list.

10    Let's just take the first item.

11         What did -- what is "varietal"?  What does that mean?

12    A.   It's a cultivar or strain of cannabis.

13    Q.   And what about "farm"?

14    A.   Farm is the farm that grew the strain of cannabis.

15    Q.   And then what is "number desired"?

16    A.   That is quantity.

17    Q.   And now there's a check mark by each of these varietal

18    items; correct?

19    A.   Correct.

20    Q.   And the phrase is "got it," with an exclamation point;

21    correct?

22    A.   Yep.

23    Q.   What is the significance of the check mark as it relates

24    to your trip on December 17, 2017?

25    A.   It was procedure to know that it was put in the bag for

**LUTZ - DIRECT / KLEINMAN**

1    transport.

2    **Q.**   Mr. Lutz, as you began your trip on December 17, did you

3    have a phone with you?

4    **A.**   Yes.

5         **MR. KLEINMAN:**   The Government moves to admit

6    Exhibit 120.   It is a stipulated exhibit.

7         **THE COURT:**   I'm sorry.   What was the last thing you

8    said about it?

9         **MR. KLEINMAN:**   It's a stipulated exhibit.

10        **THE COURT:**   All right.   Then 120 is admitted.

11        (Trial Exhibit 120 received in evidence.)

12        **MR. KLEINMAN:**   And, Ms. Hernandez, if we can go to

13   page 8.

14   **BY MR. KLEINMAN:**

15   **Q.**   Mr. Lutz, what is -- what is this exhibit?

16   **A.**   It looks like a phone bill.

17   **Q.**   And is this, in fact, your phone bill?

18   **A.**   Yes.

19   **Q.**   Okay.   And is the billing period listed?   If you could

20   please read that into the record.

21   **A.**   December 9, 2017, to January 8, 2018.

22        **MR. KLEINMAN:**   And, Ms. Hernandez, if we can go to

23   page 9.

24   **BY MR. KLEINMAN:**

25   **Q.**   And if -- is the number ending in 6238, is that your phone

LUTZ - DIRECT / KLEINMAN

1    number?

2    A.    Yes.

3    Q.    And next to your number is the word "Pixel"; correct?

4    A.    Yes.

5    Q.    What is that?

6    A.    Type of phone.

7    Q.    And is that, in fact, the type of phone that you had

8    during December 17, 2017?

9    A.    Yes.

10   Q.    Pixel is what type of phone?

11   A.    It's a phone by Google with an Android operating system.

12   Q.    And as you used the Google Pixel phone, did you have

13   location services turned on?

14   A.    Yes.

15          MR. KLEINMAN:   If we can show page 16, Ms. Hernandez.

16     And if we could blow up the top half of the page, up to

17   about here.

18   BY MR. KLEINMAN:

19   Q.    Mr. Lutz, it says -- if you can read the date and time

20   referenced in the middle of the page at 1:12 p.m.

21   A.    December 17, 1:12 p.m.

22   Q.    And what is the origination?

23   A.    Willow Creek.

24   Q.    And is that about when you started your trip?

25   A.    You would have to refer to my timeline.

**LUTZ - DIRECT / KLEINMAN**

1   Q.   Well, let me -- withdrawn.  Let me ask a different

2   question.

3        You're -- on that same day, December 17, you -- the

4   origination appears to be McKinleyville at 3:33 p.m.; is that

5   correct?

6   A.   Yes.

7   Q.   And then ultimately that day, at 7:50 p.m., the

8   origination is Rio Dell, California; correct?

9   A.   Yes.

10  Q.   And is that roughly where you stopped for the evening?

11  A.   Yes.

12  Q.   Did you resume your trip on December 18, 2017?

13  A.   Yes.

14          MR. KLEINMAN:  If we can now -- oh.

15  BY MR. KLEINMAN:

16  Q.   So you begin in the morning.  If you can read the time and

17  date of the next location?

18  A.   December 18, 9:42, Rio Dell.

19  Q.   And then what is the next origination location?

20  A.   December 18, 10:41, Rsa Cal.

21          MR. KLEINMAN:  And if we can now minimize this page,

22  this part of the page.

23     And I'd ask that we expand the second half of the page.

24  BY MR. KLEINMAN:

25  Q.   On December 18, 2017, you continued to drive south;

LUTZ - DIRECT / KLEINMAN

1  correct?

2  **A.**  Correct.

3  **Q.**  What highway were you driving on?

4  **A.**  101 south.

5  **Q.**  And if you could read into the record the phone call on

6  December 18 at 11:58 a.m., the date, time, and then

7  origination?

