**EXHIBIT C**

**A.** He still said, no, it wasn't happening.

**Q.** And ultimately, did you even ever receive any approval from any of the federal agencies like DEA or FBI or ATF to resume any sort of interdiction efforts?

**A.** No.

**Q.** These were just kind of discussions going on?

**A.** Hopes and discussions, yep.

**Q.** Was there any kind of memorandum or written document saying the federal government had given you authority to do interdiction work?

**A.** No, there wasn't.

**Q.** How did Mr. Huffaker react to Chief Masterson's consistent denials of your requests to get interdiction back up and running?

**A.** Disappointed, and, you know, pissed off.  We were both pissed off.  We loved to go out there and do interdiction.  And it was -- a couple of times he said it was the best time in his career and then it was just taken away.

**Q.** Now, drawing your attention to November and December of 2017.  Around this time, did you and Mr. Huffaker have discussions about going out on the road and pulling over drivers?

**A.** We did, yes, sir.

**Q.** What was the nature of those discussions?

**A.** We discussed going out and doing, basically, illegal

interdiction, or doing interdiction and not telling the department.

Q.   And what was the initial tone of these conversations?

A.   Kind of joking around, you know, having drinks or just hanging out and kind of spitballing ideas and just kind of joking around about it.

Q.   And then at some point did the tone of the conversation shift?

A.   Yeah.  The more we talked about it, the more realistic or comfortable it got and then just kind of put it into play.

Q.   Did you talk about what you would do with the marijuana that you seized during this illegal interdiction?

A.   Yes, sir, we did.

Q.   And what did you and Mr. Huffaker say about that?

A.   That I would give it to Billy Timmins and he would sell it.  And Billy would get 50 percent and Joe and I would split 50 percent and -- he would get 25.  I would get 25 percent.

Q.   And was the -- the way you would dispose of the marijuana and make money from it, was that like you discussed one time in passing or was it discussed multiple times?

A.   Multiple times.

Q.   Now, once these discussions got more serious, did Mr. Huffaker say why he wanted to do this?

A.   Yeah.

Q.   What did he say?

**A.** I did, yes, sir.

**Q.** Who called you?

**A.** One of the major crimes, I think it was a sergeant at the time. I don't remember his name, but somebody from the major crimes sheriff's office in Mendocino.

**Q.** What was the nature of that discussion?

**A.** There was as a complaint from a driver that was stopped on the 18th, and he was trying to identify who the officers were. He talked to all of his deputies, nobody was responsible for the stop. He talked to CHP and CHP remembered seeing Joe and I up there, so he was calling to see if I remembered if that was the stop.

**Q.** And what did you say?

**A.** That it was us, yeah. I took responsibility for the complaint.

**Q.** And after receiving this call, what did you do next?

**A.** I went to the department and booked in some marijuana, some different marijuana, two boxes of different marijuana.

**Q.** Did you get a case number?

**A.** I did.

**Q.** Just kind of describe that process a little bit.

**A.** Called dispatch, got a case number for booking in the marijuana so you'd be able to identify it. Got two boxes, put some marijuana -- marijuana in it, put the stickers on it and sealed them up with tape and put them in evidence.

**MR. FINE:**  Ms. Hernandez, could you please put on the screen what's already been admitted as Exhibit 14, and if we could show that to the jury.

**BY MR. FINE:**

**Q.**   Do you recognize this document, Mr. Tatum?

**A.**   I do.

**Q.**   So in the top left corner, do you see a case number?

**A.**   Yes.

**Q.**   And is that the case number you received when you wanted to book in this property?

**A.**   It is.

**Q.**   And then below that, under "collected date," what does it say?

**A.**   12/18/2017.

**Q.**   And then "collected by," it says "Joe Huffaker"; right?

**A.**   Correct.

**Q.**   Why does it say "Joe Huffaker" there?

**A.**   So there's the collector and the booker.  Sometimes they're both.  So sometimes the collector is the same person. Sometimes when you're searching something, there's somebody that finds it and there's somebody that books it in.  So Joe was the collector, and I was the person booking it in.

