**EXHIBIT B**

**A.**    A Mercedes white SUV.

**Q.**    What was the condition of that car?

**A.**    It was a new car.

**Q.**    When you say a new car, had you recently purchased it from the dealer?

**A.**    Correct.

**Q.**    So it was brand-new?

**A.**    It was brand-new.

**Q.**    In December 17, 2017, did you, in fact, leave for that trip?

**A.**    I did.

**Q.**    Was anyone else with you in the car?

**A.**    No.

**Q.**    And approximately what were you transporting and in what quantities?

**A.**    I had about 20 pounds of cannabis flower, also known as cannabis buds, and then around four dozen mason jars of bubble hash.

**Q.**    And where was the marijuana flower and bubble hash?

**A.**    I had the seats folded down, and it was in the back of the car with a blanket over.

**Q.**    Did you keep records of the various cannabis strands to be tested?

**A.**    Yes.

        **MR. KLEINMAN:**    Ms. Hernandez, if we could pull up

Where were they in relation to you?

A.   They were kind of surrounding me in the back of the car.

Q.   Were these officers visibly armed?

A.   Yes.

Q.   You mentioned you were -- you were in shock.  Following this incident, did you follow up regarding -- regarding what had happened?

A.   Yeah.  The next day, I called the Mendocino Sheriff's Department and I -- I asked them if they had record of what had happened.  They said they would get back to me, and nobody ever got back to me.

Q.   What was the approximate value of the marijuana flower?

A.   Probably $20,000.

Q.   So it was approximately a thousand dollars per pound?

A.   Yes.

Q.   Now, did you ultimately continue your trip that day?

A.   Yes.

Q.   And did you finalize your trip and end up arriving safely in the -- in the San Francisco Bay Area?

A.   Yes.

Q.   You testified earlier that these people took the marijuana.  Did you see what they did with it?

A.   No.

Q.   So when they -- they took it -- rather, did they put it in their car or --

**A.**  We did.

**Q.**  Who provided you with that money?

**A.**  Billy Timmins.

**Q.**  And how much money was it?

**A.**  A little -- excuse me -- a little over 27,000.

**Q.**  And how much did you get and how much did Mr. Huffaker get?

**A.**  We split it.  A little over 13,000 each.

**Q.**  And how was it provided?  Did Mr. Timmins give it directly to you?

**A.**  He did.

**Q.**  And then what did you do with the money?

**A.**  I gave Joe half and I took the other half, cash.

**Q.**  Approximately how long after the December 2017 extortions did Mr. Timmins provide you with this money?

**A.**  I don't recall specifically.

**Q.**  Can you ballpark it?  Was it a couple of days?  Was it a few weeks?  Was it months?

**A.**  Less than a month.

**Q.**  Less than a month but more than a week?

**A.**  Yes.

**Q.**  When you gave the money to Mr. Huffaker, did he say anything about how he was going to deposit the money?

**A.**  We eventually had a conversation about how -- how he deposited -- he told me how he deposited it.

**Q.**   Can you describe that conversation.

**A.**   Yes.  He said he had some workers' comp checks that he was going to deposit at the same time, and that's what he -- he deposited the cash with the workers' comp checks.

**Q.**   Did he say anything more about that?

**A.**   Not that I recall.

**Q.**   Now, around the same time period, did you and Mr. Huffaker purchase a set of hunting rifles?

**A.**   We did, yes, sir.

        **MR. FINE:**  Your Honor, at this point, the Government would move to admit Exhibit 151, which is a stipulated exhibit.

        **THE COURT:**  All right.  151 is admitted.

     (Trial Exhibit 151 received in evidence.)

**BY MR. FINE:**

**Q.**   Now, Mr. Tatum, looking at this exhibit, it appears to be an e-mail on the bottom and then you forwarding that e-mail; is that right?

**A.**   Correct.

**Q.**   What's the e-mail on the bottom?

**A.**   The e-mail on the bottom?

**Q.**   Yes.

**A.**   Oh.  It's from mitch@gunwerks to Joe Huffaker.

**Q.**   And it says -- the name says Joe Huffaker but it's your e-mail address; right?

**A.**   Correct.

Q.    And were you the one who had been in contact with Mitch from Gunwerks?

A.    Yes.

Q.    And then the body of the e-mail just said "his"; right?

A.    Yes.

Q.    And then it looks like you forward the e-mail to Mr. Huffaker; is that right?

A.    Yes.

Q.    And what's the date of the e-mail?

A.    January 2, 2018.

Q.    So that's approximately two weeks after the -- the December 18 extortion; is that right?

A.    Correct, it is.

Q.    What is Gunwerks?

A.    They are a custom gun manufacturer.  They build custom rifles and ammunition for hunting and long-range shooting.

Q.    And is hunting something you and Mr. Huffaker would do together?

A.    A lot, yes, sir.

        MR. FINE:  Ms. Hernandez, could you go to the second page, please.

