**Pages 1 - 78**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
VS. ) **NO. 3:21-cr-00374-MMC-2**
)
JOSEPH HUFFAKER, )
)
Defendant. )
)

San Francisco, California
Tuesday, June 24, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
CRAIG H. MISSAKIAN
UNITED STATES ATTORNEY
1301 Clay Street
Oakland, California 94612
**BY: ABRAHAM H. FINE**
**BENJAMIN K. KLEINMAN**
**ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
FERRONE LAW GROUP
4333 Park Terrace Drive, Suite 200
Westlake Village, California 91361-5651
**BY: RICHARD CEBALLOS, ATTORNEY AT LAW**

Also Present: **Nick Jones, Summer Intern**
**Veronica Hernandez, Paralegal**

REPORTED BY: Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter

**Tuesday - June 24, 2025** **10:02 a.m.**

**P R O C E E D I N G S**

---o0o---

(Defendant present, out of custody.)

**THE COURTROOM DEPUTY:** Calling Criminal Case Number 21-374, United States of America versus Joseph Huffaker.

Will counsel please step forward and state your appearances for the record?

**MR. FINE:** Good morning, Your Honor. Abe Fine for the United States, and with me at counsel table is my co-counsel Ben Kleinman, Nick Jones, who's a summer intern with our office this summer, as well as Veronica Hernandez, who will be our trial paralegal.

**THE COURT:** Okay. Very good. Thank you.

**MR. CEBALLOS:** Good morning, Your Honor. Richard Ceballos for the defendant, Mr. Huffaker, who is present here in court.

**THE COURT:** Okay. Very good.

We are out here on a trial run as far as the general layout of the bench and the courtroom goes. They have revamped our entire sound system. When I came in this morning, everything was in disarray, and it remains in somewhat disarray. And I also feel like I'm sitting in a hole. So we're just going to try and do the best we can with that.

The microphone, I haven't really checked to see. I guess

it has a little more flexibility, but not much.

If the court reporter can hear me, fine; and if you can't, let me know.

Okay. So we are now at what is one of many pretrial conferences; hopefully, the ultimate pretrial conference. There are some new motions in limine that were filed. And there are just a lot of things that I ought to take up with you today to get coordinated for the trial. I'm not sure what I ought to do first. I think let's do the motions in limine, get those out of the way.

So for the Government, who originally had a number of motions in limine, and the defendant did not -- this was back in the earlier stages of the case with your various predecessors, but now we have two new motions filed by Mr. Fine and Mr. Kleinman, Motions 10 and 11, and I have received responses to those.

Then from the defendant's standpoint, I have Defendant's Motions 1 and 2 and a kind of combined or consolidated opposition from the Government to that.

So maybe we'll just start with the Government's, since it's their case. All right. So Number 10 is to exclude, I guess, any reference to or testimony from E.F. But, of course, part of the Government's case concerns an alleged falsified police report which relates to E.F., in part, and so I guess he would be mentioned in some way. But you are

endeavoring not to have him actually called to testify about what happened, whatever did happen to him while driving.

Then there's an opposition. And I want to ask you, Mr. Ceballos, to what issue in particular -- don't say "guilt" -- but to what issue in particular E.F.'s testimony would go. I'm trying to see what its relevance is to the case as it currently stands.

**MR. CEBALLOS:** Well, E.F. is, we believe, going to testify as to an incident that occurred on December 5th, the count that --

**THE COURT:** Yes, I understand --

**MR. CEBALLOS:** -- was dismissed.

**THE COURT:** -- what he could say, that he was stopped, that some type of law enforcement took his drugs, followed a pattern similar to what's alleged here.

**MR. CEBALLOS:** Yes.

**THE COURT:** But apparently, he does not believe that it was either Officer Huffaker or Officer Tatum who was one of the participants, or at least the Government doesn't think they were.

And what is -- is your position to the contrary? I doubt it.

**MR. CEBALLOS:** Actually, it is. He initially identified other law enforcement officers as being the ones that stole his drugs.

**THE COURT:** Yes.

**MR. CEBALLOS:** But later on, he identified my client and others as the ones who did it.

**THE COURT:** Did he unidentify your client --

**MR. CEBALLOS:** No.

**THE COURT:** -- in some way?

**MR. CEBALLOS:** He continues to identify him as being the individual.

**THE COURT:** All right. But you don't want your client to be found guilty of a crime that is -- I don't even know if it's charged at this point.

**MR. CEBALLOS:** No, he's not.

**THE COURT:** Part of it is out, not all of it. They haven't struck, for example, the overt acts that go to the conspiracy charges. E.F. is floating around in this indictment as if he's still a live actor in the case.

So what is the issue that you wish to offer whatever evidence you want to offer about E.F.?

**MR. CEBALLOS:** Well --

**THE COURT:** What does it show? In other words, what's in dispute or that would support your client's not guilt by calling E.F.?

**MR. CEBALLOS:** Well, E.F. is going to, as he initially reported, identify other law enforcement officers who did the crime. Later on he identified my client.

**THE COURT:** Fine. What does that prove?

**MR. CEBALLOS:** It proves that other individuals committed the crime on December 18th.

**THE COURT:** Fine. Why didn't you put that in your opposition? Okay. And let's say other individuals committed that crime. Do you want to argue, then, that those same other individuals committed the crimes that are charged here?

**MR. CEBALLOS:** No.

**THE COURT:** No?

**MR. CEBALLOS:** No.

**THE COURT:** My understanding is, the defense in this case -- and please correct me if I'm wrong -- is your client was there when the various events are alleged to have occurred but didn't understand that they were being done illegally.

**MR. CEBALLOS:** That's correct, yes.

**THE COURT:** Okay. So the whole thing is his knowledge or lack thereof.

**MR. CEBALLOS:** Correct.

**THE COURT:** All right. So where does E.F. fit in, then?

**MR. CEBALLOS:** Well, we still have to deal with the police report, that he's still being charged with falsifying or allegedly falsifying.

There are still some statements in that report that, notwithstanding my client's non-involvement, some statements

are true; some statements are obviously untrue with regard to my client's participation.

**THE COURT:** Okay. Let me see if I've got it straight. On the falsified report, have I ever seen that report?

**MR. FINE:** I'm not sure if it was attached to a MIL. It's certainly an exhibit, and it's one we have some stipulations to.

**THE COURT:** Okay. The report at the time, somehow either Mr. Tatum or Tatum and your client, seeing these reports in the newspapers, said, "Oh, that could be us. We better put in a report of some sort." And a report gets put in that, from what I've read, but I don't think I've actually seen, is some combination of the B.L. and E.F. events.

**MR. FINE:** So, Your Honor, I think -- or at least our position is that the report describes the B.L. events and put -- for E.F., puts E.F.'s name, as well as the date of the December 5th stop.

And the reason that, you know, we'll elicit this at trial, that those dates were put, is because those were the identifiers given by the FBI agent who they talked to.

**THE COURT:** So it's the B.L. event described but with the E.F. date?

**MR. FINE:** Correct, Your Honor.

**THE COURT:** Okay. All right. So the false part is putting -- well, and are you also saying that the description

of the B.L. event is false?

**MR. FINE:** Yes, Your Honor. So, for example, the police report says they were in a marked police car. That's false. It says they identified themselves as Rohnert Park Police. That's false.

**THE COURT:** Okay.

**MR. FINE:** And, of course, it doesn't --

**THE COURT:** All right. So not incriminating themselves in this report.

Okay. Now, so the only part that E.F. is kind of involved in is just the date and the fact that his statements to the press that get reported in some way is the motivation alleged for the false report.

Okay. Now, if one were to call E.F. and he were to testify and he says, "Okay. It wasn't them. It was Hopland Tribal Police or some copycat" -- I don't know -- "perpetrator," what issue does that support or go to in some way?

**MR. CEBALLOS:** Well, I think it goes to the credibility of the entire investigation.

**THE COURT:** Well, now, we can't be trying the U.S. Attorney --

**MR. CEBALLOS:** No.

**THE COURT:** -- in this case.

**MR. CEBALLOS:** No, no.

**THE COURT:** Okay. If we could do that, we would be putting in the history of all these cases and sometimes what the defense does and changes their mind, and what have you, and that doesn't really happen.

There was quite a bit in your response to their motion where you question in some way, to a certain extent, the integrity of the investigation. In other words, you said the Government's known for years about the alibis, but they didn't get rid of the claim until just recently; that E.F. was not only a victim but a paid informant, although possibly not in connection with this event, whatever.

I don't know whether those things are correct or not, but those are facts in which it sounded like you wanted to put in front of the jury possibly the history of the prosecution. And if you wanted to do that, I would think that probably that would not be allowed. But it's not clear that's what you wanted to do.

**MR. CEBALLOS:** No.

**THE COURT:** That was one of my questions.

**MR. CEBALLOS:** I think there's still the issue as to the police report in terms of the falsity of what's contained in the report. There's some things that are clearly false, but there are some things that aren't. There was -- something happened to Mr. Flatten on December 5th.

**THE COURT:** Yes, but that's not really a defense, is

it, to say, "Okay. A couple of statements in the report are correct. There was a correct date, although not about B.L., but about E.F."?

If you had six lies and one truthful statement, they'd still be bringing their case.

**MR. CEBALLOS:** Right.

**THE COURT:** And they could still get a conviction if the jury accepted their evidence and argument. I'm just -- I'm not saying he can't. I'm just having trouble.

If he were, for example, bringing an alibi defense -- not alibi, but just "It's not me," we had these not really great photo lineups.

**MR. CEBALLOS:** Right.

**THE COURT:** All right. And so then the question, since those were heavily argued, does anybody really doubt he was there on the days in question? Whatever. And if there were a question about whether he was present for B.L., okay, that it would be perhaps relevant to show that somebody else out there is doing this stuff too.

All right. I mean, usually, you don't need that because if you go, like, bank robbery, okay, there are 8 trillion bank robbers out there, whatever the crime might be.

But this one, which had a sort of unique aspect, somebody could say, "Well, it's got to be him because those are the only people doing it"; and you could have possibly argued, "Hey, no.

There's Hopland out there running the same scam."