8  **A.**  December 18, 11:58, Hopland.

9  **Q.**  And there are still origination calls in Hopland at -- on

10  December 18 at 12:41 p.m.; correct?

11  **A.**  Correct.

12       **MR. KLEINMAN:**  Okay.  If we can minimize this.

13  **BY MR. KLEINMAN:**

14  **Q.**  As you were driving south, did you still have the list of

15  strands, bubble hash, and marijuana flower to which you

16  testified about earlier?

17  **A.**  Yes.

18  **Q.**  And did you have your phone with you?

19  **A.**  Yes.

20       **MR. KLEINMAN:**  Ms. Hernandez, we can put this exhibit

21  down.

22  **BY MR. KLEINMAN:**

23  **Q.**  So, Mr. Lutz, on that drive on December 18, 2017, in that

24  midday to 1:00 p.m. time frame, what, if anything, happened?

25  **A.**  I was heading south on 101 and I saw a black SUV pull

1    behind me and lights come from the front of the SUV.

2    Q.    What did you do when you saw those lights?

3    A.    I pulled over.

4    Q.    What happened after you pulled over?

5    A.    The black SUV pulled behind me.  And then an individual

6    got out of the SUV and approached my driver side window.

7    Q.    What happened next?

8    A.    He asked me for my driver's license.

9    Q.    What did you do?

10    A.    I provided him with my driver's license.

11    Q.    And when he asked you for driver's license, what, if

12    anything, did he say?

13    A.    He asked me if there was marijuana in the car.

14    Q.    What did you say?

15    A.    I said yes.

16    Q.    When this person approached your driver side door and

17    asked for your license, did this person identify themselves in

18    any way?

19    A.    Did he -- he asked me for my license.

20    Q.    And did he identify himself in any way?

21    A.    No.

22    Q.    And then after this person asked if there was any

23    marijuana in the car, what did you say?

24    A.    I said yes.

25    Q.    And what happened next?

1    **A.**    He said to show him.  And then I -- I got out of the

2    driver side door and popped open my trunk.

3    **Q.**    And at this point, when you got out of the driver side

4    door, where was this person?

5    **A.**    On the back of the vehicle.

6    **Q.**    And was another person there as well or was it just one

7    person?

8    **A.**    There was another person there.

9    **Q.**    And you said at that point you opened the trunk of your

10   vehicle; is that correct?

11   **A.**    Correct.

12   **Q.**    What happened next?

13   **A.**    I thought it was a little bit odd because they never -- he

14   never asked me for my insurance or registration.  So I did ask

15   him for some sort of identification.

16   **Q.**    What did he say?

17   **A.**    He identified himself as ATF.

18   **Q.**    And after identifying himself as ATF, did he do anything

19   else; show you a -- identify himself in any other way?

20   **A.**    No.  I did not see a badge.

21   **Q.**    Was the person who identified himself as ATF, was that the

22   same person who approached your driver side door or someone

23   else?

24   **A.**    Same person who approached my driver side door.

25   **Q.**    After this person stated that they were with ATF, what did

1  you do?

2  **A.**   Well, he asked me to see the cannabis and so I opened my

3  trunk and proceeded to take the cannabis turkey bags out of the

4  duffel bag.

5  **Q.**   You mentioned cannabis turkey bags.  Can you describe for

6  the jury how the cannabis, specifically the marijuana flower,

7  was packaged?

8  **A.**   Yeah.  It's common in the cannabis industry to store

9  one-pound increments of cannabis flower in a turkey bag -- a

10  bag that is used to cook a turkey.

11  **Q.**   And is that how the various samples in -- that you were

12  transporting to be tested, is that how they were packaged?

13  **A.**   Correct.

14  **Q.**   And after you showed these two people the marijuana, what

15  happened next?

16  **A.**   They also looked at the bubble hash.  And I -- I unloaded

17  the cannabis out of the duffel bag onto the side of the

18  highway.

19      At that point, it felt strange to me, what was happening.

20  So I wasn't sure if I was being robbed or I was being arrested

21  or -- I was a bit confused.

22      But, on the other side, heading north, I saw a CHP

23  vehicle.  And the CHP vehicle made a U-turn and then parked

24  behind the black SUV.

25  **Q.**   What happened next?

1   **A.**   An officer -- the person -- there was two people there.

2   One of the people that -- one of the -- one of -- the person

3   that was there went to go talk to CHP.

4   **Q.**   And when you say one of the people who was there, you mean

5   the two people who had stopped you; is that correct?