**Q.**   When you made the traffic stop the day before on December 18th, where did you say the marijuana was in the car?

**A.**   In the rear passenger cargo area.

Q.   And was Officer Huffaker technically the one who found and recovered the marijuana?

A.   Yes.

Q.   And is that why you listed him here?

A.   Correct.

Q.   And then going down, the first line, it says "12/19" -- I'm reading from right about here -- "12/19/2017 at about 3:31 p.m." and it says "logged-in user."  It has your name?

A.   It does, yes, sir.

Q.   Does that mean you were the one who actually booked in the marijuana?

A.   Yes.

        MR. FINE:  Ms. Hernandez, if you could put on the screen what's already been admitted as Exhibit 195 and go to page 6.  And if we're able to clear my doodles from the screen, that would be great.  Thank you.

BY MR. FINE:

Q.   Mr. Tatum, prior to today, have you reviewed this picture?

A.   I have, yes, sir.

Q.   What does it depict?

A.   This depicts the marijuana that I booked in under this case number that day.

Q.   And was the marijuana that you booked into evidence different than what you had taken from the white Mercedes?

A.   Yes.

Q.   Why did you book in different marijuana?

A.   I didn't have the marijuana to book in.  I had already given it to Billy.  It was already gone, so I needed any marijuana to book in under a case, under this case to cover our story.

Q.   And how did the quality of this marijuana that you booked in compare to the quality of the marijuana you had seized the day before?

A.   The quality that we stole the day before was better than this marijuana and worth more.

MR. FINE:  Ms. Hernandez, if we could put back on the screen Exhibit 169 and go to page 545 of that exhibit.

And 169 is already in evidence.

BY MR. FINE:

Q.   And I'm directing -- or, Mr. Tatum, I'd like to direct your attention to a call at 2:43 p.m. on December 19.

MR. FINE:  And Ms. -- perfect.  Thank you, Ms. Hernandez.

So I'm going right about here.

BY MR. FINE:

Q.   Is that about the time you received the call from the person in the Mendocino County Sheriff's Office?

A.   Yes, sir.

Q.   And for the destination location of that call, do you see Ukiah, California?

**BY MR. FINE:**

**Q.** Now, Mr. Tatum, let's fast-forward about two months to February of 2018.

I'd like to draw your attention to on or about February 13 of 2018 at approximately 9:28 a.m.

Around that time, did you receive a phone call from Tom Allman?

**A.** Yes, I did.

**Q.** Who is Tom Allman?

**A.** He was the Mendocino County sheriff during that time.

**Q.** What was the nature of your conversation with him?

**A.** He called me for a favor. He was getting a lot of media press and was pissed off because his department was getting blamed for our traffic stop, for Rohnert Park's traffic stop. Excuse me.

And it was an election year. He said that he wanted to get re-elected, and he asked me to do a press release on the traffic stop that he was getting blamed for.

**Q.** And this traffic stop, this is the traffic stop related to the call you had received from Mendocino County two months earlier; is that right?

**A.** It is.

**Q.** And that was the stop where CHP pulled up?

**A.** Correct.

**Q.** And then you got a call the next day from Mendocino

County; is that right?

A.    It is.

        MR. FINE:  Ms. Hernandez, if we could please put on the screen again Exhibit 169, which is already in evidence.

    And we could go to page 565 whenever it's up.  And if we could zoom in on a phone call on February 13 at 9:28 a.m.

BY MR. FINE:

Q.    Looking at that, you see the destination location is Ukiah, California; is that right?

A.    Yes, sir.

Q.    And is that in Mendocino County?

A.    It is.

Q.    Now, what is the next call just a few minutes later at 9:45 a.m.?  Who did you call there?

A.    I called Joe.

Q.    And how long did that phone call last?

A.    18 minutes.

Q.    What did you and Mr. Huffaker discuss during this 18-minute phone call?

A.    I told him that the sheriff called me, that he was pissed, that -- basically reiterated what the sheriff had told me, that he wanted a press release regarding the traffic stop, and that I needed his help to remember the event from the traffic stop to put out in the press release.

Q.    What was Mr. Huffaker's reaction to hearing that this stop

from two months earlier had resurfaced?

**A.**   Not -- not happy.  Yeah.  Again, we were both scared and thought that we'd got away with this, but here we are, two months later, having to deal with it again to try to cover up what we did.