BY MR. FINE:

Q.    So is this a -- an invoice that was attached to the e-mail you forwarded to Mr. Huffaker?

A.    Yes, it was.

Q.   And you'll recall that e-mail said "his"; right?  So this is Mr. Huffaker's invoice?

A.   It is.

Q.   If we look in the top left of the document, it says Gunwerks, LLC, and then it has an address; right?

A.   Yes, sir.

Q.   What's the city and state for Gunwerks listed?

A.   Burlington, Wyoming, United States.

Q.   And then below that it says "Bill To" and then it says "Joe Huffaker"; is that right?

A.   Yes, sir.  Yes.

Q.   Okay.  And then it has 7278 Circle Drive.
     Is that Mr. Huffaker's address?

A.   It is, yes, sir.

Q.   And then for the phone number, is that Mr. Huffaker's phone number?

A.   Yes, it is.

Q.   And then it looks like it's your e-mail below that?

A.   Yes.

Q.   And does it have your e-mail because you were the contact person for the -- you were arranging the purchase?

A.   Yes.

Q.   Under "Notes" below that, and you see right here, that's where I'm talking about, it says "Law Enforcement."
     Do you know what that means?

**A.**    Yes.   They give law enforcement a discount.   So he noted that it was a law enforcement sale.   Mitch, Mitch noted.

**Q.**    And so if we just kind of go down to the bottom.

        **MR. FINE:**   Ms. Hernandez, maybe you could blow up the bottom kind of half of the page.

**BY MR. FINE:**

**Q.**    If we just kind of go line by line, Item 1, it says -- it's a lot of letters and a lot of numbers and then it says "Gunwerks LR1000 Rifle."

       Do you know what that rifle is?

**A.**    I do.

**Q.**    What is it?

**A.**    That's the rifle Joe purchased.

**Q.**    And did you purchase the same one as well?

**A.**    I did, yes, sir.

**Q.**    And what was the unit price for that?

**A.**    $7,050.

**Q.**    And then what's this second item?

**A.**    It's a Nightforce scope.

**Q.**    What's a scope?

**A.**    It mounts -- it's a magnifying device that mounts on top of the rifle.

**Q.**    And then the next item is what?

**A.**    Ammunition for the gun.

**Q.**    And it looks like for the quantity, it was a -- 10 boxes.

Does that look right?

A.   Yes.

Q.   And then what's Item Number 4, what's that?

A.   That's a ballistic range finder that they sell.  They match up to the caliber of the rifle and the mathematical program inside the range finder to laser distances to shoot.

Q.   And what's the range finder?

A.   Measures the distance between one point and another.

Q.   And then last, it looks like there's one more item, Number 5.  What's that?

A.   Those are -- that is a bipod, which is used to -- it's kind of like a triangle but with no base.  It's to stabilize the front of the gun for shooting.

Q.   And then it looks like the subtotal is about $13,565?

A.   Correct.

Q.   And the 10 percent discount, is that the law enforcement discount you got?

A.   Yes, sir.

Q.   All right.

     MR. FINE:  I think -- Ms. Hernandez, I think we can take this off.  Thank you.

BY MR. FINE:

Q.   Did you and Mr. Huffaker ever receive these guns?

A.   We did, yes.

Q.   Did you ever see Mr. Huffaker's gun?

Q.   I'm not asking for an exact amount, Mr. Tatum.

A.   Okay.

Q.   I'm saying does this give you an approximation of how much marijuana you seized, you and your team seized during this period of time?

A.   Yes, sir.

Q.   Okay.  So it was 3,000 pounds, give or take?

A.   Yes, sir.  Sorry, I didn't understand.

Q.   And in addition, do you recall that you had obtained or seized $2.8 million of illegal drug money?

A.   Yes.

Q.   Including 10 firearms?

A.   Based upon looking at this, yes.

Q.   That refreshes your recollection by looking at that; is that correct?

A.   It doesn't refresh my recollection.  It just says that we seized 10 firearms.

Q.   Okay.  Mr. Tatum, I'm not trying to trick you here.  All right?  I'm just showing you a document you prepared.

A.   Yes, sir.

Q.   Okay.  All right.  I'm just asking for your honest response.  Okay?

A.   Yes.

Q.   All right.

A.   I understand that.

BY MR. FINE:

Q.   And what does it show for February 14 of 2018?

A.   Deposit.

Q.   And how much is that deposit?

A.   $16,932.50.

Q.   Special Agent Tovey, have you reviewed a deposit slip associated with this deposit?

A.   Yes, I have.

MR. FINE:  Ms. Hernandez, could you please go to page 809 of this exhibit.  And if we could zoom in on this top rectangle here.