But that's not the defense. And so I was trying to see where it would fit in, and I'm still not clear --

**MR. CEBALLOS:** There's --

**THE COURT:** -- where it does.

**MR. CEBALLOS:** There is still the conspiracy count there, and the conspiracy count goes back to the date that Mr. Flatten was involved in and, therefore, that there was a conspiracy going all the way back then.

And we believe Mr. Tatum is going to testify that my client -- not just the December 18th event, but other events, including now the December 4th event, that he was involved in; and therefore, that's part and parcel of the conspiracy.

**THE COURT:** Well, that's a different issue. Let's see -- because my understanding of the conspiracy being alleged to go back that far was based on E.F. going back that far.

If neither of these folks was involved in E.F., then you have -- then they're not relying on E.F. as part of why it started when it did. I don't know if they have anything that really gets going before the B.L. event at this point.

Let's find out from Mr. Fine.

**MR. FINE:** Yes, Your Honor. I want to address that, and then I would also like to address their opposition briefly, if that's okay, but I'll start with that question.

So what we plan to prove at trial is that between

December 5th and December 18th, or on or about December 5th, the defendant and Mr. Tatum went out several times and committed several extortions.

And so the one victim that we're going to put on the stand is B.L., who was stopped on December 18th; but in the weeks before B.L., there will be testimony that there were other stops and marijuana extortions during that time period.

**THE COURT:** Is that coming from Tatum?

**MR. FINE:** Yes, Your Honor.

**THE COURT:** All right. But he's not going to say E.F. was one of those people?

**MR. FINE:** Correct, Your Honor.

**THE COURT:** Okay. I don't know that E.F. fits in. In other words, you're not going to rely on that part of the indictment?

**MR. FINE:** Correct. And in the conspiracy count, Your Honor mentioned that there were overt acts specifically related to E.F. on December 5th. And we are not going to be proving those overt acts. We're not relying on those overt acts.

**THE COURT:** Okay. Any time E.F. is mentioned as a victim of Mr. Huffaker, you're not relying on that?

**MR. FINE:** Correct, Your Honor.

Now, as you described before, E.F.'s name is relevant as to why it's in the police report, and we will get into why --

the confusion about why that happened, but there will be no allegation whatsoever that either Huffaker or Tatum were involved in the E.F. stop, to the extent the stop happened.

**THE COURT:** I'm having trouble seeing where he fits in.

**MR. CEBALLOS:** Well, contrary to what Mr. Fine just stated, Mr. Tatum is going to testify that my client was involved in the E.F. stop.

**THE COURT:** What makes you say that?

**MR. CEBALLOS:** It's in one of the reports.

**THE COURT:** Is that correct?

**MR. FINE:** So, Your Honor, in Mr. Tatum's plea agreement, what he says is that "I was not involved in the E.F. stop, but I understand that Mr. Huffaker may have been involved, and that's part of the conspiracy."

I think -- but he has no personal knowledge of anything like that, and I can proffer to you that he will not be saying that at trial.

**THE COURT:** Okay. Now, it may be that somebody wants to ask him about that, nonetheless, if he's kind of saying different things at different times. But I don't know that you need E.F. on the stand to show that Mr. Huffaker wasn't there. It could be very brief testimony, certainly, to that extent, or there may be some other way that it would be shown.

I can understand why you want to put in any shifting sands

in his proffer or whatever. So if some of what he said earlier was not correct, I'm not quite sure how it all would pan out.

What other evidence is there that Mr. Huffaker was not involved in the E.F. event unless E.F. says that?

**MR. CEBALLOS:** Well --

**THE COURT:** No, I'm not asking you. I'm asking --

**MR. CEBALLOS:** Okay.

**THE COURT:** -- him, to see if he's got some alternative way of proving it up.

**MR. FINE:** Sorry, Your Honor. The question is: What is the evidence that shows that Mr. Huffaker was not involved in the E.F. stop?

So I think there are a couple of items. One, previous defense counsel did provide us with an alibi defense that I think is somewhat credible; but I think, ultimately -- and I want to get into -- this is where I want to address their opposition, because I think, ultimately, E.F. has some serious credibility issues, including his statement to defense counsel that he was a paid FBI informant, which is completely untrue.

Mr. Flat- -- or E.F. has contacted the FBI dozens of times during the pendency of this investigation and made all sorts of allegations that are kind of off the wall; and so I think his identification alone is not enough to suggest -- and I don't think the defendant is going to argue that he, himself, was at the E.F. stop. I don't think anyone in this room believes

that.

**THE COURT:** No. He wants to argue that he wasn't part of E.F. But he may not testify. And if he wanted to impeach with a prior inconsistent statement, if you will, or otherwise, Mr. Tatum as a witness, is there any other evidence he could rely on to say that he was not involved other than E.F. saying he was not involved?

**MR. FINE:** So I think I have a couple of responses.

It sounds like E.F. might say he was involved.

**THE COURT:** Really? I thought he was going to say he wasn't involved.

**MR. CEBALLOS:** No. He's going to say he was involved.

**THE COURT:** Really? Now I'm totally confused.

**MR. FINE:** I don't -- I don't think anyone really knows what E.F. is going to say.

**THE COURT:** This is like "Who's on First?"

Okay. Let me just see if I've got this straight. We have these -- a sort of movable E.F. in various positions here. I thought he had sort of clarified that he was mistaken when he said that it was Huffaker and Tatum.

**MR. FINE:** So he never said it was Huffaker and Tatum. He said it was Huffaker and someone else.

**THE COURT:** Oh, okay.

**MR. FINE:** And I think he's alleged that several different people were involved in the stop and it hasn't been a

consistent line, which is part of the reason that the Government ultimately dismissed that count.

But I think his latest allegation was that it was Huffaker, but the Government does not believe that to be true.

**THE COURT:** All right. Why do you want to put him on to say your client was part of that event?

**MR. CEBALLOS:** Well, I think the fact that the Government now is saying there are credibility problems with E.F. when they've based their entire case up until, I believe it was March when they dismissed the count --

**THE COURT:** You're not going to be able to put that in.

**MR. CEBALLOS:** I understand that, Your Honor.

**THE COURT:** Okay.

**MR. CEBALLOS:** E.F., however, does much more. He actually -- as I indicated in the moving papers, he actually goes and interviews witnesses. He collects evidence. He is, for all intents and purposes, in his mind, kind of like a junior G-man. And he's providing all this information about who Mr. Tatum is selling the marijuana to, he's talking to witnesses, and he's relaying all that information back to the Government or to the FBI.

**THE COURT:** Let's see. If you called him as a witness -- forget what he said to the Government and whenever he said it. If you were going to call him as a witness, you

want him to testify that your client was part of a scheme to pull over motorists and essentially rob them of their narcotics and sell it.

**MR. CEBALLOS:** I understand he's going to testify to that, and I will deal with that, yes.

**THE COURT:** And you -- okay. If you called him, he would say that?

**MR. CEBALLOS:** Yes.

**THE COURT:** And then you would ask him other questions that would elicit what testimony?

**MR. CEBALLOS:** The other individuals he identified, before he identified my client, that were involved, as well as the work that he did to prove that it was my client.

**THE COURT:** And why is that relevant if your client is not conceding that he was involved in the E.F. matter?

**MR. CEBALLOS:** He's not, but he's still being charged with conspiracy going back to the E.F. matter.

**THE COURT:** No, he's not. Apparently, they're not relying on any E.F. events. According to them, E.F. is not sufficiently credible for them to support any charge with any of the E.F. events. Okay?

So it just seems very strange to call someone to testify your client did something that your client denies he did.

And the Government themselves are essentially put in a position of having to say, "We're not relying on him. We're

not charging in any way any crimes based on E.F. We agree he's not credible." Okay?

**MR. CEBALLOS:** However --

**THE COURT:** So --

**MR. CEBALLOS:** -- Mr. Tatum, we expect Mr. Tatum to testify that based on his belief, that my client was involved with E.F.

**THE COURT:** Well, you want him -- you want to elicit evidence from somebody, either an FBI agent or Tatum himself, that he had said that your client was involved -- even though he wasn't, he believed your client was involved in this E.F. event.

**MR. CEBALLOS:** Correct.

**THE COURT:** All right. And then if you called E.F. to say he wasn't -- except he's not going to say it. He's going to say he was.

**MR. CEBALLOS:** Yes.

**THE COURT:** And that supports Tatum.

So I don't -- I don't see -- I'm sorry, but I'm --

**MR. CEBALLOS:** Yeah.

**THE COURT:** -- just missing -- it sounds like he may have a role to play, but I can't understand where it is, and I still don't -- I think what I would do -- excuse me. I'm sort of recovering from a virus.

Okay. What I think might be appropriate -- because the

way this case is developing, I really don't even know what's going to be involved.

If he is a player in the case, he's not a major player. All right? And so what I'm going to do is I'm going to grant a protective order -- okay? -- that he is not to be -- and I'm not quite sure how to do it because the Government's going to mention -- are you going to mention the E.F. date and E.F. and all that? So a protective order that precludes -- well, I don't know because the Government -- I don't want to say you can't refer to the guy because the Government's going to refer to him.

So how are you going to make clear to the jury that in the Government's view, it was false to use the E.F. date?

**MR. FINE:** Certainly, Your Honor.

So Mr. Tatum will testify that based on the information that he got from -- he learned of E.F.'s name from an FBI agent who provided him with that name and identifier. He took that name and identifier, assuming that they had done that traffic stop, and put it in the police report.

He later learned, once more information came out about the E.F. stop -- he saw a picture of E.F.; he heard more inconsistencies, different car -- that, actually, he and Huffaker were not involved in that stop. And so Mr. Tatum will explain that.

**THE COURT:** Well, wait a minute. You can't -- well, I

mean, he can put in hearsay to explain his state of mind; but how are you going to actually show, I guess, the actuality of the non-involvement of Mr. Huffaker?

**MR. FINE:** So, I mean, that's kind of like proving a negative. But I think, you know, Mr. Tatum will say, "From discussions with Mr. Huffaker," you know, which is a hearsay exception, "we determined that neither of us were involved in the Zeke Flatten stop."