6   **A.**   Correct.

7   **Q.**   And which person went to go talk to CHP?  Was it the

8   person who approached your driver side door or was it the other

9   person or someone else?

10  **A.**   It was the other person.

11  **Q.**   Okay.  And what did -- what happened next?

12  **A.**   At that point, he returned.  I was given an option of

13  being let go with my cannabis, with my hash, and them

14  confiscating the cannabis flower, or being taken to the

15  station.

16  **Q.**   How did you react?

17  **A.**   I mean, I was in shock.  My reaction was to accept their

18  offer and -- and, yeah.

19  **Q.**   So when they said your other option is to, I believe you

20  testified, take you to the station, did you know where that

21  was?

22  **A.**   No, but I figured it was a police station.

23  **Q.**   And at that point, what, if anything, did you ask for?

24  **A.**   I asked them for an inventory list of what they were

25  taking.

**LUTZ - DIRECT / KLEINMAN**

1   Q.   And what did they say?

2   A.   They said -- they asked me if I want to make a large

3   federal case out of it or just be let go.

4   Q.   And what did you say?

5   A.   I said I would prefer to be let go.

6   Q.   Can you describe for the jury what these people were

7   wearing?

8   A.   They had tactical vests on, and T shirts.

9   Q.   And the tactical vests, the clothing under the tactical

10  vests, was there any identifiable specific law enforcement

11  agency insignia?

12  A.   I do not recall.

13  Q.   And when you say T shirts, are those just like

14  plainclothes T shirts or -- or was there any sort of

15  specific --

16  A.   It's just a vest --

17  Q.   -- uniform?

18  A.   Sorry.  It's just a vest that stood out in my mind.

19  Q.   Well, let me ask the question directly.  Were they in

20  police uniforms?

21  A.   No.

22  Q.   Did either one of these people ever identify themselves to

23  you in any other way outside of ATF?

24  A.   No.

25  Q.   You mentioned asking for an inventory list.  What do you

1  mean by that?  If you could explain to the jury.

2  A.   It was my assumption that if there was search and seizure,

3  there's some kind of documentation that followed search and

4  seizure.

5  Q.   Did you ever receive any such documentation?

6  A.   No.

7  Q.   I want to talk about where these officers were when you

8  were opening your truck and one of the officers identified as

9  ATF.

10      Where were they in relation to you?

11  A.   They were kind of surrounding me in the back of the car.

12  Q.   Were these officers visibly armed?

13  A.   Yes.

14  Q.   You mentioned you were -- you were in shock.  Following

15  this incident, did you follow up regarding -- regarding what

16  had happened?

17  A.   Yeah.  The next day, I called the Mendocino Sheriff's

18  Department and I -- I asked them if they had record of what had

19  happened.  They said they would get back to me, and nobody ever

20  got back to me.

21  Q.   What was the approximate value of the marijuana flower?

22  A.   Probably $20,000.

23  Q.   So it was approximately a thousand dollars per pound?

24  A.   Yes.

25  Q.   Now, did you ultimately continue your trip that day?

LUTZ - DIRECT / KLEINMAN

1   **A.**   Yes.

2   **Q.**   And did you finalize your trip and end up arriving safely

3   in the -- in the San Francisco Bay Area?

4   **A.**   Yes.

5   **Q.**   You testified earlier that these people took the

6   marijuana.  Did you see what they did with it?

7   **A.**   No.

8   **Q.**   So when they -- they took it -- rather, did they put it in

9   their car or --

10   **A.**   I do not recall.

11   **Q.**   Got it.

12       So after you agreed to let them seize it and you chose one

13   of the options, what did you do?

14   **A.**   I continued to drive down to the Bay Area.

15   **Q.**   And specifically at that point, did you just simply enter

16   your -- go back into your car?

17   **A.**   Yes.

18   **Q.**   You testified earlier that you had location services of

19   your phone turned on.

20          **MR. KLEINMAN:**  If we could show Exhibit 117.

21          **THE COURT:**  Now, that's not been admitted yet.

22          **MR. KLEINMAN:**  No, not yet, Your Honor.

23          **THE COURT:**  All right.  You're just showing it to the

24   witness?

25          **MR. KLEINMAN:**  Yes, Your Honor.

1          THE COURT:  Fine.  Thank you.

2          MR. KLEINMAN:  We had some further talk regarding

3    stipulations.  The Government moves to admit.  This is now a

4    stipulated exhibit and the Government moves to admit.

5          THE COURT:  117 is admitted.

6       (Trial Exhibit 117 received in evidence.)