**Q.**   What happened after you and Mr. Huffaker had this 18-minute phone call?

**A.**   I drove down to his house and called our commander.  Told him about the conversation I had with the sheriff.  Told him that the sheriff wanted a press release.

Commander Taylor said:  Okay.  I authorize you to send one out.

And Joe and I proceeded to draft and remember the facts from the traffic stop to put out in the press release.

**Q.**   So let's break that down a little bit.  You said after you and Huffaker talked for 18 minutes, you went to his house; is that right?

**A.**   I did.

**Q.**   And then you called Commander Taylor?

**A.**   Correct.

**Q.**   Was Mr. Huffaker there with you when you called Commander Taylor?

**A.**   He was.

**Q.**   And you said this was at Mr. Huffaker's house?

**A.**   Yes.

**Q.**   And after the phone call, what did you and Mr. Huffaker do?

**A.**   We started to talk about what we remembered from the stop, the details about the car, the driver, and what we remembered.

**Q.**   Were you -- was someone typing something while you guys were having this discussion?

**A.**   Yes.  Mr. Huffaker used his wife's computer and was typing while we were talking about it, talking about what to put out in the press release.

        **MR. FINE:**  Ms. Hernandez, if you could show the witness what's been marked as Exhibit 157, which is not in evidence.

        **THE COURT:**  Now, I'm assuming the new position of that screen is not visible to the jury, but I just want to confirm.

    Can any of the jurors see the screen where it is now that it is on the little table next to Mr. Fine?

    No?  Okay.  Thank you.

**BY MR. FINE:**

**Q.**   Mr. Tatum, do you recognize this exhibit?

**A.**   Yes, sir, I do.

**Q.**   And this exhibit, again, has two e-mails; right?  There's a bottom e-mail and then a top e-mail?

**A.**   Correct.

**Q.**   Let's start with the bottom e-mail, what is that?

**A.**   That is Joe's wife Tristin Huffaker sent me a document on

February 13, 2018.

Q.   To your Gmail; is that right?

A.   Yes, to my e-mail.

Q.   And then the second e-mail on the top, it looks like you're forwarding that e-mail; is that right?

A.   Yes.  I forwarded it from my personal Gmail account to my Rohnert Park police e-mail account.

Q.   And it says there was a set of attachments or one attachments to this set of e-mails?

A.   Yes.

      MR. FINE:  Ms. Hernandez, if we could go to the second page.

BY MR. FINE:

Q.   Is this the document that was attached to the e-mails?

A.   It was, yes, sir.

Q.   And what is this document?

A.   This is one of the drafts that Joe and I completed talking about the stop that we did, out- -- outlining some of the facts for the press release.

Q.   Mr. Tatum, before testifying here today, have you reviewed this exhibit?

A.   I have.

Q.   And is it a fair and accurate copy of the e-mail that you received and the draft press release that you and Mr. Huffaker drafted?

A.   Yes, sir, it is.

MR. FINE:  Your Honor, we move to admit Exhibit 157.

THE COURT:  Is there an objection?

MR. CEBALLOS:  No, Your Honor.

THE COURT:  157 is admitted.

(Trial Exhibit 157 received in evidence.)

MR. FINE:  And if we could publish to the jury the first page.

BY MR. FINE:

Q.   And, again, Mr. Tatum, the bottom e-mail is from Tristin Huffaker's Gmail account; right?

A.   Yes.

Q.   And that's because you and Mr. Huffaker were using his wife's computer to draft this; is that right?

A.   Yes, sir.

Q.   And then the top e-mail is you forwarding from your personal e-mail to your Rohnert Park e-mail?

A.   It is.

Q.   And is that so you could later issue the press release?

A.   Yes.

MR. FINE:  And, Ms. Hernandez, if we could please go to the second page.

BY MR. FINE:

Q.   Mr. Tatum, can you just take a minute to review this document.

**A.**    (Witness examines document.)

Okay.

**Q.**    And if you could read the first sentence.

**A.**    (As read):

"During the month of December 2017, members of the Rohnert Park Department of Public Safety conducted a traffic enforcement stop on a white SUV vehicle in the area of the Sonoma/Mendocino County line."

**Q.**    Now, it says "white SUV."  When you and Mr. Huffaker wrote this draft press release, which traffic stop did you have in mind?