BY MR. FINE:

Q.   Agent Tovey, what is this?

A.   This is the deposit slip for that 12/14 deposit.

Q.   What name does it show associated with the deposit?

A.   Joseph Huffaker.

Q.   And what's the -- what's the date?

A.   Valentine's Day, 2018.

Q.   That's February 14?

A.   Yes.

Q.   Oops.  The item appears to have disappeared from our screen.  There it is.

And then a little further down, right -- oh -- right here where I'm circling, it says the word "currency"; is that right?

A.   Yes.

Q.   What does the currency notation there mean?

A.   It references a cash deposit.

Q.   And how much is next to currency?

A.   $7,000.

Q.   So fair to say this document shows that on February 14, Valentine's Day, 2018, Joseph Huffaker deposited $7,000 in cash; is that right?

A.   Yes.

        MR. FINE:  Now, Ms. Hernandez, if we could zoom back out on this page.

BY MR. FINE:

Q.   How much was the total deposit?

A.   $16,932.50.

Q.   And was there a check also deposited by Mr. Huffaker with this $7,000 in cash?

A.   That's correct.

        MR. FINE:  Ms. Hernandez, could we blow up this check right here.  Oops.  And I'll clear my squiggles.

BY MR. FINE:

Q.   Agent Tovey, who was this check made out to?

A.   Joseph Huffaker.

Q.   And how much is it for?

A.   $9,932.50.

Q.   And looking at the top left corner of the check, what is the entity that issued this check?

**A.**   Redwood Empire Municipal Insurance.

**Q.**   And what is that entity?

**A.**   It is an insurance company that makes workers' compensation payments.

**Q.**   Now, Special Agent Tovey, you testified that you reviewed Mr. Huffaker's bank records; correct?

**A.**   Yes.

**Q.**   In reviewing Mr. Huffaker's bank records, did you observe deposits from multiple sources?

**A.**   I did.

**Q.**   What were those main sources?

**A.**   I reviewed payroll deposits from the City of Rohnert Park, as well as check deposits from the Redwood insurance company.

**Q.**   And, again, what is the Redwood Empire Municipal Insurance Company?

**A.**   It's an insurance company that makes workers' compensation payments.

**Q.**   So for those workers' compensation checks, how much were they generally for?

**A.**   There were a few larger dollar checks, but on average, the checks were around $580.

**Q.**   And how much were some of the larger checks?

**A.**   The largest one was around $22,000.

**Q.**   And what was the time period during which Mr. Huffaker was receiving those workers' compensation checks?

A.   It was from around August 2016 through December 2017.

Q.   Okay.  So that's roughly a year-and-a-half period; is that right?

A.   That's right.

Q.   Did you observe any pattern as to what Mr. Huffaker did with the workers' compensation checks?

A.   Some of the checks were deposited across several bank accounts, and some of the checks were cashed at different banks.

Q.   Now, when Mr. Huffaker deposited the workers' compensation checks, did he sometimes deposit them along with other checks?

A.   That's correct.

Q.   And you said he cashed some of those workers' compensation checks; is that right?

A.   Yes.

Q.   Did he do those cashing all at the same bank or across multiple bank accounts?

A.   It was across multiple banks.

Q.   So between August of 2016 and February 2018, when Mr. Huffaker deposited $7,000 in cash along with this workers' Comp check, how much did Mr. Huffaker receive in workers' compensation checks?

A.   In total, it was approximately 19 checks and the value of those checks was around $42,500.

Q.   And from your review of the bank records, how much were

you able to confirm of those workers' compensation checks were deposited?

A.    The deposited checks totaled around $35,500.

Q.    And from your review of the bank records, how much were you able to confirm were cashed?

A.    I was able to confirm that around $5,200 worth of checks were cashed.

Q.    And are there some additional checks you weren't able to fully confirm whether they were cashed, but it's possible they were cashed?