**THE COURT:** Well, I'm going to grant a protective order that precludes reference to his testimony. All right? And if, along the way -- because you would be calling him, if anybody would. So along the way, if the record starts developing in some way, Mr. Ceballos, that you feel that we should hear from E.F. on a particular point as now developed in the record that I still don't know what it's going to be, then outside the presence of the jury, raise the matter anew and we'll look at it.

**MR. CEBALLOS:** Well, once the Government puts in the police report that they allege was false with E.F.'s name on it and the Government doesn't call E.F., then I think the jury is going to be confused. It's like, okay, so who is this E.F. and why is he not here testifying?

**THE COURT:** Well, at a minimum, what's weird is that the report is allegedly false, in part, not because it's got an E.F. date on it but because it's describing a legitimate stop.

So if that is what the report does and if their position is that isn't how it went down and the jury accepts that isn't how it went down, then it's not a legitimate report, even if they had used the -- what is it? December 18 is B.L.?

**MR. FINE:** Yes.

**MR. CEBALLOS:** Correct.

**THE COURT:** December 18.

And irrespective of the motivation, but they want to put in this motivation. So E.F. is going to be somebody. But it doesn't help to call him and have him confirm it. That's what's so weird.

I think we have to just wait and I'll see. It's not stopping you ultimately -- it may stop you, ultimately; but at the moment, it's not a "You can't do it. Forget it."

**MR. CEBALLOS:** Okay.

**THE COURT:** "Find some other idea."

It's that I really have to see this developing record at this point. It's just too difficult to tell.

**MR. CEBALLOS:** All right.

**THE COURT:** But there will be references made, but you can't say, "He's going to say." Okay? In other words, if you make an opening statement, if you do, you can't get up and say, "And E.F. is going to say it's totally true what's happened," whatever you're going to do.

Okay. Now, we're going to go to 11, and I'm a little

unclear about this. Does the standard proffer agreement that's used by the Government limit the Government's use to rebuttal and impeachment-type evidence?

**MR. FINE:** So what the agreement says is that if the defendant does anything at trial that is inconsistent with the statements he made in his proffer, then the proffer comes in.

**THE COURT:** Okay. Now, let me just ask one thing, though. It apparently says if he testifies. It doesn't say if he testifies contrary to the statement. It just says if he gets on the stand. In other words, if the defendant gets on the stand, it's your position, all right, at that point he can be asked anything about the statement, irrespective of whether he has said anything contrary to it?

**MR. FINE:** I think -- I'd have to look at the proffer agreement again, and I don't remember if it says for impeachment or if he testifies generally.

**THE COURT:** It just says if he testifies.

**MR. FINE:** Right.

**MR. CEBALLOS:** And we concede that.

**THE COURT:** Okay. Fine. Then is there a dispute at this point about Motion 11?

**MR. CEBALLOS:** No. As I indicated in my response, if he testifies, they're allowed to bring in the proffer.

**THE COURT:** Okay. Now, it also says argument. Okay? Now, argument, of course, closing argument, it would be too

late to bring in his statements. Argument made in the course of opening statement might raise some issues, or I'm not sure because, ordinarily, jurors don't hear argument.

So what argument do you think that proffer is making reference to?

**MR. FINE:** Yeah. So what the case law talks about in this and the case law discusses, you know, eliciting information in cross-examination that is inconsistent with the proffer.

I can tell you, Your Honor, our position is we don't intend to put the proffer in in our case-in-chief, no matter what he says in his opening or what he says during cross-examination as a witness. We intend to put it in if -- one, if he testifies; or, two, if the defense puts on a defense case that is at all inconsistent with the statements in the proffer.

And there's a Ninth Circuit case directly on point, which we cited in our Motion in Limine Number 1, the *Rebbe* case, that discusses defense case as well as if the defendant testifies.

**THE COURT:** Well, it was based on the language of that particular proffer agreement, and that's why I wanted to get clear what your specific language was.

But what you're saying is if he just gets on the stand, that, in and of itself, won't trigger your use of the proffer?

**MR. FINE:** So, Your Honor, I have a hard time seeing

how that could happen in reality, just because on cross-examination, we would ask him some question like, you know, "Did you extort marijuana from" -- or "Didn't you extort marijuana from these people? Didn't you tell the Government" -- maybe I wouldn't say "Did you tell the Government" but "Did you extort marijuana from these people on this date?" And he, I assume -- I don't think he would say "yes" to that question; and if he says anything except "yes," then it's inconsistent.

**THE COURT:** All right. So you figure that at some point there's not going to be some sanitized testimony. Hard to say, but let's assume that. And so you are primarily considering using it for impeachment?

**MR. FINE:** Yes, impeachment or if there's a defense case with witnesses, other than Huffaker, that is inconsistent with what Huffaker said in the -- in the proffer.

**THE COURT:** Okay. And you did say something about opening statement wouldn't trigger?

**MR. FINE:** So I don't want to take a position on whether opening statement would trigger.

Our plan in this case, we don't have any intention of putting in the proffer agreement based on anything that the defense says in opening statement.

**THE COURT:** Okay. All right.

All right. So then I would say that for Motion 10, I've

granted a protective order; and Motion 11, I guess, is granted.

Okay. That's the Government. Here, I'm trying to keep track of this, Ms. Geiger.

All right. Now let's go to the defendant's. All right. Part of the Motion Number 1 may be mooted to the extent that, Mr. Ceballos, you were concerned that Mr. Timmons can't really be called and asked to testify without being offered immunity. The Government had said in their, I think, pretrial statement, or whatever, that they've gotten approval to give him immunity. I don't know that that's come through yet in writing.

**MR. CEBALLOS:** No.

**THE COURT:** What about that, Mr. Fine?

**MR. FINE:** Yes, Your Honor, we have obtained the approval. We haven't submitted the application to the Court yet, but we will do so soon.

**THE COURT:** Okay. Do you know if he has a lawyer that might be here with him when he testifies?

**MR. FINE:** He does have a lawyer. I don't know whether she will be with him in the courtroom when he testifies, but he is represented.

**THE COURT:** Do you know who that is?

**MR. FINE:** Yes. Her name is Traci Corrillo, up in Santa Rosa.

**THE COURT:** Okay. I mean, it seems like his testimony is relevant. There were some assertions here that you may or

may not then want to deal with about whether he should have been disclosed earlier or whether he's changed his testimony markedly. And even if he has, I mean, the Government could still call him and then he could be questioned about earlier statements.

But the Government seems to say that he didn't actually say something different earlier. He just didn't want to talk earlier. I don't know.

Anything you want to add to that?

**MR. FINE:** Your Honor, I would rely on our papers. We -- he sat for a short interview with FBI agents, asked for a lawyer, and that was after we had, you know, disclosed to the defense what the substance of the testimony would be, what we heard from Tatum.

And then we weren't able to interview him for a long time after he got a lawyer. We were only able to interview him a little more than a month ago. We conducted that interview, and as soon as that interview report was finalized, we turned it over to the defense. So any allegation that we were holding something back or anything like that, we would wholeheartedly reject.

**THE COURT:** Is it that you didn't know that he now was represented and would speak to you until they contact the Government? I don't know. Mr. Ceballos is saying, "Hey, why didn't you try and talk to this guy earlier?"

**MR. FINE:** Yeah. So I'll say a couple of things.

First, we -- a year and a half ago, we disclosed to the defense the exact substance of what we expected Timmons' testimony to be. Once he got a lawyer, we had lots of discussions with the lawyer about whether he would even talk to us at all.

Ultimately, after months and months and months of discussions, we were able to, you know, reach an agreement about him coming in and talking to us. And that interview didn't happen until May -- I think it was May 15th or something like that. And then as soon as we finalized the interview report, we turned it over right away.

**THE COURT:** I mean, it sounds like he's relevant.

**MR. CEBALLOS:** But 17 months of discussions?

So Mr. Tatum was interviewed in September of 2023 when he disclosed his relationship with Mr. Timmons.

Mr. Timmons was interviewed a month after. Did not mention anything about that relationship with Mr. Tatum.

Mr. Timmons contacts the FBI a month later, gives them the name of his attorney and says, "Call my attorney."

They've had that since November of 2023 but waited all this time until May to set up the interview.

**THE COURT:** Well, are you arguing there's a discovery violation here?

**MR. CEBALLOS:** Absolutely, Your Honor.

**THE COURT:** It's not clear that's what you're doing. But I would have to have -- first of all, I don't have any, essentially, declaration from you because you weren't there. So I have no facts in front of me as to what Timmons said before, what his lawyer said before, or otherwise.

I don't know that I have -- let me look at Mr. Fine's declaration for a second. And he says that the Government interviewed Tatum in September, and Tatum said that he called Timmons after they had seized marijuana but it doesn't say which stop that was, okay, here, whether it was E.F., whether it was B.L., or some other motorist, or all of the above or some of the above, and that he said Huffaker knew what was going on and that they would stop the cars, et cetera, and that each of them received approximately $13,000 from Timmons, who they sold the drugs to or the marijuana.

Then he says after Tatum told him this, then the FBI attempted to contact Timmons, and he had a short interview with agents.

Now, I'm assuming Mr. Fine wasn't there. Okay. And then it's like, according to the FBI memorandum of the interview, which -- have you seen that?

**MR. CEBALLOS:** I have.

**THE COURT:** Okay. Does it say that Timmons said that Tatum told him they had -- that he had stolen marijuana and that -- let's see -- and that Timmons also stated he was not

aware of Tatum's scheme while it was happening? In other words, he only heard about it later. And then they asked him about his involvement, and he invoked his right to counsel. So he says he didn't know it was going on when it was going on.

I guess if he actually bought marijuana from them, he knew about --

**MR. CEBALLOS:** Clearly.

**THE COURT:** -- what was going on; but that's something you could, you know, impeach him with or ask him about.

In any event, that's as much as he said according to the memo.

And then it goes on to say that after Timmons got counsel -- and then there's just this very ambiguous sentence from Mr. Fine [as read]:

"After Timmons obtained counsel and after the trial date in this case was postponed several times and the current trial date set, Timmons and his counsel agreed to sit for an interview."

Well, okay. On May 16th. So do you mean that that's when they actually contacted you or -- in other words, when did Timmons, either directly or through his attorney, get back to the Government?