7          MR. KLEINMAN:  If we could publish that to the witness

8    and the jury.

9    BY MR. KLEINMAN:

10   Q.   Mr. Lutz, what is this exhibit?

11   A.   It's a copy of my Google timeline.

12   Q.   And does this appear to be a screenshot that you yourself

13   took of your Google timeline?

14   A.   Yes.  Yes.

15   Q.   If I could direct your attention to the middle portion of

16   your timeline, can you read the time you were in and around

17   what is listed as the Mendocino County area?

18   A.   12:07 to 12:35 p.m.

19         MR. KLEINMAN:  The Government also moves to admit

20   stated Exhibit 118.

21         THE COURT:  Is that -- this is stipulated?

22         MR. KLEINMAN:  Yes, Your Honor.

23         THE COURT:  All right.  118 may be admitted as well.

24      (Trial Exhibit 118 received in evidence.)

25   \\\

LUTZ - DIRECT / KLEINMAN

```
 1   BY MR. KLEINMAN:

 2   Q.   Mr. Lutz, what is this exhibit?

 3   A.   That is the morning of.

 4   Q.   So fair to say this is, essentially, the beginning of your

 5   timeline of that same day?

 6   A.   Correct.

 7   Q.   And is the address 1570 Holmes Flat Road, is that where

 8   you stopped for the night on December 17 --

 9   A.   Yes.

10   Q.   -- of 2017?

11   A.   Yes.

12   Q.   Mr. Lutz, just a couple more questions.

13        Did you know either of the people who stopped you and took

14   the marijuana on December 18, 2017?

15   A.   No.

16   Q.   Had you seen other either person before?

17   A.   No.

18   Q.   Now, you testified earlier that you had the marijuana in

19   turkey bags.  Was that your typical practice?

20   A.   Yes.

21   Q.   Why?

22   A.   It maintains the hygiene and integrity of the product.

23   Q.   And why is that important if you're going to have the

24   marijuana tested?

25   A.   To not contaminate the product.
```

**LUTZ - DIRECT / KLEINMAN**

1  Q.    So it wouldn't make sense to have marijuana tested if the

2  individual strands are not separated; correct?

3  A.    Correct.

4  Q.    Would you ever keep marijuana in a cardboard box?

5  A.    No.

6  Q.    Why?

7  A.    Unhygienic.

8  Q.    Just a few more questions, Mr. Lutz.

9        When you -- the officer who identified as ATF, that was

10  the same officer who approached your driver's door; correct?

11  A.    Yes.

12  Q.    Now, at what point in your interaction with that officer

13  did you -- or with that person did you notice that person was

14  armed?

15  A.    When I was outside of the vehicle.

16        **MR. KLEINMAN:**  Nothing further.

17     Thank you, Your Honor.

18        **THE COURT:**  I noticed that it's almost 2:30.  We

19  started at 1:00.  So this would be a good time for you to take

20  your mid-afternoon break, ladies and gentlemen.  Us as well.

21     So that would be 15 minutes.  You should come back at

22  quarter to 3:00.  Please remember my admonition.

23     And, Mr. Lutz, please stand by until they file out.

24  All right.  Thank you.

25                  (The jury leaves the courtroom.)

LUTZ - CROSS / CEBALLOS

 1        (Proceedings were heard out of the presence of the jury.)

 2            **THE COURT:**  Okay.  It's fine for you to step down.

 3        Okay.  We'll be 15 minutes.  Thank you.

 4            **MR. KLEINMAN:**  Thank you, Your Honor.

 5                (Recess taken at 2:29 p.m.)

 6                (Proceedings resumed at 2:47 p.m.)

 7            **THE COURTROOM DEPUTY:**  Please remain seated, and come

 8    to order.

 9                (The jury enters the courtroom.)

10        (Proceedings were heard in the presence of the jury.)

11            **THE COURTROOM DEPUTY:**  Please be seated.

12            **THE COURT:**  So let's go forward, then, with

13    cross-examination.

14                        <u>**CROSS-EXAMINATION**</u>

15            **MR. CEBALLOS:**  Thank you, Your Honor.

16    **BY MR. CEBALLOS:**

17    **Q.**   Good afternoon, Mr. Lutz.

18    **A.**   Good afternoon.

19    **Q.**   When you demanded immunity from the Government, you did so

20    because you were engaged in the business of marijuana back in

21    2'17 when this happened; correct?

22    **A.**   Yes.

23    **Q.**   You're currently engaged in the business of marijuana?

24    **A.**   Correct.