**A.**    The white Mercedes that we had stopped.

**Q.**    And that's the one we were discussing earlier where the driver had two different types of marijuana; is that right?

**A.**    Yes, sir.

**Q.**    And if you could -- looking at the second paragraph, could you read the second sentence starting with "Throughout."

**A.**    Yes.  (As read):

"Throughout the cargo and seating area of the SUV, the officers noticed several large cardboard boxes that were partially being covered by a blanket."

**Q.**    Mr. Tatum, when you stopped the white Mercedes, do you recall the marijuana being in the back of the car under a

blanket?

**A.**    I do, yes, sir.

**Q.**    Now, looking at the third paragraph, the first sentence, can you read that?

**A.**    Yes. (As read):

"During the officer's investigation, it was determined that the driver was transporting -- transporting a large amount of processed cannabis bud along with concentrated cannabis outside of the state and federal guidelines for possessing and transporting cannabis."

**Q.**    And why did you and Mr. Huffaker put that sentence in there?

**A.**    To help justify why we -- well, we were trying to make it look like we seized, but why we stole the bud marijuana, because it was outside the guidelines.

**Q.**    And, again, some of the facts there about both the processed bud and the concentrated cannabis, that's consistent with the stop you and Mr. Huffaker did on the white Mercedes?

**A.**    Yes, sir.

**Q.**    Mr. Tatum, can you read the last paragraph here, starting with "During the time."

**A.**    Yes.  (As read):

"During the time of this routine traffic stop, no other agencies, including the Mendocino County

Sheriff's Office or Hopland Tribal Police, were involved or assisted with the investigation."

Q.   Why did you and Mr. Huffaker add this last paragraph?

A.   To satisfy the sheriff's request that nobody in Mendocino was involved.  His office wasn't involved.  He wanted to make it clear that Rohnert Park was fully responsible for the traffic stop.

Q.   Now, did this draft press release that you and Mr. Huffaker drafted, did it mention that you had extorted marijuana from the driver of the white Mercedes?

A.   No, sir.

Q.   Did the press release indicate that you had identified yourselves as ATF agents?

A.   No, it did not.

Q.   Mr. Tatum, did you issue the press release later that day?

A.   I did.

Q.   And that was on February 13 of 2018; is that right?

A.   Approximately, yes.

        MR. FINE:   And I think we can take this down.  Thank you, Ms. Hernandez.

BY MR. FINE:

Q.   Mr. Tatum, the next day, did you -- the next day after you issued this press release, did you receive a call from an FBI agent?

A.   I did.

**Q.** What did the FBI agent say to you?

**A.** He wanted the police report regarding the traffic stop Joe and I did because the driver was complaining to the FBI as well as the sheriff's office in Mendocino County.

**Q.** Can you describe the conversation a little more? What else was discussed?

**A.** He requested a case number and the case because he wanted to follow up and possibly file charges against this driver and wanted documentation to do so.

**Q.** And at that point, did you and Mr. Huffaker know the name of the person who you had stopped in the white Mercedes?

**A.** No, we had no idea.

**Q.** And so did the FBI agent provide you with any information in that regard?

**A.** He did.

**Q.** What did he provide you with?

**A.** He provided the name, date of birth, all the information about the driver, which turned out to be a different traffic stop, not the white Mercedes stop.

**Q.** Did he provide you the name Ezekial Flatten?

**A.** Yes, he did.

**Q.** And did he provide you with a date of December 5 of 2017?

**A.** He did.

**Q.** Now, you said he also asked you for a police report; is that right?

**A.** He did.

**Q.** Did a police report exist at that point?

**A.** No, it did not.

**Q.** Why not?

**A.** We stole the marijuana.  We weren't intending to prosecute this guy or retain any information about the driver.  We didn't want to get caught or in trouble, so we just -- it wasn't a legitimate stop.  We were breaking the law.

**Q.** Now, the next day, did you call Mr. Huffaker?

**A.** I did.

**Q.** What did you tell him?

**A.** Reiterated what the FBI guy told me, that he gave me the name.  Because Joe and I both talked about we don't even remember who this guy was.  So he gave -- told Joe that he gave me the name and all the information about the guy.  Gave me the date, and Joe and I thought that that traffic stop was also on the 5th, so we just went with that date based upon what the FBI guy -- the date that the FBI guy gave us.