A.    That's correct.  There were three checks that totaled $1,740 that I suspect were cashed.

Q.    And can you describe why you're not always able to confirm whether a specific check was cashed?

A.    I reached -- reached out to these different banks to get more information about cashed checks.  Cashed checks are very hard to obtain from financial institutions, just that's the way they pull records in response to subpoenas.

So if I was able to get a positive response back from the bank that the check was cashed, then I can say the check is cashed.

If for some reason the bank was unable to provide check images, but I didn't see evidence that the checks were deposited into a bank account, I can, I think, safely assume they were cashed.

Q.   And, Special Agent Tovey, if you add up all the workers' compensation checks that Joseph Huffaker, either you were able to confirm were cashed or were potentially cashed over the entire, you know, year and a half period, what's the figure you get?

A.   It was right around $7,000.

Q.   Now, Special Agent Tovey, you mentioned that you also reviewed Mr. Huffaker's phone records as part of this investigation; is that right?

A.   Yes.

        MR. FINE:   Your Honor, at this time the Government would move to admit Exhibit 83, which is a stipulated exhibit.

        THE COURT:   All right.   83 will be admitted.

    (Trial Exhibit 83 received in evidence.)

        MR. FINE:   And, Ms. Hernandez, if we could go to page 427 of the document.

BY MR. FINE:

Q.   Special Agent Tovey, looking at the top left part of the page, whose -- whose phone records are these?

A.   Joseph Huffaker.

Q.   And looking below the name, what phone number is associated?

A.   It's (707)291-3466.

Q.   And what kind of phone is that?

A.   It's an iPhone.

started in 2016 or '17, but, again, I don't know the dates exactly.  That's all.

Q.   Could it have started as far back as 2015?

A.   I don't think so.  I don't know.  I don't know the dates.

Q.   Did --

A.   I don't recall a date.

Q.   When did your friend, Jacy Tatum, finally admit to you that the marijuana he was having you sell he was getting it not from cultivation, but from stealing it from people?

A.   It was probably a short time after we started -- excuse me.  Because, like I said before, I knew that he wasn't cultivating that much cannabis or marijuana, whatever you want to call it.

Q.   So --

A.   So it was a conversation that we had at some point.  I just don't recall the exact words.  I'm sorry.

Q.   So sometime in 2016, you knew, because he told you, that the marijuana he was having you sell, he stole it?

A.   Yeah.  I believe so, yeah.

Q.   All right.  And, again, knowing that he's a police officer, did you say anything to him to the effect, "Jacy, what are you doing stealing from people?"

A.   We had a conversation about it.

Q.   Oh.  Okay.

A.   Yeah, like I said, before we had a conversation about it.

**Q.** What did he say?

**A.** He said that he wasn't worried about it. He was always under the assumption he's a police officer and he was pretty high ranked, that it was all good. And, again, I wasn't going to sit here and keep questioning him. He's -- like I said, he's a grown man.

**Q.** Well, the marijuana that he had you sell before, the marijuana that he was growing out of his mom's house, you didn't have any problem selling that for him; correct?

**A.** No.

**Q.** But when he starts asking you to sell marijuana that he stole, that's a little different; wouldn't you agree?

**A.** I was -- I brokered marijuana and cannabis. I didn't have a problem with it. I mean, that was his deal. I don't know where he got it from. I wasn't going to sit here and ask him every single time that I saw him: Where did you get this from?

Do you know what I mean? It had just happened. The relationship had happened, and I sold his cannabis.

**Q.** Yeah, but you knew that the cannabis you were selling was basically stolen property?

**A.** Yes.

**Q.** Okay. And you had to know that by selling stolen property, that implicates you?

**A.** I -- yes, I took that risk. You're right.

**Q.** And you knowingly did that?

**A.**    I did.

**Q.**    This incident that you -- well, it was at this interview in May of '25 that you first mentioned to them that you recall meeting my client at the side of the road in Commisky; is that correct?

**A.**    It was which meeting?

**Q.**    The second meeting, the one in '25, the most recent.

**A.**    Yes.

**Q.**    Okay.

**A.**    Correct.

**Q.**    And how was it -- who brought this up?  Who brought it up? Did you volunteer, "Hey, I recall an incident with Mr. Huffaker"?  Or did they bring it up, the FBI?

**A.**    I knew that the case was going on.  I knew, you know -- I knew I had to just tell them the story that I knew.  And so I brought it up, I believe.  I don't know who brought it up, but I came forth and told them what I knew.