**MR. FINE:** Certainly. Pretty quickly after Timmons retained an attorney, we had discussions with the attorney, negotiations about setting up an interview.

**THE COURT:** Okay. When was that?

**MR. FINE:** It happened on several occasions. Initially, at that time when we talked to the counsel, the trial date had been set for -- I believe it was February 2024.

**THE COURT:** Yeah. So are we talking about a year or more ago you started talking to counsel about interviewing Timmons?

**MR. FINE:** Correct. That was -- that was more than a year ago, yes.

**THE COURT:** Okay. And it took that long to finally get a date for an interview?

**MR. FINE:** It did, Your Honor, which was quite frustrating from our perspective. But I think what drove the ultimate interview date was the trial date. It was hard to get them to agree to an interview that far before trial. Once we finally got close to trial in May of last year, they finally agreed.

**THE COURT:** Okay. Now, there had to be some agreement, was there not, with Timmons that he wasn't going to be prosecuted if he talked to you folks, or what?

**MR. FINE:** So there was a proffer agreement, which we also -- is part of the interview memorandum which we disclosed to the defense. There was a proffer agreement, our office's standard proffer agreement, similar to the one Mr. Huffaker signed, and that's what we turned over to the defense.

And as we've also said, we expect we're going to be seeking immunity for Mr. Timmons as well, which we expect to file with the Court soon.

**THE COURT:** Okay.

**MR. FINE:** And I'm sorry, Your Honor. If I could just respond to the discovery violation allegation.

I don't see how there could -- there was nothing to disclose. We -- there were -- we had discussions with counsel about setting up an interview over a long period of time. I don't see how anything there is about my -- our discussions with defense counsel about setting up an interview is discoverable.

The thing that was discoverable was the interview with Timmons, which we disclosed as soon as it happened.

**THE COURT:** Yeah. I mean, the Government isn't required to act in what you might argue would be a logical way to prove up their case. But according to Mr. Fine, they kept talking to counsel for Timmons over a period of over a year, finally got him in on a proffer, and then they gave you the information. It does not sound like there's a violation going on there.

**MR. CEBALLOS:** I don't think I'm arguing the logic. I'm arguing the fairness. And this is not the first time that the Government allegedly dumped discovery late before trial. This occurred prior.

We're now a month and ten days before trial, and the Government drops this report on Mr. Timmons which it waited 17 months to produce.

**THE COURT:** Well, there's your knowledge of Timmons as a prospective witness. All right? In other words, whether they interviewed him or not, I suppose he could be called as a witness. You could contact him as a potential witness, all coming from Tatum's statement about what went on.

What you seem to be saying is they delayed interviewing him until they got right before trial so that they could make it harder for the defense to --

**MR. CEBALLOS:** Yes.

**THE COURT:** -- prepare.

But, of course, they didn't know what he was going to say either. Only whatever you all knew, which is what Tatum said. And I assume you don't want to concede that Tatum was totally credible.

So, I don't know. It sounds like they originally did try to interview him. And that was the FBI, let's say. Then he's not cooperating with them. He gets a lawyer. Then the argument is that the prosecution in some way decided to delay everything until the last minute. But if I accept what Mr. Fine says, is they were trying to interview him earlier but couldn't.

And what did the lawyer say? Just, he didn't want to talk

about it then or what?

**MR. FINE:** Yeah. I mean, the lawyer, frankly, was hard to get ahold of, was not responsive. We had a few calls. And then there was not that much urgency when we had the trial date that far off.

Once we got close to trial -- and, again, it's not as if what Timmons said in his interview was new information. What he said in his interview was consistent with what we disclosed to the defense a year and a half ago about what his testimony could be from the mouth of Tatum.

**THE COURT:** Could be, but not what it would be.

**MR. FINE:** Correct.

**THE COURT:** All right? So there's a difference.

Okay. Nevertheless, I don't -- I'm not prepared to find that there was some conscious or unconscious attempt to make it difficult for the defense. They have known about him, and you could -- I don't know whether you've tried to interview him or find out what he would say, but I assume he's not going to talk to the defense.

**MR. CEBALLOS:** He's not.

**THE COURT:** Okay. Well, he is going to have immunity. He does appear to be relevant. He's impeachable to the extent that he gave prior statements that he didn't know what was going on. He has no charge against him. I don't know.

Anyway, I am going to deny Motion 1, which seeks to keep

him off the stand.

And I'll go to 2. Okay. Well, it's the same motion, really, so, all right. So then I'm going to deny 2. I guess it's just two separate reasons for keeping him off.

All right. So it does mean he'll be a witness.

Now, I want to go over a number of things with you. And the -- one of them was proposed voir dire by the Government and a proposed jury questionnaire question by the defendant.

As I mentioned earlier, there was a questionnaire that was put together before either of your entrances into the case. Now, there have been some changes, and I'm hoping that you will get that questionnaire probably in -- maybe even today, but maybe in a day or two, so that you can look at it.

Here's what the situation is. The Court -- and I don't mean me. I mean the Northern District -- has, over a period of time, used various SurveyMonkey questionnaires that go out to potential jurors. And in any given case, the judge assigned to the case is entitled to ask them to add a few case-specific questions, but not a lot.

And when this case originally was pretried, I received proposed questions, a number of them very similar to what you have indicated, Mr. Ceballos or the Government, and I tried to incorporate them and sort of combine some of them so they'd just be one question.

Anyway, I gave all that to the Jury Office, using the

SurveyMonkey questionnaire then in place. And lo and behold, in some process that I think involves input from both the defense and the prosecution bar, there's a whole new SurveyMonkey questionnaire. All right. And I'm not really crazy about it. I wasn't that crazy about the other one. And this one has some questions that are, I think, not that great.

But I tried, then, to have you start over using it as the starting point to take the questions that had been gleaned from the proposals made in pretrials and get those incorporated back in, in some logical way. It's not fabulous, but it will at least give us some starting point. All right?

And if you see questions on the questionnaire and say, "What in the heck are they doing this for," those were not mine. All right? Those are whatever was in the SurveyMonkey questionnaire. I actually did remove some things, where possible.

But in any event, so my plan is at the moment, unless I change it, which I probably will, is that we get the questionnaires back after they are completed. And the Jury Office will get those to us as soon as they can. I'm hoping it'll be then this week.

Then we need to get together before the day of jury selection to go over those questionnaires and see if there are any people that you feel are excludable, either on hardship or on the substance of their answers for cause, that everybody

just agrees let's get rid of these people. And then we can let the Jury Office know and they won't have to come in on the selection date. At a minimum, you want to familiarize yourself with what everybody has said and get a feeling for it.

My plan is to actually follow up with jurors on responses, if it seems appropriate. And then ordinarily, I haven't had counsel questioning the jurors themselves and have asked counsel to provide -- he's looking surprised. Nonetheless, I have had a lot of very, very bad experiences with jury voir dire in my time in state court where people literally put the cases before the jury and then ask them what their view was of the evidence and then people gave it and then they said, well, then they're prejudiced. And my view is no, you tried the case in voir dire.

So I think that to keep it as clean as we can, I'm going to ask the questions. But I may change, and if I do, I would give you a limited, very limited amount of time to follow up with jurors. But first let's -- you can always give me written questions that I can then pose to the jurors, and I try to be pretty thorough with them. So, you can see.

But let's get those questionnaires first.

Now, Ms. Geiger, our jury selection date is?

**THE COURTROOM DEPUTY:** July 3rd.

**THE COURT:** 3rd. And that is the Thursday.

**THE COURTROOM DEPUTY:** Thursday.

**THE COURT:** So if we could meet on Tuesday, it'd probably be better than Wednesday, because Wednesday, then we have less time to really talk about them and try and get the names to the Jury Office. But if you can't do Tuesday, at least Wednesday.

So do you want to look at your schedules and see? I mean, it could even be Monday, but I'm hoping we'll have them by then. They seem pretty confident they'll have them.

And then I want to talk to Ms. Geiger about how many jurors she's going to ask them to bring in.

(Discussion off the record between the Courtroom Deputy and the Court.)

**THE COURT:** One problem is these jurors are not going to be time-screened in any way, so we're going to have to see what their hardship concerns are.

The trial, we're giving them a -- what were the dates we gave them, from what to what?

**THE COURTROOM DEPUTY:** The 7th through the 18th.

**THE COURT:** All right. We told them through the 18th, and, you know, you're looking at, like, a two-week trial, essentially. And we do get a lot of people that ask to be excused, so we've asked for a pretty good number with the idea that there are a lot of challenges.

We need to talk about how many alternates. I would say, I think, two should be fine, two alternates. And then I think

it's ten and six that you'd have, plus one each for the alternate, and it'd just be one per side. So you start getting a lot of challenges if you use them. Plus we have to seat, then, the 14 jurors.

And I can go over with you kind of the selection process essentially. But the seats are 1 to 7 in the back row, 8 to 14 in the front. And what I would do, then, is just call for the challenges seriatim; and then once we -- I'm just thinking. I guess -- I'm trying to remember about filling the seats.

(Discussion off the record between the Courtroom Deputy and the Court.)

**THE COURT:** We usually have, like, what is sometimes called the six-pack, where we get six people that will be voir dire'd along with the 14, for example, or six or four. I'm going to have to think about that for a minute. It's just been a while since we've done a criminal case.

But anyway, you will know when you challenge at least who the first people are coming in. Then we fill up that excess again and proceed.

So I think it may just be the two who are the, you know, extra people in the box, plus four in that first row, is how we do it, and so the challenges would only go to the first 12. All right. The last two are just kind of your six-pack start. Okay. I'm just kind of rethinking for a minute. Now, and we'll go as far as we have to go and, hopefully, hopefully not

run out of jurors.

Okay. I usually get rid of the hardships right at the beginning before we start filling the box up, with an effort to know how many we've got and how we're going to proceed in that way.

Okay. As far as the questions that you did give to me, let me just take a quick look because I had noted that Ms. Hernandez is not on the list that we gave the Jury Office. But rather than just -- I kept adding names because each of you came up with some extra names, so we've added those and ask them to keep changing it. But she's going to be here to be introduced, and that's fine and shouldn't be a problem.