25    **Q.**   And you want to continue being engaged in the business of

**LUTZ - CROSS / CEBALLOS**

1  marijuana; is that correct?

2  **A.**   Correct.

3  **Q.**   In addition to being in the business of marijuana, would

4  it be fair to say that you're a consumer of marijuana?

5  **A.**   No.

6  **Q.**   You don't consume marijuana at all?

7  **A.**   No.

8  **Q.**   You interviewed with the FBI back on July of 2020; is that

9  correct?

10  **A.**   Correct.

11  **Q.**   So that's about three years after this alleged incident

12  occurred?

13  **A.**   Correct.

14  **Q.**   But prior to that, you actually were interviewed by a

15  reporter by the name of Kym Kemp?

16  **A.**   Correct.

17  **Q.**   And she is a reporter for the Redheaded Blackbelt?

18  **A.**   Correct.

19  **Q.**   And do you remember telling her about your encounter with

20  these individuals?

21  **A.**   Yes.

22  **Q.**   Okay.  And prior to actually speaking with her, you were

23  aware that she had written a couple of articles back in

24  February of 2018?

25  **A.**   I don't recall.

1  Q.  Did you read any articles that she wrote?

2  A.  I don't recall.

3  Q.  When you spoke with Kym Kemp, when was that?

4  A.  I don't recall.

5  Q.  Would April of 2018 be approximate when you spoke to her?

6  A.  Yes.

7  Q.  And when you spoke to Kym Kemp, you didn't tell her that

8  these individuals represented themselves as ATF, did you?

9  A.  I don't recall.

10        THE COURT:  Is that K-I-M, K-I-N?

11        MR. CEBALLOS:  K-Y-M, first name, and then Kemp,

12  K-E-M-P.

13        THE COURT:  Kemp?

14        MR. CEBALLOS:  Yes.

15        THE COURT:  Okay.

16  BY MR. CEBALLOS:

17  Q.  Now, the CHP that pulled up, how do you know they were

18  CHP?

19  A.  By markings on their car.

20  Q.  Okay.  Have you had an encounter with CHP before?

21  A.  Yes.

22  Q.  Okay.  And do you recall their uniforms, if any?

23  A.  No.

24  Q.  Do you recall the -- what was it, one officer or two

25  officers?

**LUTZ - CROSS / CEBALLOS**

1  **A.**   In the CHP vehicle?

2  **Q.**   Yes.

3  **A.**   I don't know.  I don't recall.

4  **Q.**   Do you recall anything about whether male, female,

5  anything like that?

6  **A.**   No.

7  **Q.**   What about race?

8  **A.**   No.

9  **Q.**   How close did these CHP officers get to you?

10 **A.**   I don't think they -- they didn't exit their vehicle.

11 **Q.**   They didn't exit the vehicle?

12 **A.**   No.

13 **Q.**   Approximately how far away were they from you?

14       From where you're seated right now, is there a place here

15 in the courtroom that you can point to?

16 **A.**   Yeah.  Probably somewhere on that table.

17 **Q.**   Which table?  This counsel table?

18 **A.**   Yeah.

19 **Q.**   Towards the end where the young lady is?

20 **A.**   Yeah.

21       **MR. CEBALLOS:**  Your Honor, we --

22       **THE COURT:**  30 feet, 25 feet.

23       **MR. CEBALLOS:**  25 feet.

24       **THE COURT:**  Okay.

25       **MR. CEBALLOS:**  Yes.

**LUTZ - CROSS / CEBALLOS**

1  BY MR. CEBALLOS:

2  Q.    When Mr. Kleinman was asking you about these officers, he

3  used the word "they" a lot.  I want to actually break it down

4  in terms of which officer did which.