**Q.** So you told Mr. Huffaker specifically that you had received a call from the FBI; is that right?

**A.** Yes, I did.

**Q.** What was Mr. Huffaker's reaction to hearing that the FBI had called you?

**A.** Worried.  Same thing, we were both worried that this was not going away and it wasn't looking good.

MR. FINE: Ms. Hernandez, could you please put back on the screen Exhibit 169, which is already in evidence. And go to page 565 of the document. Sorry. Maybe 566, the next day.

And if we could zoom in on February 15.

BY MR. FINE:

Q. So starting at 4:57 p.m. on February 15, do you see a call there?

A. I do.

Q. And it looks like there was a voice mail; is that right?

A. Yes.

Q. And then it looks like Mr. Huffaker called you back the next call?

A. Yes; correct.

Q. And how long was that call?

A. 15 minutes.

Q. 15 minutes.

And what did you discuss on that call?

Sorry. I should give you more context. This is February 15. This is what -- this is the day after you received the call from the FBI agent; is that right?

A. Yes. Discussed what to write about and how we needed to document what happened.

MR. FINE: Your Honor, at this time the Government would move to admit Exhibit 180, which is a stipulated exhibit.

THE COURT: 180 is admitted.

(Trial Exhibit 180 received in evidence.)

**BY MR. FINE:**

Q.   Now, this -- who is this e-mail from?

A.   Joe Huffaker.

Q.   And what's the date and time?

A.   February 15, 2018, at 5:41 p.m.

Q.   So this is just about an hour after you had spoken on the phone; right?

A.   Correct.

Q.   And the e-mail is sent to who?

A.   To me.

Q.   To your personal e-mail; right?

A.   Yes, sir.

Q.   And what's the subject line of the e-mail?

A.   It says "Review."

Q.   And what is it?  What's the body of this e-mail?

A.   These are some of the facts that Joe and I talked about on the phone that were documented in a document about the traffic stop on the 5th, which really occurred on the 18th.

Q.   So let's talk about that.  It's got the date of December 5 right here.

A.   Yes.

Q.   And then it's got the name of Ezekial Flatten right here; is that right?

A.   Yes, sir.

Q.   And at the time you and Mr. Huffaker were drafting this police report, did you believe Ezekial Flatten was the person that you had stopped in the white Mercedes?

A.   Yes.

Q.   And, again, why did you think that?

A.   We never retained the driver's info.  And when the FBI agent called me, this is the name and information he gave me about the driver that was complaining on the 5th.

Q.   And same with the December 5 date, is that the date that the FBI agent gave you?

A.   Correct.

Q.   At some point a few months later, did you determine that you and Mr. Huffaker did not, in fact, stop Zeke Flatten on the 5th?

A.   We did, yes.

Q.   How did you determine that?

A.   Based upon a couple of news articles that came out about Mr. Flatten talking about the stop and the interaction with the officers.  And the way they were dressed, the conversation, we both were like, we never stopped this guy.  Nothing was -- there was nothing about the stop that we recognized about what Mr. Flatten was saying happened.

Q.   Did you actually later determine that the stop of the white Mercedes had been a different person and had occurred on December 18?

**A.**   Yes.

**Q.**   Now, this document on the screen, this draft e-mail, this wasn't the final version of the police report you ultimately submitted; is that right?

**A.**   No, it was not.

**Q.**   Before you finalized, were some more details added to the police report?

**A.**   Yes.

**Q.**   And did you and Mr. Huffaker meet up in person to discuss adding those details?

**A.**   We did.

**Q.**   Can you describe that?

**A.**   We met at the police department, went over this document and some final documents, some final facts, and then ultimately submitted the final document into the I/LEADS computer system.

         **MR. FINE:**   Ms. Hernandez, could you please put on the screen Exhibit 194, which is already in evidence.

**BY MR. FINE:**

**Q.**   Is this the final police report that you and Mr. Huffaker submitted?

**A.**   Yes.

         **MR. FINE:**   And, Ms. Hernandez, if we could go to page 4 of the document.

**BY MR. FINE:**

**Q.**   Now, Mr. Tatum, right here it says nar- -- oops.

"Narratives"; is that right?