**Q.**    Was this the information that Jacy Tatum wanted you to corroborate for him?

**A.**    He didn't say exactly.  He just asked me if, you know, they talked to me, if I would tell the truth.  And, you know, he's sorry for bringing me into this mess.  But, you know, it was what it was.  But, you know, it -- I just basically told them what I knew.  That's all.

**Q.**    You've said several times today that your memory is not

Q.   And do you recall your conversation that you had with the FBI agents?

A.   I don't.  Not exactly, no.

Q.   Is it the same agent here, Duncan Haunold?

A.   It was, yes, sir.

Q.   As well as the U.S. attorneys?

A.   Yes, sir.  As well -- as well as my attorney.

Q.   All right.  And, again, at this third meeting we'll call it, you, again, admitted that you brokered or sold marijuana that Jacy Tatum had been stealing from people?

A.   Correct.

Q.   I think at this meeting you said it actually started in 2015?

A.   Yeah.  I mean, I don't -- again, I'm trying to remember those dates for everybody, but I can't remember the exact dates.  I'm sorry.

Q.   And it ended in -- what? -- towards the end of 2016, beginning of 2017?

A.   I believe so.

Q.   During that period of time, from 2015 to the beginning of 2017, how much marijuana do you think you brokered for Mr. Tatum?

A.   I don't recall.

Q.   Well, let's try to see if we can give us the best estimate.

Would you say 500 pounds?

A.   More -- yeah, maybe about 500 pounds, I would imagine.

Q.   Could it be 1,000 pounds?

A.   I don't think it was that much.  It could be, though.

Q.   Could it be 2,000 pounds?

A.   Well, if it's not 1,000, I don't think it could be 2,000. I don't think it's that much, no.

Q.   Okay.  Somewhere between 500 and 1,000 pounds?

A.   Sure.

Q.   And how much money do you think you made selling the marijuana that Tatum had stolen from people?

A.   I don't know.  That's hard to say.  I didn't keep a log.

Q.   Ballpark estimate.

A.   We don't keep logs when we do this.

Q.   Okay.  Well, I think earlier you testified that it was going, what, $1,000 a pound?  1,100, 1,200 a pound?

A.   Depended on the season.  Depended on --

Q.   Okay.

A.   -- yeah, what season we were in and what the market demanded, yes.

Q.   Okay.

A.   So it was -- it varied quite a bit, like I said earlier.

Q.   And if it was a higher quality marijuana, it would have demanded a higher price?

A.   Yes, sir.

Q.    And you knew the marijuana business so you knew how to price the marijuana that Tatum was dealing?

A.    Well, your brokers kind of set the tone too.  You don't get to just pick your number.  You know what I mean?  It's not like that.

Q.    Well, who picked the number?  Was it you or was it Tatum?

A.    Nobody -- it was the broker --

Q.    Okay.

A.    -- that I sold the marijuana to.

Q.    Okay.

A.    I didn't get to go in and go, "Hey, man, you know, I want this."  I mean, that's nice if you can do that, but sometimes it didn't demand that.

Q.    All right.  But there were times that some of the marijuana you sold that Tatum had given to you, they fetched a higher price, based -- depending on the quality?

A.    Yes.  That's fair.

Q.    And there were, of course, some marijuana that weren't of high quality and they just got basically your bottom dollar?

A.    Yes, sir.

Q.    So if we just use a thousand pounds as an average --

A.    Okay.

Q.    -- and let's say a thousand pounds he had you sell, would that be a million dollars?

A.    It would be close.  It would be close.

Q.   So if your deal with Mr. Tatum was to go 50/50, that means you got about 500,000 and Jacy Tatum got 500,000?

A.   I mean, it would be in the ballpark.  Like I said, I didn't keep a log so I couldn't tell you an exact number.

Q.   And when you gave Mr. Tatum his share, it was all in cash?

A.   Yes, sir.

Q.   And just so it's clear, there was only one single incident in December of 2017 where you saw my client?

A.   That I can recall where there was cannabis being transferred, yes.  I think there was --

Q.   There were not two?

A.   There might have been two.  I -- again, I'm drawing a blank.  But it wasn't a lot.

Q.   Mr. Timmins, are you a consumer of marijuana?

A.   No.

Q.   All right.

A.   I mean, sometimes I'll take CBDs and THC at nighttime to go to sleep.

Q.   Okay.

A.   I don't smoke it but, you know, they have all these edibles now that are great.

Q.   I'll take your word for it.

A.   Yeah.

          MR. CEBALLOS:  All right.  I have nothing further, Your Honor.