Actually, when we introduce counsel, I always ask the jurors, "Even if you didn't recognize someone by name, do you see someone" -- "you know, maybe you've seen them, I don't know, at Trader Joe's every Wednesday or something." So, okay.

Then there is a question on the SurveyMonkey questionnaire about being involved in law enforcement or, I think, knowing anyone well who is.

And then you've got here in Question 15, Mr. Fine, FBI, ATF, DEA, IRS. IRS? Where are they fitting in?

**MR. FINE:** So we have an IRS case agent who has analyzed some of the financial records --

**THE COURT:** Oh, okay.

**MR. FINE:** -- that we expect to testify about that.

**THE COURT:** Okay. Rohnert Park Police, Cloverdale Police, Mendocino County Sheriff's Office, CHP.

I do have a question that I believe I added about: Have you had any experiences with law enforcement that might cause a problem for you? And then if we want to be specific, we can throw these people in when the jurors are here -- or these entities, rather.

I am not going to -- well, let me ask you about this. Would you take a look -- do you have with you their proposed jury questions?

**MR. CEBALLOS:** I do not, Your Honor.

**THE COURT:** Well, let me read one to you and see what you have to say about it. Okay. I'm going to read this as proposed [as read]:

"In this case, the United States may call as witnesses one or more individuals who have pled guilty to criminal charges and are testifying in the hope of receiving a reduced sentence in return for their cooperation. Based on the fact of such a plea agreement alone, would anyone automatically disbelieve such a witness under most circumstances, regardless of the witness's testimony or without comparing it with the other witnesses and evidence in the case?"

**MR. CEBALLOS:** We would object to that, Your Honor.

**THE COURT:** Okay. Now, it is asking someone, essentially, for a view about people who testify under some kind of an agreement.

I suppose every witness is entitled to be judged on their testimony, but when you start picking facts out -- in other words, let's say you just picked a different fact. You said, "Okay. There may be a witness who testifies that for a long time, they couldn't remember anything because they were hit on the head, and then that condition started to clarify and now they remember everything. Would any of you disbelieve that witness just because of that conflict in their testimony?"

I mean, where do you draw the line? That's my only concern here. I don't know if you can really do it. And I'm sure you don't have any case authority on it.

**MR. FINE:** Correct, Your Honor. I think what we're trying to suss out is if there are any jurors who have very strong feelings toward cooperating witnesses generally and if there were some, you know, jurors who said, "Oh, all cooperators are rats and I wouldn't believe a thing they say," that's something that I think would be relevant to jury selection.

Now, I think we could ask it in a much more general way.

**THE COURT:** Perhaps that would be better.

**MR. FINE:** Yeah.

**THE COURT:** And if you can think of some more general

idea that in the posed-by-the-Court-request or if I let you ask some questions. But it's just this kind of thing that creates problems when -- and so I think if you ask somebody: Do you have such strong views about people who cooperate that you would never believe anything anybody would say," you know, something like that, that might be okay and a little different than trying to kind of shore them up with the question itself. But I won't vote on the question yet.

**MR. CEBALLOS:** I mean, the problem, I think, with that question is that you can even add to it where "And would you believe someone who's placed on a *Brady* list?"

**THE COURT:** Well, I want to get --

**MR. CEBALLOS:** Yeah.

**THE COURT:** -- to your *Brady* list --

**MR. CEBALLOS:** Okay.

**THE COURT:** -- idea.

**MR. CEBALLOS:** Okay.

**THE COURT:** Okay? Because I -- I am not sure -- let me go to that for a minute. Hang on. What did I do with yours? Hold on. Here we are.

All right. You have a question. Hang on while I just get to -- was it here, or was it somewhere else that I saw this about the *Brady* list?

I guess it's not in your --

**MR. CEBALLOS:** It was on the jury instruction.

**THE COURT:** It's on the jury instruction.

**MR. CEBALLOS:** Right.

**THE COURT:** Thank you. I'll get to those.

All right. But let me ask you, while we're -- the subject has come up. What do you understand the Rohnert Park PD's, or whatever they are, *Brady* list -- not the PD but the District Attorney's *Brady* list is? What's on it?

**MR. CEBALLOS:** It's a list of officers that they've determined have, essentially, credibility problems because they've -- and there's a long list of issues they consider, but one of them is that they testified falsely in a prior proceeding. And there was a finding by the D.A.'s Office such that if that person is ever called to testify as a witness, they are obligated under their *Brady* obligation to disclose that to the defense.

**THE COURT:** Okay. Now, it's not just people, though, who have testified falsely in the view of the D.A., or it is? That's who's on their list?

**MR. CEBALLOS:** It's only law enforcement.

**THE COURT:** No. I understand. Law enforcement -- only law enforcement who have testified falsely, in their view?

**MR. CEBALLOS:** No. Again, there's a long list. If they've --

**THE COURT:** Okay.

**MR. CEBALLOS:** -- committed a crime of moral

turpitude.

There's about a dozen factors.

**THE COURT:** Okay. It's somebody's opinion about the credibility, potentially, of a witness or something that's happened. It could be an expression of bias against a group, a defendant having been part of the group in some way.

I mean, there could be a million things that could -- in their view, if this guy gets on the stand -- or woman, if it's a woman -- that maybe not even actually that they testify, but just if they -- let's say they made the arrest and they've written a police report. Okay? Maybe that particular officer, for one reason or another, has done something that the D.A. feels they will have to disclose because it goes to their credibility.

Okay. But it's the D.A.'s view: We don't really know what it was that the person did unless it's on the list in some way. I guess they -- I don't know if they keep a file and this is just something that they then use to now, okay, let's go cross-reference and see what we don't like about this officer.

I don't feel that belongs on the factors for the jury to consider because, first of all, you have to explain to them.

Are you going to try and put in evidence that in some way somebody is on a D.A.'s *Brady* list?

**MR. CEBALLOS:** Well, we've proposed a stipulation to the Government. I'm assuming they're still deciding on it.

However, if they don't stipulate, we do have the chief deputy from Sonoma County who has been subpoenaed to come in and testify that Mr. Tatum is on their *Brady* list.

**THE COURT:** I think that's irrelevant. What is irrelevant -- what would be relevant is any *Brady* information they have that actually is relevant to this case, but not that they put him on some list. All right? That's somebody's opinion that somebody has got some problem that may have to be disclosed in some case, not even every case.

Let's say you had an officer who called someone some racial slur, and now you've got that officer either testifying or making an arrest of a person who falls into whatever the category is that they made the racial slur. Okay. That would have to be disclosed in that case, but not necessarily some other case that doesn't have anybody in that minority group.

So I think that it's just not, to me, relevant at the moment. It's just not clear.

Now, who's on it? Tatum?

**MR. CEBALLOS:** Yes. Yes, he's on it.

And the chief deputy is not simply going to say he's on the list. He's going to explain why he was on the list and that he testified falsely --

**THE COURT:** Yeah. Why was he?

**MR. CEBALLOS:** He testified falsely in a proceeding.

**THE COURT:** Okay. According to whom?

**MR. CEBALLOS:** According to the D.A.'s Office in Sonoma County.

**THE COURT:** And who heard it?

You can't just say the D.A. is of the view, unless -- well, if on a question of credibility of a witness, if you want to challenge somebody's credibility by their reputation or some whatever, if it's reputation -- and I don't know. Reputation in the D.A.'s Office -- then maybe you could put in that he has a bad reputation; but if you want to put in he testified falsely, you can't put in, to my knowledge, specific instances of prior bad conduct.

"Didn't you cheat on your high school math test?"

Okay. The witness then -- let's say Tatum is on the stand.

"Didn't you cheat on your high school math test?

"No."

End of discussion. You cannot put in the math teacher who saw him copying it off somebody else's paper.

So this is going to be a major question. And also, there's no, at the moment, motion in limine concerning it.

But some D.A. who thinks that Tatum is not credible ordinarily would be a credibility witness. And then I'm not sure where that goes because all they can say is, "In my view, in my dealings, he's not credible."

And then you say, "What did he do with you?"

"Nothing."

Okay. You've got somebody from the D.A.'s Office who knows there's a list. So -- and whoever decided that he wasn't credible in prior testimony, you'd have to find that person. And then I don't know if they still exist. And then you could ask Tatum about it, and if he denies it, you're stuck. So I don't know where you're going with it.

**MR. CEBALLOS:** Yeah. We weren't going to get into why he's on the list. That has been turned over -- because we --

**THE COURT:** That he's on the list --

**MR. CEBALLOS:** -- agree that's irrelevant.

**THE COURT:** -- is irrelevant. Okay?

If you want to call someone to say, "In our office's opinion, this guy is not credible," maybe you can do that. I can hear from Mr. Fine on that point. We can take a look at the rules of evidence.

**MR. CEBALLOS:** Okay.

**THE COURT:** Okay. But just because somebody's on a list doesn't necessarily turn out to be relevant.

Okay. All right. And you -- okay. All right.

Okay. So at the moment, I am not going to -- I'm going to not be giving the proposed *Brady* list additur to the instruction.

Now, the way you gave me the instructions, I appreciate that you agreed on most of them, but this was not a helpful way

to submit them. You did not provide me with the source of any of the instructions, such as their whatevers. Now, if you're using the -- well, the model instructions, yes, you have it there.

The modified instruction, each of you modified the credibility instruction. All right? One of you wanted to add *Brady* and then take out some other things, and the Government doesn't have everything exactly either. And when you do that, you need to tell the Court that that is an instruction that has been modified, which neither of you did.

Okay. But I am going to give it in its full form, not the way you asked for it, Mr. Ceballos, and not the way you asked for it, Mr. Fine. I'm going to give the actual instruction, which is -- give me a second. I believe it's 1.7.

And, unfortunately, I have to keep track of these, so let's see. Proposed Instruction Number 7 is 1.7. Yes. So I'm just going to give it in full as the Ninth Circuit has it.

And we have to discuss how these instructions are going to be put together because the jurors are going to get, each of them, a set of them when they go out. You don't have to make the copies, but I need somebody to put a set together that's workable. You can draw straws, or one of you can volunteer to take on that job.

**MR. CEBALLOS:** I volunteer Mr. Fine.

**MR. FINE:** That's fine, Your Honor. We're happy to

put together a set.