5         You indicated one officer approached you; is that correct?

6  A.    Yes.

7  Q.    All right.  Do you remember anything about this officer?

8  Male?  Female?

9  A.    Male.

10 Q.    Okay.  Race?  Black?  White?  Hispanic?  Asian?

11 A.    I think he was tan.

12 Q.    I'm sorry?

13 A.    He was tan.

14 Q.    Tan.  Okay.

15        That is not a race but...

16 A.    I don't really --

17 Q.    All right.

18 A.    What race am I?

19 Q.    What about height?

20 A.    I don't recall.

21 Q.    Tall, short?

22 A.    I don't recall.

23 Q.    All right.  Heavy?  Thin?  Medium build?

24 A.    He was -- he was fit.

25 Q.    He was fit?

LUTZ - CROSS / CEBALLOS

```
 1   A.   Yeah.

 2   Q.   Okay.  What was he wearing?

 3   A.   A vest.

 4   Q.   What kind of vest?

 5   A.   Looked like a tactical vest.

 6   Q.   Tactical vest.  What color?

 7   A.   Green.

 8   Q.   Green?  Okay.

 9        Anything else underneath the tactical vest?

10   A.   Yeah.  I think -- I said, I mentioned a T shirt.

11   Q.   What color T shirt?

12   A.   I can't recall.

13   Q.   Okay.  What about pants?

14   A.   Can't recall.

15   Q.   The vest, did it have any sort of insignia on it?

16   A.   I can't recall.

17   Q.   What about cap, a hat of some sort?  A baseball cap?

18   Cowboy hat?

19   A.   No hat.

20   Q.   None?  Is that -- you have to answer out loud for the

21   court reporter.

22   A.   No hat.

23   Q.   Okay.  And what was the first thing about this individual,

24   this -- we'll call him "officer" for lack of a better word.

25        What was the first thing that he said to you?
```

**LUTZ - CROSS / CEBALLOS**

1    **A.**    He asked me for my license.

2    **Q.**    Okay.  And did you provide him your license?

3    **A.**    Yes.

4    **Q.**    Okay.  And then after that, what happened?

5    **A.**    He asked me if there was marijuana in the car.

6    **Q.**    Okay.  And you responded yes?

7    **A.**    Correct.

8    **Q.**    And then what happened?

9    **A.**    He said, "Show me the marijuana."

10    **Q.**    Okay.  And did he ask you to exit the vehicle?

11    **A.**    Yes.

12    **Q.**    And did you?

13    **A.**    Yes.

14    **Q.**    And when you exited the vehicle, did he search you at all?

15    **A.**    No.

16    **Q.**    Okay.  Did you then -- where did you go after you exited

17    your vehicle?

18    **A.**    To the back of the vehicle.

19    **Q.**    All right.  Is that where you told him you had the

20    marijuana?

21    **A.**    No.  He asked me if I had marijuana while I was seated in

22    my driver seat.

23    **Q.**    Okay.  Now, so far we've been talking about this

24    Officer 1.  You said there was a second officer.

25    **A.**    Yes.

**LUTZ - CROSS / CEBALLOS**

1  **Q.**  Okay.  Where was that officer?  We'll call him Officer 2.

2  **A.**  He was behind the car.

3  **Q.**  Behind whose car?

4  **A.**  My car.

5  **Q.**  Behind your car?

6  **A.**  Yes.

7  **Q.**  Okay.  Let's describe that person.  Male?  Female?

8  **A.**  Male.

9  **Q.**  Okay.  Race?

10  **A.**  I don't recall.

11  **Q.**  How about height?

12  **A.**  I don't recall.

13  **Q.**  Heavy?  Thin?

14  **A.**  I don't recall.

15  **Q.**  Describe what he was wearing.

16  **A.**  Something similar.

17  **Q.**  Something similar like -- like what?

18  **A.**  Tactical visit.

19  **Q.**  Okay.  Similar green vest?

20  **A.**  Yes.

21  **Q.**  Any insignia on that vest?

22  **A.**  I don't -- I don't know.

23  **Q.**  What about his shirt?

24  **A.**  Yeah.  I don't think he was bare-chested.

25  **Q.**  Okay.  So you think he had some type of shirt or T shirt

**LUTZ - CROSS / CEBALLOS**

1  underneath?

2  **A.**   He was not wearing a tuxedo.

3  **Q.**   Okay.  Do you remember the color?

4  **A.**   No.

5  **Q.**   What about pants?

6  **A.**   He was wearing pants.

7  **Q.**   All right.  Do you recall what color they were?

8  **A.**   No.

9  **Q.**   Do you recall if they were slacks, dress pants, jeans,

10 corduroy, anything about them?

11 **A.**   I don't recall.

12 **Q.**   Okay.  What about a hat?  Was he wearing any type of hat?

13 **A.**   I don't recall.

14 **Q.**   All right.  And as you exited the vehicle, what happened

15 then?

16 **A.**   I opened the trunk and I showed them the cannabis.

17 **Q.**   Okay.  Is the first officer still speaking to you?

18 **A.**   Yes.

19 **Q.**   Okay.  What is he saying to you?

20 **A.**   I mean, he -- he's not really saying much.  He was -- he

21 asked me to -- he asked me to show him the cannabis and I'm

22 taking cannabis out of the car.

23 **Q.**   Okay.  And at what point did the CHP vehicle arrive?