A.   Yes, it does.

Q.   What is the narratives portion of a police report?

A.   The interaction, the words that were used to describe the traffic stop.

           MR. FINE:   And my apologies, Ms. Hernandez.   Could we go one page back, actually.   And I can --

BY MR. FINE:

Q.   Now, again, as we've discussed, it says the date of December 5; right?

A.   Yes, it does.

Q.   But that wasn't the right date?

A.   No, it was not.

Q.   And similarly, on the third paragraph it says Ezekial Flatten; right?

A.   Yes.   Also incorrect.

Q.   Looking at that third paragraph, can you read the first sentence?

A.   Yes.   (As read):

           "I asked Mr. Flatten where he was headed"

Q.   Sorry.   I -- no, I said the wrong thing.   I meant the -- can you read the first sentence, is what I meant, of the third paragraph.

A.   (As read):

           "Officer Huffaker and I exited our marked patrol

vehicles and contacted the driver and sole occupant of the vehicle," comma, "Ezekial Flatten, DOB 10/5/72."

Q.   Now, were you and Mr. Huffaker driving a marked police vehicle when you stopped the white Mercedes?

A.   No, we weren't.

Q.   And did you and Mr. Huffaker discuss adding that portion to the police report?

A.   We did.

Q.   And why did you add that portion?

A.   To make it look more authentic and that the driver should have known who we were and trying to discredit why he was complaining.

Q.   Can you read the next sentence, the -- I'll be more precise.  The second sentence of the third paragraph starting with "Officer Huffaker and I."

A.   Yes.  (As read):

        "Officer Huffaker and I identified ourselves as
        Rohnert Park DPS officers and advised him he was
        speeding."

Q.   Now, when you stopped the white Mercedes, did you identify yourselves as Rohnert Park police officers?

A.   No.  That was a lie.

Q.   Can you read the next sentence after that beginning with "Officer Huffaker and I were."

**A.**   Yes.  (As read):

"Officer Huffaker and I were dressed in full police uniform including names, badges, and ID numbers."

**Q.**   Was that true?

**A.**   That was a lie.

**Q.**   Now, moving down to the fourth paragraph, this one, can you read the second line that starts with "Throughout."

**A.**   Yes.  (As read):

"Throughout the cargo and seating area of the SUV, I noticed several large cardboard boxes that were partially being covered by a blanket."

**Q.**   And, again, that's referring to something that did happen on the December 18 stop; right?

**A.**   Correct.  Yes, sir.

**Q.**   Now, going to the bottom of the page, right here, can you read that paragraph?

**A.**   Yes.  (As read):

"During this time, a California highway patrol officer and his trainee arrived to assist us. Mr. Flatten said 'I'm glad they showed up.  I didn't think you guys were real cops.  I kept hearing about people getting ripped off.'"

End quote.

**Q.**   Now, during the stop of the white Mercedes, California

highway patrol did pull up; right?

**A.**   They did.

**Q.**   But the driver of the white Mercedes actually say this?

**A.**   Yes.

**Q.**   He said this exact quote or something like that?

**A.**   Yes.

   **MR. FINE:**   And if we could go to the next page.

**BY MR. FINE:**

**Q.**   This is the second page of the police report; is that right?

**A.**   Yes, it is.

**Q.**   Looking at the last paragraph, right here, can you read that?

**A.**   Yes.   (As read):

   "Case forwarded to the DA's office for filing a violation of 11357(c)(2) H&S, possession of more than 1 ounce of marijuana, against Mr. Flatten."

**Q.**   Now, did you actually forward this case to the DA's office?

**A.**   No, I did not.

**Q.**   So that part wasn't true either; right?

**A.**   That was a lie.

**Q.**   Now, did anywhere in this police report describe that you extorted marijuana from the driver of the white Mercedes?

**A.**   No, sir.

**Q.**   Did anywhere in this police report describe that you identified yourself as ATF agents?

**A.**   Could you repeat that?

**Q.**   Sure.  Did the police report, did this police report that you and Mr. Huffaker submitted, did it say that you identified yourself as ATF agents?

**A.**   I don't believe so, no.

**Q.**   And you said you and Huffaker reviewed the final version of this police report before it was submitted; is that right?