And just so I'm clear, I think possibly what happened here, Your Honor -- and this is completely our fault -- is I think I used an outdated version of the credibility instruction. If there's a more recent one that has more factors, then I apologize for that.

**THE COURT:** No. It isn't factors. There's more language in it. It's not that the listed factors are different.

All right. So my understanding is the only dispute -- and that's great -- was over the credibility instruction.

But here's the thing. When you get these instructions out of a pattern book, in effect, they're not in logical order, and you need to put these in logical order.

So we can try to go over all that now or -- the way it's going now, you've got what is evidence, direct and circumstantial.

Let me see how this went for a minute.

And what I want to do is I want to get a cover sheet. All right? Maybe since you're going to have the laboring oar on this, Mr. Fine, what I'd like is just the title of the Court and cause. So U.S., et cetera, United States v. Huffaker, the case number, and then just the words "Jury Instructions." Okay? Nothing at the bottom, no lawyers' names, nothing. Just a very clean sheet of paper that has the title "United States

District Court," et cetera, and then the title of the case, United States v. Huffaker, the case number, and "Jury Instructions," period. That's it. Very neat, clean.

Then for each instruction -- and I don't think we should have a table of contents. We just have instructions. And they shouldn't indicate stipulated or anything. They should just read "Instruction Number 1" and then the title, nothing at the bottom, nothing at the top, very clean, and the text as you have it.

Now, the first instruction is actually, I guess, a preliminary one. And that's a question I want to ask you. Will you want me to essentially go through preliminary instructions at the beginning? And if so, then that would be 1, 2, 3, 4, 5, 6, 7 in its unadulterated form, 8, 9, 10.

Let me take a look at 11 for a minute.

(Pause in proceedings.)

**THE COURT:** Okay. 11.

Hang on.

(Pause in proceedings.)

**THE COURT:** Okay. And maybe 12, although sometimes I save that till we actually throw them out to deal with some legal matter.

**MR. CEBALLOS:** Are these instructions before the start of trial or before argument?

**THE COURT:** It's my understanding that you wanted me

to give these before the first witness is called.

**MR. CEBALLOS:** That'd be great.

**THE COURT:** Is that correct?

**MR. FINE:** Yes, Your Honor.

**THE COURT:** Now, they're very long. And just keep in mind, these people really want to start hearing about the case. However, okay.

Now, the question is, should those be given -- they would be given before opening statement because we tell them there's the format. Okay.

Now, then you will see 13. You do not want me to read this every day.

**MR. CEBALLOS:** No.

**THE COURT:** What I would like to see is whether you would stipulate that I could remind them of the obligations that they've been instructed about earlier and not have to read all of 13.

**MR. CEBALLOS:** We'll stipulate.

**MR. FINE:** Agreed, Your Honor.

**THE COURT:** Thank you.

As far as stipulations of fact, if you have some, are they going to be sprinkled, you know, through the trial, or how did you plan to deal with those?

**MR. FINE:** I think we're -- so we have some stipulations about evidence. You know, these exhibits are

admissible, these exhibits are authentic, but we reserve our right to argue about admissibility.

**THE COURT:** Those are more legal in nature.

Do you have any stipulated facts, such as some event occurred or --

**MR. FINE:** Yeah.

**THE COURT:** -- something?

**MR. FINE:** I think possibly we might. We're still working through --

**THE COURT:** Okay.

**MR. FINE:** -- some of those.

**THE COURT:** 14 may or may not end up being given -- okay? -- because there may not be any stipulations of fact.

14 reads [as read]:

"The parties have agreed to certain facts that have been stated to you. Those facts are now conclusively established."

If there weren't any, they're going to be going: What did I miss? So keep in mind that if there are none, when you put these together, you want to pull 14, and that affects your numbering.

Now, are there any recordings that you are going to be playing?

**MR. FINE:** There may be. There were internal investigation interviews that were recorded that, I believe --

I'm not sure if the defense is planning to cross-examine Tatum with those or with just the transcript.

And then our Motion in Limine Number 11 referred to the internal investigation transcript of Mr. Huffaker, and we said, you know, if they made the defense that he wasn't at that stop, then we would put those statements in where he admits to being at the stop.

But those are the only ones that come to mind for me.

**THE COURT:** All right. So we may or may not be hearing any trans- -- we may or may not have a recording in the case; right?

**MR. CEBALLOS:** Correct.

**THE COURT:** I'll just put "May not need." That's Number 15.

Okay. Now, let's look at that, though, because this is an exemplar, if you will. It has a number of brackets that, if it were going to be used, you have to make the selections. You can't give a jury this bracketed-type thing. You would have to say: You are about to hear or you've heard or you've watched. In other words, so just keep that in mind. If you're going to use it, it cannot be used this way.

All right. Now, now you have Number 16, photos of the defendant. Now, there's a long bracketed sentence -- all right? -- as the third item. What was your plan about that?

**MR. FINE:** Your Honor, so I think that is from the model instruction as kind of like up to the judge whether --

**THE COURT:** Do you want it or not?

**MR. FINE:** I think our preference would be probably to keep it out, but I don't think we have a strong -- I don't think it's necessary and I could see how it would be confusing. So I think our -- if we were to choose, we would take that out.

**THE COURT:** Well, if you were going to use it, the photo that was used of Mr. Huffaker is what -- where did that come from?

**MR. FINE:** I believe it's his driver's license photo, but I'm not --

**THE COURT:** Okay.

**MR. FINE:** -- a hundred percent sure of that.

**THE COURT:** Well, you can do a couple of things.

If that photo spread is presented, you can just agree in front of the jury or you can have a stipulation, or something, that it's a driver's license photo.

What this bracketed sentence is for, I think, is in case you have a situation where it is like a mugshot, you don't want to say it's a mugshot because -- in the same light, you don't want the jury to be speculating that maybe it's a mugshot and maybe this person has a prior arrest. So it really doesn't apply here -- okay? -- as long as -- and it's pretty clear that photo isn't really like a mugshot photo; but just in case, when

it comes up, there should be something to indicate it's from a driver's license if that's the case.

So when you give this, if we are going to have it, you need to take out that entire sentence. So you need to remove the bracketed sentence. All right. In other words, they're just going to speculate, where did you guys get this photo, and it'll do more harm than good.

All right. Now, your next, 117, statements by the defendant. Now, they're only going to hear that, I gather, if you put in the proffer, or is there some other time that it might come in?

**MR. FINE:** Well, Your Honor, I think many witnesses will testify "Huffaker said this to me" or "said that to me."

**THE COURT:** Oh, I see. Okay. Fine.

All right. Now, we're at another one of these multiple bracketed things. It's called "Testimony of Witnesses Involving Special Circumstances, Immunity Benefits, Accomplice and Plea."

What I would do with that one, if -- oh, we're getting feedback. I don't know. As I said, this whole sound thing and everything else they've done to disrupt this courtroom is an impediment at the moment.

This is one that if you -- I expect you're going to have Timmons -- right? -- and that this instruction in some form will have to be used. All right. I would take out -- I don't

know what to do with the sound. Okay. I think you need to take out either all of these words that follow this dash and just leave it the way, sort of testimony of witnesses involving special circumstances or immunity -- I don't know if he -- did he get any -- he didn't get any monetary benefits.

**MR. FINE:** Correct.

**THE COURT:** I don't know if there were other benefits. Maybe -- he's not -- he didn't plead -- maybe -- either just have immunity or take them all out.

**MR. FINE:** I think just take them all out because there's going to be -- I think Tatum would fit under this as well.

**THE COURT:** Oh, yes. All right. Let's do that, then. Just call it "Testimony of Witnesses Involving Special Circumstances."

Now, you're going to have to fill this in. And you've got, apparently, more than one witness who has been given certain things. So you're going to need to give this maybe -- I'm not quite sure. Would you be giving it once with the names of witnesses, or do you just give the instruction twice and fill in whatever the circumstances are?

You're going to have to share this with each other because there has to be a final form.

So let's just say it said Timmons, for discussion, and then you say "received immunity." Now, was there a promise

that he wouldn't be prosecuted or that the testimony wouldn't be used against him? In other words, you see all these options?

**MR. FINE:** Yeah.

**THE COURT:** You need to talk about those as to Timmons.

And then there's all this stuff about receiving benefits and then admitted being an accomplice. Well, I don't know if he admitted being an accomplice. He's kind of a -- I don't know what he is. He's not an accomplice as to the start of it maybe.

And then he didn't plead guilty, so that one's out.

Okay. I think you're going to need two of them, one for Timmons and one for Tatum, and you need to discuss it. So, all right. I'm just going to write "Need to" and "Attorneys need to agree," if you can. Otherwise, I'm going to have to resolve this.

Okay. And we'll just keep going. Eyewitness ID.

Okay. Aiding and abetting. All right. So are you -- you're relying on aiding and abetting?

**MR. FINE:** Yes, Your Honor.

**THE COURT:** Now, you will see -- let's just -- let me see if I can deal with -- I think I'm still not sitting exactly where I usually would be.

Okay. Let's clip these together for a moment. Okay.

Oh, let me go 1 through 12, that would be the preliminaries, and then this first group all together.

And now you will see that you have an out-of-order, if you will, instruction. We haven't even told them about the charges, and yet we're telling them they've heard all the evidence and you get these instructions. And that's a closing instruction, so that's got to go really well toward the end, if it's not the last one. All right. So that has to be moved.

Whoops. Okay. One second. I can't really clip these yet.

Okay. Let's see. Now, that's 23. Okay.

Okay. Is it 23? No. It was 22. Okay.

All right. Now let's look at the charges. Defendant has pleaded not guilty to the charges, presumed to be innocent. Doesn't have to prove anything.

I'm wondering. That, ordinarily, you'd think might go earlier; but maybe the idea is we then do the charges and then say he's pled not guilty and he doesn't have to testify.
I think you need to decide where these 23 and -4 -- one second. Well, you don't know about whether you're going to give 25 or not because he may not testify, so may not need this one.

All right. You should decide where this best fits, in your mind; and if you can't for this little group, depending on what's given, I will stick them somewhere.