24 **A.**   While I was taking the cannabis out of the car.

25 **Q.**   Okay.  So shortly thereafter?

**LUTZ - CROSS / CEBALLOS**

1    A.    Yes.

2    Q.    Okay.  So how much time had elapsed from the time you

3    pulled over to the time you got out of your vehicle and walked

4    to the back of your vehicle?

5    A.    Not much time.  Five minutes.

6    Q.    Five minutes?

7    A.    Yeah.

8    Q.    Okay.  Well, you opened the back of the vehicle.  Tell us

9    what happens then.

10   A.    I proceed to take the cannabis out of the bag.

11   Q.    Okay.  Was it in a box or how was it contained?

12   A.    It was in a duffel bag.

13   Q.    A duffel bag?

14   A.    Yeah.

15   Q.    What kind of duffel bag?

16   A.    A large duffel bag.

17   Q.    What color?

18   A.    Maybe black, maybe blue.  I don't know.  I don't recall.

19   Q.    Okay.  And was all the marijuana contained in one bag?

20   A.    I believe so.

21   Q.    And you mentioned something about the hashish?

22   A.    Yes.

23   Q.    Where was that?

24   A.    It was in mason jars inside of mason jar crates next to

25   the duffel bag, the cannabis flower.

1    **Q.**    And this is all in the back of the vehicle?

2    **A.**    Yes.

3    **Q.**    And what kind of vehicle was it again?

4    **A.**    It's a GLC 300.

5    **Q.**    All right.  So this is kind of like a hatchback?

6    **A.**    Yes.

7    **Q.**    All right.  So you open the vehicle.  Do you open the bag

8    that has marijuana or does the officer do that?

9    **A.**    I opened the bag.

10   **Q.**    All right.  And after you opened the bag, what happens

11   then?

12   **A.**    I take the cannabis out of the bag, put the cannabis on

13   the floor.  And then I was kind of given that choice.

14   **Q.**    When the officer, Officer 1, first approached you while

15   you were still seated in your car, is that when he identified

16   himself as ATF?

17   **A.**    I think he identified himself as ATF at the back of the

18   car.

19   **Q.**    At the back of the car?

20   **A.**    Yes.

21   **Q.**    And it was Officer 1 that said that?

22   **A.**    Yes.

23   **Q.**    Okay.  So you now have opened the bag, removed the

24   marijuana.  What happens then?

25   **A.**    I was given that choice.

1    Q.    So as soon as you open the bag and show the marijuana,

2    Officer 1 gave you that choice?

3    A.    No.  I think -- I think I -- he asked for -- I think I

4    asked him for the inventory list at that time or after.  I'm

5    not sure.

6    Q.    You asked him for an inventory list?

7    A.    No.  I think, first, he gave me the choice.  I asked him

8    for the inventory list.  He asked me if I want to make a

9    federal case out of it.  I said no.

10    Q.    And this is Officer 1 that's speaking to you?

11    A.    Correct.

12    Q.    All right.  So pretty quickly you said, "No, I don't want

13    to make a federal case out of it.  You can take it"?

14    A.    Yeah.

15    Q.    Is it the CHP vehicle still there?

16    A.    No.

17    Q.    How long was the CHP vehicle there?

18    A.    Briefly.  Very brief.

19    Q.    Give us a time estimate.  Are we talking seconds?

20    Minutes?

21    A.    Two minutes.

22    Q.    Two minutes?

23    A.    Yeah.

24    Q.    Okay.  And you're sure they never got out of the vehicle?

25    A.    Yes.

LUTZ - CROSS / CEBALLOS

1   Q.   You never saw one of those officers leave and walk back

2   and speak with these CHP officers?

3   A.   I did.

4   Q.   You did?

5   A.   Yeah.

6   Q.   All right.  So when did that happen?

7   A.   Officer 2.

8   Q.   Officer 2 did that?

9   A.   Yeah.

10  Q.   Okay.  And could you overhear what they were talking

11  about?

12  A.   No.

13  Q.   How far were they from you?

14  A.   To the end of that table.

15  Q.   Okay.  Officer 1 stayed with you?

16  A.   Yes.

17  Q.   Okay.  How long did Officer 1 stay with you?

18  A.   I don't know.

19  Q.   Well --

20  A.   This is 2017.  We're here in 2025.

21  Q.   Right.  Would it be fair to say that --

22  A.   If you're asking me, minutes.

23  Q.   I know.

24       Would it be fair to say that you're having some difficulty

25  remembering what happened back in 2017?