**A.**   Yes, we did.

**Q.**   After you finalized and submitted this police report, did you send it to the FBI agent?

**A.**   Yes, I e-mailed him the report.

        **MR. FINE:**  Ms. Hernandez, could you please put on the screen and just show the witness Exhibit 50 -- 154, which is not yet in evidence.

**BY MR. FINE:**

**Q.**   And, again, Mr. Tatum, this is a document that has two e-mails; is that right?  There's one on the bottom and one on the top?

**A.**   Yes, sir.

**Q.**   Let's start with the e-mail on the bottom.  Who was that from?

**A.**   It's from me.

**Q.**   To whom?

**A.**    To Agent Heinrich at the FBI.

**Q.**    And what's the date?

**A.**    February 20, 2018.

**Q.**    And then what is the top e-mail?

**A.**    The top e-mail is from me to Joe Huffaker's e-mail, personal e-mail.

**Q.**    And what's the date on that?

**A.**    March 15, 2018.

**Q.**    And it looks like there are two attachments; is that right?  If you look --

**A.**    Yes.  That's correct.

**Q.**    And are the attachments the police report and the press release?

**A.**    Correct.

**Q.**    Mr. Tatum, before testifying here today, have you reviewed this exhibit?

**A.**    I have.

**Q.**    Is it a fair and accurate copy of the e-mail that you sent to Jeremy Heinrich at the FBI that's the bottom e-mail?

**A.**    Yes, sir.

**Q.**    And is the top a fair and accurate copy of the e-mail that you forwarded to Mr. Huffaker?

**A.**    It is.

        **MR. FINE:**  Your Honor, the Government would move to admit Exhibit 124.

THE COURT:  Is there an objection?

MR. CEBALLOS:  No, Your Honor.

THE COURT:  154 is admitted.

(Trial Exhibit 154 received in evidence.)

BY MR. FINE:

Q.  And so, Mr. Tatum, just showing the jury again.  The bottom e-mail is what?

A.  The bottom e-mail is the final report that I sent to the FBI agent letting him know that he received it or that I sent it.

Q.  And could you just read the e-mail.

A.  Yes.  (As read):

"Morning, brother.  Attached are the two docs we have on this guy.  If you need anything else, hit me back.  Thanks again.  Be safe out there, man, Jacy."

Q.  Why do you call him brother?

A.  Just a police term, a brotherhood of police officers.

Q.  And Jeremy Heinrich is the same FBI agent who had called you a few days earlier; is that correct?

A.  Correct, yes, sir.

Q.  And the top e-mail looks like you had forwarded this to Mr. Huffaker; is that right?

A.  Yes, sir.

Q.  Why did you forward it to him almost a month later?

A.  I don't remember.

**Q.** Was that around the time of your IA testimony?

**A.** Yes, it was.

**Q.** Does that help you recall why you were forwarding this to Mr. Huffaker at that time?

**A.** Yes. We were preparing to give our statements for the internal investigation.

**MR. FINE:** And then, Ms. Hernandez, if you could just go to the next page of the document.

**BY MR. FINE:**

**Q.** And, again, this is the police report we were discussing earlier?

**A.** Yes, sir.

**Q.** And it was attached to the e-mail; is that right -- that you sent to the FBI?

**A.** Correct.

**MR. FINE:** And then, Ms. Hernandez, if we could just go to the second-to-last page of the document.

**BY MR. FINE:**

**Q.** This is the press release; is that right?

**A.** It is, yes, sir.

**Q.** And that was also attached to the e-mail you sent to the FBI?

**A.** It was, yes.

**Q.** Thank you.

**MR. FINE:** Ms. Hernandez, I think we can take that

people."

Q.   In fact, you stated that it wasn't you that brought up the idea, that it was my client that brought up the idea first; is that correct?

A.   Yes, sir.

Q.   Okay.  And when he brought up the idea for the first time, did you then say, "Hey, what a great idea.  Guess what?  I've been doing it for the past two years.  I'll show you how it's done"?

A.   No.

Q.   Well, when he brought up the idea, did you tell him, "I've been doing it for the past two years, buddy.  I just didn't want to tell you"?

A.   No, I did not.

Q.   Well, how did that come about?  When he brought it up, how did it come about?

A.   We had several conversations jokingly, having drinks, just joking around about it.

Q.   You were joking about ripping off people?

A.   Yeah.

Q.   Really?

A.   Yes, sir.

     We didn't joke about "ripping off people."  We didn't use that language.