Okay. So, all right. Now you've got reasonable doubt,

and all of a sudden we're back to what is evidence. Now, we've already talked about that. So the question is: Do we go through all of this again? No.

I think that the question is: If I'm going to give them at the outset, are they really any different here? I do have to give them again, but are they really -- maybe they're different. But if we were doing this, then you're really deciding how we start and segue in.

So you've got a block of instructions with an intro that basically says, okay, now you're the jurors and I'm going to tell you how the trial is going to go forward and here's a bunch of instructions that keep in mind while you're listening to testimony. All right? You can decide whether you want me to put any of the reasonable doubt and all that up-front or not, but we need to discuss these.

Okay. Then you're going to have a group of instructions that either has an intro or doesn't that, all right, now, you've heard everything and now I'm going to sort of repeat a bunch of stuff but it's important, and start going over what's evidence, direct and circumstantial, the full bore, credibility.

Then you've got activities not charged. Okay?

**MR. CEBALLOS:** I assume that would go to the December 4th incident that Timmons is going to talk about.

**THE COURT:** I guess.

**MR. FINE:** Well, I think that's part of the conspiracy.

**THE COURT:** I think it's --

**MR. FINE:** So I would argue that it's charged.

**THE COURT:** Yeah. Do we have activities that aren't charged that you're aware?

**MR. FINE:** Not really that I can think of. I think my understanding is that this is typically given as kind of a --

**THE COURT:** 402.

**MR. FINE:** Yeah, or just kind of a catchall in case there's something that comes up at trial that --

**THE COURT:** Well, if you want to just give it as a whatever, I guess it's okay. Then you have separate crime as charged. You have to decide each one. Then you have on or about.

Now, they're not going to get a copy of this indictment, so the jurors have to be told what -- oh, and all of a sudden we're in the middle of duty to deliberate. Okay? That, obviously, goes at the end.

And then all of a sudden, consideration of evidence, conduct of the jury.

So these have to be reordered. They can't be in this totally discombobulated format.

And then here we have notes, and so that -- some of these things go right at the beginning.

Punishment, fine.

Now, verdict form, that's the last thing. Okay? And just make that the last instruction sequentially, verdict form, and then I will go over the verdict form with them. And we'll talk about the verdict form in a minute. Okay.

Maybe I would give them -- after verdict form, maybe I'd give them communication with the Court. I don't know. Doesn't matter one way or the other. All right.

Then you've got the charges. All right? And these are all currently sitting at the end and don't belong there. So you want to decide how you want to do those charges and where they would go. In other words, do we start with -- I forget. Is there an intro that gets us going at the conclusion of the case and then figure out what follows it? You should do that.

Let's see. Then, okay. Now, I don't know -- you don't have a Count Two, and they're going to be wondering what happened to Two. So maybe you don't say in Count X or Y. I'm not sure. Or we go to the indictment.

**MR. CEBALLOS:** Can you remember them?

**THE COURT:** It's bad enough we're calling them superseding.

**MR. FINE:** Your Honor, in another case that I had with the exact same issue, the judge just kind of bumped all the other ones down. So Count Three became Count Two, Count Four became Count Three, so they were sequential. I don't know

if the defense --

**THE COURT:** Well, we can do it, but -- let me see if I've got -- I don't know. I've got to do something with this microphone because it's just in the way.

Here's a proposed verdict form from the Government. Do you have any problem with the proposed verdict form?

**MR. CEBALLOS:** I do not, no.

**THE COURT:** All right. Now, it doesn't say anything more than as charged in the superseding indictment. There's no reference to a count. All right? And my understanding is that -- let's look for a moment. You have conspiracy to commit extortion. We have -- well, oh, I'm sorry. They are -- they do refer to counts.

Well, you either stipulate that, for purposes of the verdict, that these are going to be renumbered to run sequentially so that you end up with everything being renumbered after Count One. You end up with six counts instead of seven.

**MR. CEBALLOS:** Yeah, we'll stipulate to that.

**MR. FINE:** I think that makes the most sense, Your Honor.

**THE COURT:** All right. Well, then you want to clearly do these over to reflect that, both in the verdict form and in the instructions themselves.

So that's -- here's the problem. You want to start with

extortion under color of official right. That's Count Three. They're going to say: Why are you starting with Three? So you either don't put numbers on them at all or you -- I think you should just put them in sequential order.

**MR. FINE:** So, Your Honor, the reason I didn't do that for the jury instructions is because I found that when you have a conspiracy in a substantive count, it's less confusing to describe the substantive count first and then conspiracy to commit that substantive count, because if you get into conspiracy first, the jury instruction doesn't describe the elements of the underlying --

**THE COURT:** I'm not sure. Let's see.

(Pause in proceedings.)

**THE COURT:** Well, the way you've got it is a kind of generic conspiracy instruction as opposed to conspiracy to commit extortion. And you have more than one conspiracy count. Yet you're starting with extortion.

Then you have -- what's this? Yeah. What is Number 41?

**MR. FINE:** It's from the model instructions. It's about the interstate commerce element of Hobbs Act robbery.

**THE COURT:** Okay. You need to get rid of modified as set forth in Government MIL Number 9.

And what is this bolded part? That's not part of the pattern?

**MR. FINE:** So we had a motion in limine about this at

the pretrial conference long ago, and this is an addition that we made based on -- it's a direct quote, I think, from a Ninth Circuit case that clarifies in a marijuana case.

**THE COURT:** Oh, all right. But I would not bold it.

**MR. FINE:** Yes.

**THE COURT:** Okay. So unbold that.

Then you have conspiracy to commit extortion. Then you have obstruction of justice; destruction, alteration, or falsification of record.

Is that what the charge is, obstruction of justice?

**MR. FINE:** Yes, Your Honor.

**THE COURT:** Do you want to call it falsification of records in federal investigations but get rid of destruction and alteration, or do you just want to get rid of all of that and call it obstruction of justice?

**MR. FINE:** I think just calling it obstruction of justice is fine.

**THE COURT:** Okay. Well, then you're going to get rid of everything.

Is that okay with you, Mr. Ceballos?

**MR. CEBALLOS:** That's fine.

**THE COURT:** All right. So then it goes: The defendant is charged in whatever count -- it's now Four, I guess -- of the superseding indictment with obstruction of justice, blah-blah-blah-blah-blah.

Then your next one is conspiracy, and there, you're calling it to falsify records. So let's see if that ties into the text.

All right. Okay. You have false impersonation and conspiracy.

Okay. So I guess I could explain to them that I'm doing -- it now really would be Two instead of One. So I would say I'm doing Two instead of Three, rather, and then I'm going to go back to One and here's why: Because everybody thought it'd be better if I read this first. Okay.

**MR. FINE:** Or, Your Honor, or we could just -- in the jury instructions, we could take the count numbers out of the jury instructions so there's not an issue. Oh, they see Count Two first and then Count One. There's just, here are the charges and then the verdict form has the numbers but --

**THE COURT:** Well, you know, you can -- maybe you can do that with the verdict form too. I don't know. But if we're going to do it -- I can explain to them I'm not starting with Charge One for the reason that counsel thought it'd be better.

**MR. FINE:** Blame me.

**THE COURT:** I'm not going to blame anybody individually. Okay. But do you see the problem of you need to get the closing instructions as a closer and we need to get -- at the end of the case, I'm going to be repeating myself quite a bit, which is why I always wonder: Should I go through all

this credibility and everything to start with? But maybe it helps them while they're listening to it. I don't know.

Okay. And so you have quite a task set out for yourself, but it is a collaborative effort here. So even though he's going to be the scrivener to a certain extent, Mr. Ceballos, you're going to have to participate --

**MR. CEBALLOS:** Understood.

**THE COURT:** -- in this.

Okay. All right. Now we've got that squared away, sort of.

All right. Okay. There was a temporary withdrawal of stipulations. Okay.

Let me check the time. We have been proceeding for almost two hours. We don't have to do much more. So let me ask the reporter.

Would you like to take a break, or would you like to try and wrap it up?

(Discussion off the record.)

**THE COURT:** She's going with wrap it up.

All right. We need to have what I'll call a statement of the case for the jury. The current SurveyMonkey wanted us to somehow tell these jurors what the case was about, and that was problematic, in my view.

And what I do want to do, though, is tell the jurors very briefly what the charges are here -- okay? -- because we are

going to have to ask them if anybody's got a problem along those lines.

But to try and lay out the facts of this case in some way in writing in the jury questionnaire and ask people -- for example, they had a question that said "This is a case about" and then they had examples like drugs or sexual assault or whatever and some kind of question like "Do any of you have any problem with that?"

Well, you can't really take a one-word or even several-word description of this case. So I said I'm going to get rid of that one.

And then what I don't like is instead of saying "The defendant is charged with," it says "This is a case about." And then you're supposed to put a bunch of facts in as if almost the defendant had done all that. So that was weird. I got rid of that.

So we need a statement. You can agree on one. If you can't, I will write something. Okay? But if you go, for example, it doesn't have to be lengthy, and then it can be "The defendant has pled not guilty to all of the charges, and it's the Government's burden to prove his guilt beyond a reasonable doubt" as a little wrap-up on it. But for the guts of it -- let me see if I can find the Government's statement for a moment.

That's not it. That's not it. That's not it. That's not

it.

Maybe just the U.S.'s trial memo.

That's not really what I was thinking about. Maybe. It's really sort of descriptive.

All right. If you take a look -- and I don't know if you have this handy or if you do, Mr. Ceballos. The Government has a trial memo. On page 4, they start getting kind of factual in a descriptive way at the bottom of that page.

In other words, one could say something like "The Government has charged the defendant with conspiring with Tatum to pull over drivers suspected of possessing large amounts of marijuana, telling them they're federal officers, taking their marijuana and selling it. And based on that, the Government has charged the defendant with the following," something like that. And it'd be very brief, followed by "Defendant pled guilty" --

**MR. CEBALLOS:** Not guilty.

**THE COURT:** I keep saying "pled guilty." I've got the proffer in mind.

All right. "Defendant's pled not guilty to all of the charges, and it is the Government's burden to prove his guilt beyond a reasonable doubt."

But that last little part that you've got on Four is somewhat workable, and you just need to rewrite it slightly to fill in because, you know, you have the sentences slightly

different there, but I think it's possible that that would work.