1  A.    Yes.  Specifics, like colors of pants, exact timing.

2  Q.    Okay.

3  A.    But I was there.

4  Q.    Sure.

5      You -- but you were interviewed by the FBI three years

6  after the fact; right?

7  A.    Yes.

8  Q.    Okay.  And you were again interviewed back by the FBI on

9  June 27 of this year, 2025; correct?  Not too long ago?

10  A.    Yes.

11  Q.    Okay.  And you even told the FBI when you were interviewed

12  that you just -- you didn't recall the exact time of the stop?

13  A.    Yes.  That's why I have Google timeline.

14  Q.    All right.  Did they -- when the FBI interviewed you on

15  June 27, was it in person or was it through video?

16  A.    Video.

17  Q.    And, in fact, the first time you interviewed with the FBI

18  back on July of 2020, that was through video as well?

19  A.    Correct.

20  Q.    When the FBI interviewed you in June of 2025, did they go

21  over the report that they had written about your interview in

22  July of 2020?

23  A.    We had gone over the report, yes.

24  Q.    Well, how did you go through the report if it was done

25  through video?

1   **A.**   There's something called screen share.

2   **Q.**   Okay.  So they actually showed you the report that they

3   wrote about your interview?

4   **A.**   I think I had a copy of it previously.  My lawyer had sent

5   it to me.

6   **Q.**   Okay.  So you had an opportunity prior to June 27 to

7   review the report?

8   **A.**   Yes.

9   **Q.**   Okay.  Did you find anything in the report that you --

10  well, let me ask you this:  Did you ask for a copy of that

11  report to see it?

12  **A.**   I think my lawyer had sent it to me.

13  **Q.**   Okay.

14  **A.**   Prior.

15  **Q.**   Did you ask your lawyer, "Hey, I don't remember what

16  happened.  Can you get a copy of the report?"

17  **A.**   No.

18  **Q.**   All right.  But your lawyer obtained it from the FBI, and

19  your lawyer provided it to you?

20  **A.**   Yes.

21  **Q.**   And you read it?

22  **A.**   Yes.

23  **Q.**   And did it help refresh your recollection of what

24  occurred?

25  **A.**   Yes.

**LUTZ - CROSS / CEBALLOS**

1  Q.   Although you still have some difficulty recalling details?

2  A.   Yes.

3  Q.   Like the exact time, other than using Google; is that

4  correct?

5  A.   Yes.

6  Q.   At either interview, whether it be the July 2020 or the

7  June 2025, did the FBI show you any photos of individuals and

8  ask you to identify or see if you could identify anyone?

9  A.   In the first interview, they did show me pictures.

10 Q.   Of individuals?

11 A.   Correct.

12 Q.   How many did they show you?

13 A.   How many pictures?

14 Q.   Yeah.

15 A.   I don't recall.

16 Q.   Do you know if it was three?  Four?  Five?  Six?

17 A.   I don't recall.

18 Q.   Do you recall if they showed you these photographs one at

19 a time?

20 A.   I don't recall.

21 Q.   Do you recall if they admonished you in any way prior to

22 showing the photographs?

23 A.   Please repeat the question.

24 Q.   Did they admonish you?  Did they basically say something,

25 "We're going to show you photos of people who may have been

LUTZ - CROSS / CEBALLOS

1   involved in this"?

2   **A.**   I don't recall.

3   **Q.**   Okay.  Well, were you able to identify anyone?

4   **A.**   I identified one person.

5   **Q.**   Okay.  Who did you identify?

6   **A.**   The person that was speaking to me, Officer 1.

7   **Q.**   Okay.  And did they ever tell you who that officer was?

8   **A.**   I don't recall.

9   **Q.**   Okay.  And this is the one that you said was, I think, to

10  use your words, "tan"?

11  **A.**   Yes.

12  **Q.**   Is that another way of saying darker skin?

13  **A.**   Yeah.

14  **Q.**   Okay.  And that's the one that identified himself as ATF?

15  **A.**   Yes.

16          **MR. CEBALLOS:**  Thank you.  I have nothing further.

17          **THE COURT:**  Okay.  Any redirect?

18          **MR. KLEINMAN:**  No, Your Honor.  Thank you.

19          **THE COURT:**  All right.  Then thank you, Mr. Lutz.

20  You're excused at this time.

21          **THE WITNESS:**  I appreciate it.

22          **THE COURT:**  Okay.

23                          (Witness excused.)

24                  (End excerpt - time noted 3:04 p.m.)

25                          ---o0o---

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Tuesday, July 8, 2025

_____
    Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
         Official Reporter, U.S. District Court