Q.   That's what you were doing?

MR. CEBALLOS:  I believe so, but I can ask him again.

THE COURT:  Why don't you ask him again, just so we know where you're coming from here.

BY MR. CEBALLOS:

Q.   Mr. Tatum, did you state --

THE COURT:  No.

BY MR. CEBALLOS:

Q.   Did you --

THE COURT:  That's the whole point.

BY MR. CEBALLOS:

Q.   Did you write the press release yourself?

A.   No, I did not.

Q.   Okay.  In this document --

THE COURT:  All right.  So you think he said something that was different?

MR. CEBALLOS:  Yes.

THE COURT:  All right.  So you want to ask him in whatever the notes were he wrote for himself, or what have you, in preparation for this internal affairs investigation, did he say something?

MR. CEBALLOS:  Yes.

THE COURT:  All right.  Fine.

BY MR. CEBALLOS:

Q.   Did you state that you wrote the report, drafted the press release in this document?

**A.**   I did.

**Q.**   Okay.  And was that the truth?

**A.**   Partly.  I didn't say I was the only person, but I -- I drafted part of it, yes.

**Q.**   Well, you do state you were the only person; is that correct?

**MR. FINE:**  Objection, Your Honor.  That's not what it says.

**THE COURT:**  Now, you can't object.  He's saying is that what it says.  The witness is looking at the same statement you are.  If he hasn't correctly described his statement, the witness can say it's not correct.

**THE WITNESS:**  No, sir, it's not correct.

**BY MR. CEBALLOS:**

**Q.**   You did not mention my client in this statement, did you?

**A.**   I did not, no, sir.

**Q.**   All right.  Now, Mr. Tatum, how many times have you been interviewed by the FBI?  Best guess.

**A.**   We met on several occasions.  We weren't -- I wasn't really interviewed.  Several of those were just discussions, reviewing documents.

**Q.**   The plea agreement that you eventually signed with the Government was dated -- was dated December 1, 2021?

**A.**   Yes, sir, it was.

**Q.**   So it's fair to say that you met with him prior to signing

And then on February 20, 2018, they're finalizing it.  They need to finalize it because a report didn't exist.

There's the Sonoma/Mendocino county line.  There's reference to a newer white Mercedes SUV.  Again, this is the stop of Barron Lutz and they have confused the name Ezekial Flatten.

This report reads (as read):

        "Officer Huffaker and I exited out marked patrol
    vehicle" -- they likely mean our marked patrol
    vehicle -- "and contacted the driver and sole
    occupant of the vehicle."

They were not in a marked patrol vehicle.  That's untrue.  That's false and the defendant knew it.  (As read):

        "Officer Huffaker and I identified ourselves as
    Rohnert Park DPS officers and advised him he was
    speeding."

That's false.  No, they didn't.  They identified as ATF.  (As read):

        "Officer Huffaker and I were dressed in full
    police uniform, including name, badges, and ID
    numbers."

Totally untrue.  Barron Lutz described what they were wearing.  They were not in full uniform.  There were no badges.  There were no ID numbers.  And when asked, they refused to identify themselves.

Here's another line (as read):

"I requested to inspect Mr. Flatten cargo, which he consented to."

This was not consent.  Barron Lutz did not consent to the search.  It was a demand.

And then (as read):

"During this time, a California Highway Patrol officer and his trainee arrived to assist us.

Mr. Flatten said, 'I'm glad they showed up.  I didn't think you guys were real cops.  I keep hearing about people getting ripped off.'"

That quote does not make any sense in the context of this police report.  It shows that they were not wearing full uniforms, they were not wearing badges, they did not identify themselves, because nobody would say that.  You would not -- you would not think to ask "Are you a real police officer?" if they were in full police uniform in a marked vehicle.  This report is totally false.

And Brian Masterson told you that was one of the first things that jumped out at him.  He said it makes no sense.

Lieutenant Snodgrass told you that in his over 20 years of experience, he could not recall a single time where when he was in full uniform, anyone had ever asked him "Are you a real police officer?" because, again, it makes no sense.  But, again, this was false.  They were not in uniform.