Now, I would be very surprised if anybody has had any experience with a case such as this, but you never know.

Now, do you want to try to get that together so that -- I'm going to direct you to meet and confer, to put a statement together that's pretty close to what we're going to do and submit it for -- it doesn't have to be filed, but give me a copy the next time we meet.

And that would be then on what date? Remember, we want to go through the questionnaires.

**MR. FINE:** Your Honor, our preference would be either the afternoon of July 1st or July 2nd, we're free all day. But if you want to do July 1st, our preference would be for the afternoon if that works for the Court and Mr. Ceballos.

**THE COURT:** Let's see.

**MR. CEBALLOS:** My preference would --

**THE COURT:** We're meeting on the 3rd?

**MR. CEBALLOS:** Yes.

**THE COURT:** So either starting on the morning of the 2nd or the afternoon of the 1st.

And how about you, Mr. Ceballos?

**MR. CEBALLOS:** I would prefer, if we're going to do that, do the morning of July 2nd.

**THE COURT:** Okay. Now, we're going to have a lot of

questionnaires. Okay? There could be 60 or more. It means that you need to be fully ready to discuss them by the morning of the 2nd.

Now, when we say "morning," we've got to pick a time. And let's just make it -- I'm debating between 9:00 and 10:00. I'll say 9:30.

**THE COURTROOM DEPUTY:** Did you say 9:30?

**THE COURT:** Yes.

**THE COURTROOM DEPUTY:** Okay.

**THE COURT:** Okay. And that raises another question as far as our days during the trial.

We're going to start with the jury each day at 9:00. However, there are things that sometimes come up beforehand, and I don't want to have you coming at 9:00, telling me what those problems are, and then keeping the jury waiting. If we do that with any regularity, they will lose faith and not come in on time.

So I'm currently debating between 8:30 and a quarter to 9:00, and I will tell you it'll probably be 8:30. And then if nothing's come up, then go get a cup of coffee or something or hang out somewhere.

You're familiar with our attorneys lounge, Mr. Ceballos?

**MR. CEBALLOS:** I am, yes, Your Honor.

**THE COURT:** Yeah. Great. Okay.

Now, I'm trying to think if there's anything else that I

need from you or you need from me right now.

**MR. FINE:** Your Honor, I had two issues I wanted to raise.

**THE COURT:** Okay.

**MR. FINE:** One, as I mentioned earlier, the parties have agreed on stipulations to a number of exhibits; and we were wondering how the Court typically handles those, if you preadmit them before the testimony or --

**THE COURT:** No. Here's what I suggest. If you have an exhibit that you're offering -- okay? And those will be marked. You're going to have an exhibit list, we need.

Do we have that yet?

**THE COURTROOM DEPUTY:** I think it was filed.

**THE COURT:** Okay. Can you get me a copy of that?

Okay. So we need an exhibit list.

All right. So let's say you've got an exhibit and it's not one you have any stipulation about. So you would say, "Okay. I've got Government's 5," or whatever you've got. Show it to opposing counsel, vice versa.

Are you using letters or numbers?

**MR. CEBALLOS:** We're letters.

**THE COURT:** Okay. So Defendant's A, Defendant's B, show it. Okay. And then if you're going to lay a foundation, you go and lay a foundation.

But if you have a stipulation, you can say, "I've got

Defendant's A or B or Government's 1 or 2, and we have stipulations to its admissibility," and then fine, we'll admit it right then. Then you can run with it any way you want with the witness. Okay?

Does that work for you?

**MR. FINE:** Yes, Your Honor.

**THE COURT:** Okay. That's one.

**MR. FINE:** That's one. I had one more.

So last week, the defense provided us with an expert disclosure. We had, I think, a pretty productive discussion about it this morning. It's a former FBI agent, and the defense would like him to testify about some of the phone records, which I think generally is okay. The one issue we had is there was a page at the end of the disclosure, essentially saying a list of things the Government didn't do in this investigation but they could or should have done in terms of phone records, and we think that's improper expert testimony.

**THE COURT:** Well, I'm not even sure what the subject is here.

**MR. FINE:** Sure.

**THE COURT:** Now, you've got phone records between whom?

**MR. FINE:** Phone records -- so either Tatum or Huffaker's phone records. And so what -- my understanding of what the agent would testify about --

**THE COURT:** No, no, no, no. I want to find out what you're putting in.

**MR. FINE:** Oh. We're putting in phone records which the parties have stipulated to.

**THE COURT:** To show what? What do they show?

**MR. FINE:** They show a couple of different things. They show phone calls between Huffaker and Tatum and Tatum and Billy Timmons, as well as Tatum and other people in regards to the obstruction part of it. And they also show location of cell towers that the person whose phone number it is, is pinging on at a certain time.

**THE COURT:** Okay. These have a sort of a categorical title. In other words, you asked for these from -- I don't know.

**MR. FINE:** Verizon, yeah.

**THE COURT:** Verizon. And do they have any kind of a name like "Pen Register" or anything like that?

**MR. FINE:** They have -- in the records, it says, I think, like "Origination" in one and "Destination" for the --

**THE COURT:** That's what you asked for? In other words, what did your office ask for? Somebody's criticizing you about what you didn't do.

**MR. FINE:** So I think what -- I don't think he's -- he's saying -- I think we asked for phone records, but not cell site records. And I think what he's saying is: Oh, they

didn't ask for cell site records. They could have asked for cell site records.

**THE COURT:** Oh. I thought you said you have that. No?

**MR. FINE:** No, we don't have cell site records.

We have what's in the phone records where it has -- I mean, it's similar to cell site records, but there's a separate cell site, more detailed version that you need a search warrant for, which we didn't obtain in this case.

**THE COURT:** What is the cell site, then? What exactly?

**MR. FINE:** Yeah. So it's -- so in the phone records, it does have some cell site data in terms of which --

**THE COURT:** Tower.

**MR. FINE:** -- tower it's pinging off of.

Now, if you get a search warrant for more detailed cell site records, you can see not only where they were pinging during a phone call, but where they were pinging when they sent text messages, when they checked their email, when they did anything on their phone as opposed to just make a phone call.

**THE COURT:** Why would that be relevant? Text message maybe, but I don't know.

**MR. FINE:** I think what we're saying is, more generally, that they shouldn't be able to put up a former FBI agent to criticize the Government's investigation in this case

from the chair of an expert.

**THE COURT:** Well, if there are other things that could be done to get better information but not just other information --

**MR. FINE:** Mm-hmm.

**THE COURT:** -- I could see someone offering that.

But then is he going to say it would have helped them to know more about something? It would have cleared your client if they got this warrant? What's he going to say?

**MR. CEBALLOS:** Possibly. But even beyond that --

**THE COURT:** Well, possibly.

**MR. CEBALLOS:** -- the Government has not produced a document about what -- or who is actually going to testify to these cell phone records.

So I would request, in addition, that when their witness does testify to these cell phone records, that my expert be allowed in court to listen to their expert, which will narrow down what he will testify to.

**THE COURT:** Maybe we should do this. Ordinarily, there's an order excluding witnesses who are not testifying. However, obviously, the defendant has a right to be here.

And do you have some investigating officer, somebody --

**MR. FINE:** Yes, we'll have one FBI case agent at counsel table.

**THE COURT:** And who is it?

**MR. FINE:** It will be Duncan Haunold, I believe will be our case agent.

**THE COURT:** Is there any objection to him?

**MR. CEBALLOS:** No.

**THE COURT:** Fine.

Now, experts are excluded, in the Court's view, from that order because they often have to comment about other experts or evidence that's been presented, and so they should be able to do that.

So your request is granted.

**MR. CEBALLOS:** Thank you.

**THE COURT:** Okay. Is there going to be any kind of -- so the Government is going to call -- I don't know. Do you have some stipulation as to how these --

**MR. FINE:** Yeah.

**THE COURT:** -- records are going to come in?

**MR. FINE:** We have a stipulation as to their admissibility. So we've stipulated to admissibility. And one of the case agents will get on and talk about, you know, here's what the record says.

**THE COURT:** Okay. Now -- all right. So, I mean, if you're saying, well, the expert shouldn't be able to criticize the Government, let's say, attorney -- in other words, the attorney should have done something differently -- well, a lot of times they do say like "Did you dust for fingerprints? Did

you do this? Did you do that?" And that's probably decided by law enforcement itself.

Getting these kind of records was, I gather, coming from the U.S. Attorney's Office. But it doesn't have to be really a criticism of the U.S. Attorney. It could simply be testimony that there are more detailed records that are available. And then if you wanted to put somebody on to say why you didn't ask for them, I guess you could. It wouldn't be you. But why they're not needed, that kind of thing.

And I think it's not so much that -- he shouldn't be able to say the U.S. Attorney should have asked for this, but he can say there are better records and that they could have gotten them.

And if they had, then my question is: What are they going to find out -- okay? -- and why that would be something that would be helpful or not.

In other words, let's say somebody was trying to do DNA and then maybe the defense says there are better tests that could have been done, that this is too basic a DNA test or what have you. And maybe the DNA choice was made by the Government, but you could still put that in.

And so I think if he starts testifying and it sounds like it's improper, either the way the question's asked or his testimony, just object to that. It's too hard for me to tell exactly where he's going to go with this. It's kind of

late-breaking news.

Okay. That was your Number 2.

**MR. FINE:** That was my Number 2.

**THE COURT:** All right. What about you, Mr. Ceballos?

**MR. CEBALLOS:** I don't have anything.

**THE COURT:** All right.

**MR. CEBALLOS:** 1 or 2.

**THE COURT:** Our court reporter thanks you for that.

And I don't know if your paralegal is going to make it to the trial. She seems to be suffering from some head cold.

Don't breathe on any of the lawyers. Okay?

All right. Okay. Do we have anything else before we recess?

**MR. CEBALLOS:** So we come back next Wednesday at 9:30.

**THE COURT:** See you then. Thank you.

**MR. FINE:** Thank you, Your Honor.

**THE COURT:** All right.

**THE COURTROOM DEPUTY:** Court is in recess.

(Proceedings adjourned at 12:04 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, June 9, 2026

Ana Dub

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter